Benjamin Natkin (Cal. Bar No. 205040)
benjamin@natkinlaw.com
Law Offices of Benjamin Natkin
Los Angeles, California 90034
Telephone/Facsimile:  (310) 836-8780

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION—LOS ANGELES**

| | |
|---|---|
| **DR. ERIK NATKIN, DO PC**, a Utah corporation <br><br> Plaintiff, <br><br> vs. <br><br> **AMERICAN OSTEOPATHIC ASSOCIATION**, an Illinois corporation; **OSTEOPATHIC POSTDOCTORAL TRAINING INSTITUTE, OPTI-WEST EDUCATIONAL CONSORTIUM**, a California corporation; **GOOD SAMARITAN HOSPITAL CORVALLIS**, an Oregon corporation, doing business as Good Samaritan Regional Medical Center; and **DR. LUIS R. VELA, DO**, an individual, <br><br> Defendants. | Civil Action No. 2:15-cv-8346 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **BREACH OF FIDUCIARY DUTY; BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; BREACH OF CONTRACT—THIRD PARTY BENEFICIARY; DEFAMATION (LIBEL, SLANDER/SLANDER *PER SE*)** <br><br> **JURY TRIAL DEMANDED** |

1

Plaintiff **DR. ERIK NATKIN, DO PC**, alleges:

**JURISDICTION**
(28 U.S.C. § 1332)

1. Jurisdiction in this Court is proper under 28 U.S.C. § 1332 in that all plaintiffs have diverse citizenship from all defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs:

   a. Plaintiff **DR. ERIK NATKIN, DO PC**, is a Utah corporation having its usual place of business in the State of Utah; Plaintiff is the assignee of the claims asserted herein; Dr. Erik Natkin, DO, is the assignor;

   b. Defendant **AMERICAN OSTEOPATHIC ASSOCIATION** (AOA) is an Illinois corporation having its usual place of business in the State of Illinois;

   c. Defendant **OSTEOPATHIC POSTDOCTORAL TRAINING INSTITUTE, OPTI-WEST EDUCATIONAL CONSORTIUM** (OPTI-West) is a California corporation having its usual place of business in the State of California;

   d. Defendant **GOOD SAMARITAN HOSPITAL CORVALLIS** is an Oregon corporation, doing business as Good Samaritan Regional Medical Center (Hospital) having its usual place of business in the State of Oregon; and

   e. Defendant **DR. LUIS R. VELA, DO**, is an individual who is a citizen of the State of Oregon.

**FACTS GIVING RISE TO CLAIMS ASSERTED HEREIN**

2. Founded in 1897, the AOA is a professional association of doctors of osteopathic medicine, including osteopathic medical interns/residents and fellows, and osteopathic medical students.[1]  The AOA has federal authority as the exclusive

---

[1] Under the *Basic Documents* and in accordance with traditions of the osteopathic medical profession, the first year of postgraduate study is variously referred to as an internship or a residency depending on the program.

2

agency for accrediting all aspects of osteopathic medical education—from medical school through residency and fellowship—and osteopathic hospitals. The AOA asserts this authority primarily through its *The Basic Documents for Postdoctoral Training* (*Basic Documents*), which contain "the standards for internship and residency training programs and accreditation standards for osteopathic postdoctoral training institutions." The purpose of the *Basic Documents* is "to promote uniform standards for all its accrediting bodies in postdoctoral training, [Continuing Medical Education] and Healthcare Facilities Accreditation to enhance quality and improve compliance." The *Basic Documents* set the requirements for pre- and postgraduate osteopathic medical training programs, including:

a. The program goals;

b. Institutional requirements, which mandate, among other things:

    i. Compliance with AOA policies;

    ii. An internal review process;

    iii. Standards for trainee eligibility, recruitment and selection process;

    iv. Standards for the work environment;

    v. Maintain specified library and educational resources;

    vi. Standards for the core competencies; and,

    vii. An institution publish a "House Staff Manual" that must include "operational policies and guidelines that govern rules and conduct for all trainees"—interns, residents, and fellows—and, among other things:

        1. "Due process for disciplinary action";

        2. "General hospital rules and regulations";

        3. "Promotion and dismissal policies";

        4. "Supervision"; and,

        5. "Appeal and grievance process"

c. Program requirements, including, among other things:

    i. Definition of "specific knowledge, skills, behaviors, and attitudes required, and the education experiences that provide opportunity to develop competency in the specialty, relative to specialty standards"; and

    ii. "Supervision of residents must be provided on a graduated basis based on evaluation of individual knowledge and skill…. The supervising physician shall be responsible for determining the activities the trainee will be allowed to perform within assigned levels of responsibility and for being available to the trainee";

d. Requirements for the Director of Medical Education (DME), Program Directors (PD), and Faculty;

e. Requirements for interns and residents, including:

    i. Maintaining membership in the AOA during each year of training;

    ii. A contract that must include or make reference to, among other things, "[g]rievance and due process procedures"; and,

    iii. "Prior to termination of a trainee contract, the institution must provide the trainee with appropriate due process, personal and/or academic counseling…[with] written documentation of deficiencies and attempts to resolve these concerns";

    iv. Grievances, complaints and due process for trainees:

        1. "Complaint procedures are established to: Protect the integrity and maintenance of educational standards; Provide a mechanism for concerned individuals or organizations to bring information concerning specific actions and programs that may be in noncompliance with the AOA's educational standards to the attention of the accrediting agency; and, Recognize the responsibility of the AOA to provide complainants the opportunity to use the AOA as a vehicle to address specific grievances";

2. "The base institution shall provide trainees with appropriate policies and procedures for grievance and due process…. Policies shall address academic and disciplinary actions that could jeopardize a trainee's appointment and/or career and must address the non-renewal of contracts, termination of program, and academic failure of clinical services rotations";

3. "These policies and procedures shall address adjudication of complaints and grievances related to the hospital, program or staff";

4. "The procedure for filing an official complaint begins with informal consultation. Each complainant must initially attempt to resolve any differences or problems with the specific program, base institution or OPTI through direct dealings. A complaint to the AOA should only be made after these attempts at resolution have been unsuccessful or where a trainee is concerned about retribution"; and,

5. "A complainant may seek informal consultation, or may file a formal compliant, with the AOA Division of Postdoctoral Training regarding a program or institution concerning a violation of AOA approved standards";

v. "[T]raining must be designed to offer structured and supervised exposure to balance learning with service appropriate to trainee levels of document expertise…. Supervision shall be provided on a graduated basis as the trainee progresses through the training program, based on evaluation of individual knowledge and skill as well as institutional policy, program, and specialty college requirements…. The supervising physician shall be responsible for determining the activities the trainee will be allowed to perform within the context of the assigned levels of responsibility, and for being available to the trainee"; and,

vi. "All trainees must practice ethical behavior and abide by specific codes of conduct as defined by the base institution in its house staff manual";

f. Evaluation of trainees, including, among other things:

i. All components of a trainee's program must be evaluated. This evaluation must be related to the educational objectives of the program and shall include clinical experiences, intellectual abilities and skills, attitudes and interpersonal relationships and progress in core competency achievement"; and,

ii. "Prior to early termination of a contract, the institution shall provide the trainee with appropriate written warning and counseling. The assigned faculty member is responsible for documenting deficiencies and attempting to resolve concerns with the trainees, including potential remediation for deficiencies"; and,

g. Standards for accreditation of Osteopathic Postgraduate Training Institutes (OPTIs), which includes, among other things, an OPTI's demonstration of "its support of trainee scholarly activity, and mandatory provision of a forum for trainees for "free and open communication to discuss their training or welfare concerns. This forum should have voice through trainee representation on the [Osteopathic Graduate Medical Education Committee]."

3. Beginning in 1995 with a four-year phase-in period that ended in 1999, the AOA began accrediting regional OPTIs to oversee and administer the AOA's requirements for medical training; however, the AOA retains ultimate authority to ensure each program meets AOA requirements. (See paragraph 2 above.)

4. The regional OPTI overseeing Hospital's postgraduate osteopathic medical intern/residency program is OPTI-West.

5. By his mid-30s, Dr. Natkin had established a successful painting and remodeling business and a successful property management business. However, his dream of being an orthopedic surgeon with a subspecialty in hand surgery remained

6

unfulfilled. Dr. Natkin made the not-insignificant decision to sell his businesses and return to school. The enormity of this decision becomes manifest when one considers that Dr. Natkin's undergraduate degree did not demand he complete the prerequisite courses necessary for attending medical school; thus, Dr. Natkin first had to spend a year of post-undergraduate study amassing the prerequisite credits before he could take the Medical College Admissions Test (MCAT) and then another year applying to schools of medicine during which he continued to study to improve the body of knowledge on which he could draw as a medical student and eventually as a doctor. Additionally, the enormity of his decision is magnified when one understands that graduation from medical school alone is insufficient to engage in the practice of medicine: At least one year of postgraduate medical education is required of newly minted doctors before they can engage in the practice of medicine. While allopathic medical schools carefully control the number of admissions each year to maximize their students' potential of finding a residency in their desired specialty, osteopathic medical schools enroll and graduate far more students than there are available osteopathic residencies; leaving potentially thousands of graduating doctors of osteopathy unable to find a residency at all, much less one in their desired specialty, and with hundreds of thousands of dollars in student loan debt. However, this shortage of residencies for doctors of osteopathy is not widely known or easily discerned and thus Dr. Natkin chose to apply to both allopathic and osteopathic schools of medicine and when he was accepted at one of the latter, Western University of Health Sciences, College of Osteopathic Medicine of the Pacific (Western U/COMP), he accepted its offer of candidacy. Further complicating this agonizing decision, Dr. Natkin had to weigh his desire to pursue his dream against the effect upon his chances of marrying and starting a family as he is not someone to do anything half way.

6. While Dr. Natkin was in medical school, Hospital's parent corporation, Samaritan Health Services, Inc., which owns five hospitals in the Willamette Valley area of

Oregon, and is the area's largest employer, began negotiations with Western U/COMP to open a branch of its school to serve the area. As part of the deal, Western U/COMP required Hospital set up a residency program for doctors of osteopathy.

7. During Dr. Natkin's attendance at Western U/COMP, the dean of the college, Dr. Clinton Adams, DO, MPA, FACHE, had become (and remains) a mentor to Dr. Natkin. Thus, when, in his final year of medical school, despite his exemplary credentials, Dr. Natkin informed Dr. Adams that he was having difficulty securing a residency, Dr. Adams was extremely surprised. Consequently, Dr. Adams introduced Dr. Natkin to Dr. Alissa Craft, DO, who had been selected by Hospital to act as the Director of Medical Education (DME) for Hospital's planned residency program. Dr. Craft was impressed; however, Hospital's orthopedic surgery and "traditional rotating" residency programs were not yet ready to open and Dr. Craft asked Dr. Natkin to keep in touch with her.

8. Dr. Natkin secured an allopathic general surgery preliminary internship in Denver, Colorado, accredited by the Accreditation Council for Graduate Medical Education (ACGME), a position he hoped would segue into a second-year orthopedic surgery residency.

9. When Hospital's orthopedic surgery residency program was ready to open, Hospital granted Dr. Natkin an interview. During the interview process, Dr. Natkin met with Dr. Craft again and also, for the first time, met Dr. Vela, selected by Hospital as the orthopedic surgery residency Program Director (PD). Dr. Vela was particularly interested in hiring Dr. Natkin because of his prior year's surgical intern experience in a well-established residency program and because of his entrepreneurial, business, and management experience.

10. Although Hospital's accreditation permitted it to hire a second-year orthopedic surgery resident, Hospital was concerned it was not ready to have a second-year orthopedic resident in the inaugural year of its program, so Hospital offered Dr.

Natkin a position starting as an intern, causing him to have to repeat an extremely grueling year to realize his dream of becoming an orthopedic surgeon.

11. Dr. Natkin became aware that, during his first year and the year prior, Dr. Craft found herself repeatedly butting heads with Nancy Bell, RN-BC, BSN, MPH, who was Vice President of Academic Affairs, a position not recognized by the *Basic Documents*, and who was also Administrative Director of Medical Education, a position recognized by the *Basic Documents* but traditionally filled by an MD or DO. When Dr. Vela was appointed to oversee graduate medical education including the DME office, another position not recognized by the *Basic Documents*, Dr. Craft grew tired of dealing with Dr. Vela's overwhelmingly driven personality and resigned as DME, a position to which Dr. Vela quickly ascended in addition to his position as PD of the orthopedic surgery program.

12. For Dr. Natkin, his first year at Hospital went very well. At Dr. Natkin's final first-year evaluation, Dr. Vela praised Dr. Natkin for Dr. Natkin's leadership, growing the program, being a "trail blazer," and for living up to the expectations Dr. Vela had when bringing Dr. Natkin into the program.

13. Dr. Natkin's second year at Hospital did not go as smoothly. Dr. Natkin found himself the target of Dr. Vela's driven personality, marked by two particular instances that occurred within a relatively short span of time:

    a. While "on call" to Hospital's emergency room (ER),[2] in the presence of an ER attending physician and with the express oral permission of the on-call orthopedic surgery attending physician, Dr. James Ryan, MD, who Dr. Natkin consulted, Dr. Natkin performed a "Steinmann Pin" procedure. Dr. Ryan, who was responsible for supervising Dr. Natkin, only approved Dr. Natkin to perform the procedure after hearing Dr. Natkin's assessment and plan and after

---

[2] While colloquially known as an "emergency room" or "ER," in medical circles it is known as the "emergency department" or "ED." To avoid confusion, the colloquial terms will be used in this Complaint.

reviewing Dr. Natkin's history of having performed the procedure successfully many times while under supervision including that of Dr. Ryan, telling Dr. Natkin to "Go ahead and do it; it's an intern's job. If there are any problems, call me and I'll come in." As he had been taught to do at his internship in Denver, Colorado, when on call to the ER, Dr. Natkin assiduously reported to the ER staff what procedures he planned to perform. Indeed, the ER staff frequently poked fun at Dr. Natkin for doing this and continuing to adhere to this good practice.

On another occasion, while Dr. Natkin was assisting in one of Hospital's operating rooms (OR), the OR staff discovered that the OR did not stock a particular "immobilization boot" that Dr. Natkin knew was stocked by the ER. Dr. Natkin spoke up, and when the OR staff assented, hurried across the hallway to the ER to acquire the urgently needed boot. While on his dash back, an ER nurse stopped Dr. Natkin, telling him the ER staff had had a number of physician and staff from outside the ER taking ER supplies and enough was enough. Dr. Natkin stopped. Apologized. And asked the nurse if there was a policy they were supposed to follow for one department to use the supplies of another department. The nurse said yes and told Dr. Natkin the policy was to call billing and make sure the patient gets billed for any supplies acquired from another department. After the OR staff finished the procedure, Dr. Natkin followed the policy as related to him by the nurse. This policy does not appear in the House Staff Manual, as is required by the *Basic Documents*. Nevertheless, Dr. Natkin met with the other orthopedic residents the following day to explain the unwritten policy.

Shortly thereafter Dr. Vela summoned Dr. Natkin into his office. Dr. Vela handed Dr. Natkin a form on which was printed "**CONFIDENTIAL**" and "VERBAL COUNSELING" after which was handwritten "/written warning." Also handwritten on the form was "Placement of Stienman [*sic*] pin without

attending present" and "Taking supplies from [ER] without charging to patient." Dr. Vela announced to Dr. Natkin, "You're written up." Dr. Natkin attempted to protest, but Dr. Vela quickly shut him down, telling Dr. Natkin that before performing any procedure without the direct supervision of an attending, the resident competently had to perform the procedure at least three times and have Dr. Vela personally "sign off" on the resident performing the procedure. This policy does not appear in the House Staff Manual, as is required by the *Basic Documents*. Dr. Vela frequently made up and changed policy as he went along, never bothering himself to write it down and put into the House Staff Manual. No one ever really knew what policy to follow at any given moment. This policy also violates the *Basic Documents*' mandate that each resident's supervision "be provided on a graduated basis based on evaluation of individual knowledge and skill," which implies no hard and fast policy such as this is permissible. Nor is such a policy particularly practical, given Dr. Vela's frequently absenting himself from Hospital grounds.

Dr. Natkin had in fact performed the procedure more than three times and was subsequently "signed off" by Dr. Vela personally, albeit after Dr. Natkin was "written up." Never before and never since, to the best of Dr. Natkin's knowledge, has this purported policy been enforced against any other resident even though Dr. Natkin knows of at least two residents that violated this "policy" and were not discipline. One of the two, while on rotation under Dr. Vela who was on duty but not in Hospital at the time, performed a procedure the resident had never before performed, performed it without discussing it with Dr. Vela or with any other attending orthopedic surgeon or, indeed, with anyone, performed it without an attending present or supervising, and, when Dr. Vela learned of it, Dr. Vela did nothing.

Accordingly, Dr. Natkin could never have been on notice that he could be subjected to discipline on either of the matters for which he was "written up"

even though he in fact did neither.  Ordinarily, a resident who believes him- or herself to have been unfairly disciplined by his or her program director could seek redress from the DME; however, since Dr. Vela occupied both positions, Dr. Natkin enjoyed no such luxury.  Dr. Natkin's only possible recourse lay in attempting to informally resolve the matter by involving Defendant OPTI-West and, ultimately, by presenting a formal complaint to Defendant AOA.  However, Dr. Natkin also, recently and with uncomfortable frequency, had been subjected to Dr. Vela's berating and belittling Dr. Natkin (itself a violation of express policy actually published in the House Staff Manual) for any mistake rather than having mistakes turned into "teachable moments," which is the entire purpose of a residency program.  Consequently, Dr. Natkin decided it was better to "go along to get along" than risk antagonizing Dr. Vela further by involving OPTI-West.

b. As with all residency programs in all institutions, as part of the second year of the program, more-senior residents were assigned responsibility for shepherding the new first-year orthopedic surgery residents through their first year.  As the only orthopedic surgery resident who had had any experience being under a senior resident on whom to model his teaching of first-year residents, Dr. Natkin treated the first-year residents in the manner the senior residents in Denver, Colorado had taught him.  The first-year residents, having only the other two senior orthopedic surgery residents to compare Dr. Natkin against, felt Dr. Natkin was being "hard" on them and complained directly to Dr. Vela.  Although Dr. Vela regularly beat the drum about following resident hierarchy and going up the chain-of-command with a problem, which, as well as what would have happened had this occurred at the Denver, Colorado, program or any other residency program, should have demanded Dr. Vela direct the first-year residents to first speak with Dr. Natkin, or, if that failed or the circumstances were such they felt they couldn't, with the other senior

orthopedic surgery residents, and then an attending, and then and only then, if that, too, failed, could the residents go to Dr. Vela as the Program Director.

Additional steps in a program where the particular program director involved was not also the DME or where the program has an assistant or associate program director include going to the assistant/associate program director before going to the program director, and, after the program director, going to the Administrative Director of Medical Education (ADME), then the DME, the OPTI, and finally, the AOA.

Nevertheless, rather than require the first-year residents follow protocol, Dr. Vela entertained the residents' complaint. Several weeks later, during Dr. Natkin's quarterly evaluation, Dr. Vela, for the first time, brought up the first-year residents' complaint with Dr. Natkin and handed Dr. Natkin a single sheet of paper on which was printed "Learning Contract related to communication and leadership teamwork style for Dr. Erik Natkin." Notably absent from the document is any indication as to whether it is a disciplinary action, or what type of disciplinary action, as described in the *Basic Documents* and incorporated almost verbatim into the contract between Hospital and Dr. Natkin in its "Grievance Policy," if any, Dr. Vela was taking against Dr. Natkin. Ignoring the additional year of residency Dr. Natkin had undergone in Denver, Colorado, that had made him such an attractive hire and the hardships that Dr. Natkin had willingly undergone and would continue to undergo by allowing Hospital to hire him as a first-year resident rather than placing him in the second-year resident position to which he was actually entitled, Dr. Vela remonstrated to Dr. Natkin for "being only one year ahead" of the first-year residents who had complained. Immediately thereafter, Dr. Natkin met with the first-year residents to openly discuss their concerns and come to a better understanding for the future.

Subsequently, Dr. Jonathan Evans, DO, one of Dr. Natkin's orthopedic surgery attending physicians and one of four doctors who then comprised the Orthopedic Advisory Committee, and who by then or very soon thereafter became an Associate Program Director for the orthopedic surgery residency program, informed Dr. Natkin that Dr. Vela's action had completely undermined any authority the second-year residents had with any of the first-year residents. Again, although he believed himself to have been treated unfairly, Dr. Natkin again decided discretion was the better part of valor and chose not to risk further antagonizing Dr. Vela by involving OPTI-West or the AOA.

Notably, some two years later, one of the very same first-year residents who had complained about Dr. Natkin's being hard on them, was observed verbally abusing and berating a more junior resident. This was something he did *not* learn from Dr. Natkin who had never berated any of his first-year residents. This resident's behavior was tolerated and not subjected to any disciplinary action. More recently, another of the very same first-year residents, as a fifth-year resident, openly berated a fourth-year resident in front of Dr. Evans, the Associate Orthopedic Surgery Program Director, and who then, again ignoring the hierarchy, directly complained to Dr. Vela about the fourth-year resident. Again Dr. Vela did nothing about this unprofessional behavior.

14. It was becoming apparent that while Dr. Vela was quick to excuse any missteps he himself had taken with "We're a new program, we're going to make mistakes," Dr. Vela did not extend this courtesy to anyone against whom he leveled his sights.

15. The entirety of Dr. Natkin's third year at Hospital, as well as the first quarter of his fourth year at Hospital, went comparatively smoothly without incident. Indeed, in the opening months of Dr. Natkin's third year, Dr. Vela complimented Dr. Natkin's performance during his rotation with Dr. Vela as exemplary, stating, "The other residents have big shoes to fill."

16. Several months into his fourth year of residency at Hospital, Dr. Natkin, to his utter shock and dismay, once again found himself in Dr. Vela's crosshairs over an incident that resulted in Dr. Natkin's termination.

a. As a first-year resident in Denver, Colorado, Dr. Natkin had been taught that, when a resident is called upon to present an attending physician's case for peer review at a Mortality and Morbidity (M&M) conference, a resident is never to render an opinion as to whether an attending physician's care of a patient met the standard of care unless directly asked, but rather to simply present the facts and let others draw and voice their own opinions or let attendings ask questions about treatment performed and outcome. Over a year earlier, Dr. Natkin had followed this protocol at one of Hospital's M&M conferences when Dr. Natkin was called upon to present a case that should have been presented only with the interested attending physician present, who was actually not present. Even though the attending physician had failed to meet the standard of care, Dr. Natkin followed what he had been taught: Never throw your attending under the bus.

In contrast, Dr. Richard Stanley, DO, another of Dr. Natkin's orthopedic surgery attending physicians, had expressed his opinion that it was the duty of every attending, fellow, resident, and intern to challenge doctors with the hard questions whether in- or outside an otherwise privileged conference. Hospital staff well knew Dr. Stanley's penchant to loudly and publicly berate residents, interns, medical students, and other Hospital staff for any mistakes he determined they might have made (putting Hospital and other doctors at risk for malpractice lawsuits), for offering his opinion on the competency of other doctors even in cases in which he was not involved (a HIPAA violation), and belittling other attending physicians' performance behind their backs to residents, calling them "teaching moments."

15

b. On one particular Friday, Dr. Natkin attended a weekly "fracture conference." For this conference, Dr. Jacqueline Krumrey, MD, and Dr. Evans were the only attendings present. Upper-level residents run fracture conferences. At this fracture conference, another fourth-year orthopedic surgery resident, Dr. Seth Criner, DO, selected the cases to be reviewed and presented the cases. Dr. Criner selected about a dozen cases to present, in three of which Dr. Stanley had been in charge, including one that Dr. Krumrey had previously indicated she wanted to revisit, and in the rest of which other attending physicians had been in charge. However, due to time constraints, Dr. Criner was able to present only eight cases, including two of Dr. Stanley's.

c. A fracture conference is an informal conference that provide an opportunity for medical students, interns, and residents to learn from the successes and mistakes of the other doctors whose cases are presented, except they are limited to cases involving bone fractures. Within the context of a residency program, the senior residents are to ask questions, respectively, of the medical students and residents by seniority lowest to highest, and any resident may ask questions of those lower in the hierarchy. Thus, for example, in one of the cases presented that Friday involving Dr. Krumrey, it was determined that Dr. Krumrey's treatment was adequate, but less than optimal due to Hospital not having in its supply the hardware that would have been optimal for treating this particular fracture, resulting in Dr. Krumrey's having to improvise.

d. Unlike an M&M conference, the attending physician is not generally required to be present at a fracture conference and Dr. Stanley was not present at this Friday's fracture conference. During the presentation of Dr. Stanley's cases, asked only appropriate questions, and offered no opinion as to the quality of Dr. Stanley's care of the patients. Upon typical fracture-conference questioning, it became obvious that the quality of the attending physician's care and the patients' outcomes were less than optimal. Of all the persons in

16

attendance at the conference, only Dr. Krumrey made any remarks about the quality of Dr. Stanley's care that might be considered disparaging, responding to the question, "How might this outcome have been avoided?," quipped that Dr. Stanley could have had the ambulance take the patient to another hospital and that the ambulance could have just as easily gone north to Portland.

e. Although he had not been present at the conference, that same Friday, Dr. Stanley learned of what had happened at the conference and, against the advice of Dr. Evans, who was also partnered with Dr. Stanley in an outside private clinic, Dr. Stanley complained to Dr. Vela, opining that Dr. Natkin had colluded with Dr. Criner to select and present cases with the intention of making Dr. Stanley look bad.  Unbeknownst to Dr. Stanley, the third of his cases, had there been time to present it, would have made him look good, with at least adequate if not superior quality of care and outcome.  Dr. Vela never learned of this because he never bothered to ask.

17. Without speaking with Dr. Natkin or Dr. Criner, Dr. Vela called for an emergency meeting of the Orthopedic Advisory Committee the following Monday.  The Orthopedic Advisory Committee then consisted of Dr. Evans, Dr. Krumrey, Dr. Stephen Newman, MD, and Dr. Leon Malkin, MD; however, both Dr. Newman and Dr. Malkin were unavailable, so only Dr. Evans and Dr. Krumrey attended the meeting.  Dr. Vela entered the meeting, announced that he had had enough and had decided to terminate Dr. Natkin.  There was no discussion or vote.  It was clear there was no purpose to this meeting as Dr. Vela had already made his decision and could not be dissuaded from terminating Dr. Natkin.  Dr. Natkin was not asked to attend this meeting.

18. After this meeting, Ms. Bell texted Dr. Natkin to inform him he was to attend a meeting the next morning, Tuesday, with her and Dr. Vela, without mentioning the reason for the meeting.  Physically present when Dr. Natkin arrived in response to the summons were Dr. Vela, Dr. Evans, and Ms. Bell.  Dr. Natkin was

17

asked to talk to about the fracture conference.  Unbeknownst to Dr. Natkin until some 20 minutes after having been asked to talk about the fracture conference, also present via conference call was Dr. J. Michael Finley, DO, the Chief Academic Officer of OPTI-West.  Dr. Finley's telephonic presence effectively eliminated any possibility of Dr. Natkin obtaining the informal and impartial review by OPTI-West as provided by the *Basic Documents*, incorporated by reference into each resident's contract with Hospital.

Dr. Natkin was not informed of the specific complaint and was instead directed to openly discuss the preceding Friday's fracture conference.  At the conclusion of this discussion, Dr. Natkin was accused of having colluded with Dr. Criner to set up Dr. Stanley to make him look bad.  Dr. Natkin denied any collusion between himself and Dr. Criner to make Dr. Stanley look bad.  Dr. Natkin denied any intent on his part to make Dr. Stanley look bad or to single out or disrespect Dr. Stanley in any way.  Dr. Natkin apologized for any misunderstanding related to the fracture conference.   Dr. Natkin was informed that he would be placed on probation and suspended pending further investigation by the "Medical Executive Committee."  [*Sic.*]

Dr. Natkin was handed a document to sign that, excepting space for several signatures, had clearly been prepared before he ever walked into the room.  The document carried the heading "**GSRMC Resident Probation**" beneath which was a table.  In one cell of the table was preprinted "Has the resident demonstrated improvement in the defined problem area(s) and met required terms?"  In the adjoining cell to the right, the "No" box was hand–check-marked.  In the row below, in the first column, was preprinted "Recommendation" and, in the adjoining cell to the right, of three preprinted choices with check-boxes in front of them: (1) "No further action needed; resident has met improvement plan objectives"; (2) "Extend improvement plan time period"; and (3) "Place resident on probation."  The last of the three boxes, indicating the recommendation was to

18

place resident on probation was hand–check-marked.  Beneath the three check-box choices was preprinted "*Please explain decision:*" after which was typewritten:

Dr. Natkin has been counseled and on probation previously for unprofessional conduct.  He has repeatedly demonstrated an unwillingness and inability to correct this serious deficiency.  At this time Dr. Natkin's unprofessional behavior has escalated to the point that it is detrimental to the program, negatively impacts the learning environment of other residents and is potentially harmful to patient care activities.  He is suspended from all clinical duties pending investigation.

19. The explanation for the decision is not supported by Dr. Natkin's personnel record and is entirely a figment of Dr. Vela's imagination.  In fact, Dr. Natkin received overwhelmingly glowing evaluations for his professional conduct:  threes and fours on a scale of 1–4, 4 being of the highest quality, and *never* had been previously placed on probation.

20. As alleged in paragraph 2 above, the *Basic Documents* repeatedly impose upon "base institutions," including Hospital, the duty to provide "due process," defined as "a mechanism by which institutional policies and procedures are outlined for discipline or the adjudication of trainee complaints and grievances relevant to the OGME program" for disciplinary action and for grievance and appeal processes, to be published in a "House Staff Manual" of "[o]perational policies and guidelines developed by the hospital that govern rules and conduct for all interns and residents.  Nowhere in Hospital's House Staff Manual has Hospital ever provided any due process mechanism for discipline.  Only a grievance and appeal procedure for trainee complaints is provided, and for many years, was only provided within an appendix to resident contracts.

21. The next day, Wednesday, according to Dr. Vela from statements he made in front of Dr. Natkin at Dr. Natkin's appeal hearing approximately four weeks later and according to a letter sent by the appeal committee to Dr. Natkin the day after it

heard Dr. Natkin's appeal, discussed in paragraphs 25 through 31, inclusive, Dr. Vela called what Dr. Vela termed "an emergency GME Committee" meeting and which the letter termed a "GME Executive Committee Meeting," wherein Dr. Vela presumably acted as both the committee chair as Director of Medical Education and as a voting member and in which Dr. Vela purports to have presented to the committee the events and the decision whether to terminate Dr. Natkin's contract with Hospital. The letter makes no reference to the Monday meeting; however, the letter makes reference to minutes of a meeting of "Ortho RAC" on Tuesday. Thus, there may have been as many as three meetings. Although Dr. Vela offered to provide Dr. Natkin with a copy of the minutes of these meetings, Hospital has refused to provide Dr. Natkin with the minutes despite repeated requests. Dr. Natkin was not invited to any of these meetings and thus could make no answer to the accusations leveled against him. Consequently, Dr. Natkin has no knowledge of who comprised the committee or what was said or if the meetings ever occurred at all.

22. Subsequently, Hospital, through Ms. Bell, informed Dr. Natkin via email that there was to be a meeting on the following Monday that he was to attend and at which would be discussed the decision made at that day's GME Committee meeting.

23. That meeting took place as scheduled and was attended by Dr. Natkin, Dr. Vela, Dr. Evans, and Ms. Bell. Dr. Vela informed Dr. Natkin that everyone at the various meetings had voted to terminate Dr. Natkin's contract. Dr. Natkin was presented with a preprinted form document bearing the name, logo, and motto of Samaritan Health Services, Hospital's parent corporation, bearing the title "**Letter of Resignation from Residency**" that had been mostly filled out for him, indicating his last day of work would be six days prior to the meeting at which he was presented with this document, namely, the preceding Tuesday meeting at which he had purportedly been placed on probation and suspended. Left blank was a section marked "It is my decision to resign from my residency contract

because (Please be specific):" Dr. Natkin refused to sign the document. Hospital then terminated Dr. Natkin, who indicated his intent to seek legal counsel.

24. In accordance with the AOA and Hospital's grievance procedure, Dr. Natkin timely appealed his termination.

25. Under the grievance procedure, as the DME, in what appears to be a clear conflict of interest under the circumstances, Dr. Vela selected the members of the ad hoc subcommittee to hear Dr. Natkin's appeal and was also charged with assuring Dr. Natkin of due process. Hospital set Dr. Natkin's appeal to be heard 22 days after his termination. Dr. Natkin was not provided any access to documentary evidence to support the prosecution of his appeal.

26. Under the grievance procedures, the appeal was to be closed and consist of a presentation by Dr. Vela, as Dr. Natkin's Program Director, and a presentation by Dr. Natkin or his representative, who he had to select from amongst the other residents or the medical staff. Prior to the hearing, Mr. Tyler Jacobsen, Esq., then Hospital's assistant general counsel and now its general counsel, stated he might attend the appeal hearing; however, Dr. Natkin would not be permitted to have an attorney present at the appeal hearing.

Dr. Natkin selected Dr. Todd Lewis, MD, to be his medical staff representative at the appeal hearing. Dr. Lewis is a well-respected spinal surgeon, has served as Hospital's Chief of Staff, Chief of Surgery, Chief of Orthopedics, and Chief of Ethics, and who has for 23 years been an oral examiner of spinal candidates for the American Board of Orthopædic Surgery, has written several of the written examinations, performed countless peer review evaluations and site visits for disciplinary issues, and has extensive medical staff leadership experience. Dr. Lewis, upon learning of the termination of Dr. Natkin told Dr. Natkin he believed Hospital's decision to terminate Dr. Natkin was wrong and offered to be Dr. Natkin's medical staff representative at his appeal.

21

27. The ad hoc subcommittee consisted of Dr. Clint Evans, DO, Dr. Caroline Fisher, MD, PhD, and Dr. Sugat Patel, MD.  As he said he might, Mr. Jacobsen attended the appeal hearing.  Also present and allowed by Hospital to participate in the appeal hearing, purportedly as moderator, was Ms. Bell.  Also present by telephone conference was, once again, Dr. Finley, DO, further compromising whatever objectivity he might still have had after having listened in on the meeting at which Dr. Natkin was purportedly put on probation and suspended.

28. At the outset of the appeal hearing, Ms. Bell announced that the ad hoc subcommittee would not consider the truthfulness of the reasons for Dr. Natkin's termination, only whether he received due process.  Such a restriction appears nowhere in AOA or Hospital's grievance policy.

29. Ms. Bell interrupted Dr. Lewis numerous times as he attempted to ensure that the record of the proceeding register his objection that Hospital was allowed legal representation at the hearing while Dr. Natkin was not and his objection that the issues to be considered were limited.

30. Despite the restrictions imposed on Dr. Natkin, the subcommittee permitted Dr. Vela to make several statements about the circumstances surrounding Dr. Natkin's termination, including that Dr. Natkin had been placed on probation during his third year at Hospital, which is entirely undocumented and in fact never occurred, and attribute statements to Dr. Evans and Dr. Krumrey.  As this was the first time Dr. Natkin was hearing of this supposed probation and the supposed statements of Dr. Evans and Dr. Krumrey, neither of whom were in attendance at the hearing to be questioned, Dr. Natkin could not possibly have been prepared to defend against these new accusations.

31. Despite the overwhelmingly positive evaluations he had received for his professionalism (see paragraph 19 above) and the lack of any documentation supporting Dr. Vela's accusation Dr. Natkin had been on probation for a lack of professionalism, the ad hoc committee upheld the termination of Dr. Natkin.  The

letter in which the subcommittee informed Dr. Natkin of its decision, the subcommittee referred to several documents on which the subcommittee had relied in reaching its decision that were never provided to Dr. Natkin, specifically, the minutes of the Ortho RAC meeting and the minutes of the GME Executive Committee meeting referred to in paragraph 21 above.

32. Because Dr. Finley had participated in both the meeting at which Dr. Natkin was purportedly placed on probation and suspended and the appeal hearing, Dr. Natkin decided attempting to informally resolve the matter through OPTI-West was a waste of resources, and he complained directly to the AOA; however, because Hospital continued to refuse to provide access to critical documents, including the minutes of the appeal hearing and the aforementioned purported meetings of the Ortho RAC and GME Executive Committee, Hospital completely hamstrung Dr. Natkin with what he could provide the AOA in support of his complaint.  Although Dr. Natkin's complaint indicated the existence and nonexistence of documentary evidence in Hospital's sole possession that would show his complaint to be meritorious, AOA did not seek to obtain any information from Hospital, but simply reviewed the evidence Dr. Natkin was able to provide and determined there was no information to support Dr. Natkin's complaint and closed its file.

33. Due to Hospital's termination of Dr. Natkin from its residency program, Dr. Natkin endured a six-months long investigation by the Oregon Medical Board during which he was prevented from engaging in the practice of medicine anywhere in the United States.  Nevertheless, during this time, Dr. Natkin attempted to take his lumps and set about mitigating his damages by finding another orthopedic residency program in which he could complete his training. Once the Oregon Medical Board cleared the cloud upon his license, Dr. Natkin applied for licenses to practice medicine in Utah and in Colorado.

34. Soon thereafter, the Utah Osteopathic Board Secretary contacted Dr. Natkin.  She indicated the Board intended Dr. Natkin attend a meeting of the Board to explain to the Board Dr. Vela's remarks on the Federation of State Medical Board's Federation Credential Verification Service (FCVS).  Dr. Natkin had no idea what the Secretary was talking about, and consequently discovered that Hospital had caused to be published, and is continuing to cause to be published on FCVS, the following, appearing in a row labeled "**Unusual Circumstance:"**

1.  Did this individual ever take a leave of absence or break from his/her training?  ............................................................... ☐Yes   ☒No

2.  Was this individual ever placed on probation?  ............. ☒Yes   ☐No

3.  Was this individual ever disciplined or placed under investigation?  ........................................................ ☒Yes   ☐No

4.  Were any negative reports for behavioral reasons ever filed by instructors?  ........................................................ ☒Yes   ☐No

5.  Were any limitations or special requirements placed upon the individual because of questions of academic incompetence, disciplinary problems or any other reason?  .................. ☐Yes   ☒No

**Please explain any "Yes" response from above:**

Dr. Natkin was placed on academic probation several times for unprofessional behavior and failure to meet academic standards of professional conduct.  [D]r. Natkin received no academic credit for PGY4

Dr. Vela certified the entry as Hospital's Orthopedic Program Director. The FCVS is a private database available to medical licensing agencies in the United States that acts as a depository for all the information about a doctor's education and training so that any time a doctor applies for a

24

license anywhere in the United States, he or she does not have to go through the process of having every institution from which he or she received education or training send whichever licensing agency the doctor's record and negates the necessity of investigating to determine whether the doctor's application has omitted any information.

Dr. Natkin asked the Secretary whether he could provide a written explanation with supporting documents to the Board and was encouraged to do so. At not-significant expense of time and money, Dr. Natkin provided the Board with a copy of the information he had provided to AOA in support of his complaint and the information he had provided to the Oregon State Medical Board. When the Chairman of the Board reviewed this information, the Chairman decided it was not necessary to call Dr. Natkin to appear in person, and granted Dr. Natkin a license to practice medicine.

35. Dr. Natkin was also contacted by the Colorado Medical Board regarding Dr. Vela's remarks on FCVS after Dr. Vela failed to return its repeated telephone calls and emails for more information, something the Colorado Medical Board indicated that no other program director had ever before failed to do. It took six months of appeal for Dr. Natkin to obtain his license to practice medicine in Colorado. Dr. Vela never responded to the Colorado Medical Board.

36. There was virtually zero chance of Dr. Natkin finding a vacant fourth-year orthopedic surgery resident position as someone already holding the position literally would have to die, resign, or be terminated from the position. Notwithstanding how Hospital easily succeeded in terminating Dr. Natkin, it is almost impossible for a fourth-year resident to be fired: One would have to have been grossly negligent and killed a patient, according to several practitioners. Even residents with recurrent history of substance abuse and actually have put patient care at risk are provided opportunities to rehabilitate themselves and remain in

their program.  Indeed, at a national conference of surgeons, one physician who worked at Hospital remarked, in a small group within a roomful of over 100 surgeons, when the conversation turned to standards for termination, that over half the doctors in the room would have been fired from their residencies had they subject to termination for the reason that one of Hospital's residents had been terminated.  Dr. Natkin is the only resident Hospital has ever terminated.  The other doctors in the conversation agreed that residents were only terminated early in their programs for washing out on their lack of basic skills.

37. Dr. Natkin instead had to find a program willing to create, just for him, a position as a fourth-year orthopedic surgery resident, all while having to tactfully disclose his difficulties at Hospital without disparaging Dr. Vela, Hospital, or its program.

38. Despite the incredibly low odds, Dr. Natkin was able to find a program willing to create a position just for him as a fourth-year orthopedic surgery resident:  The Philadelphia College of Osteopathic Medicine (PCOM) in Philadelphia, Pennsylvania.  Dr. Natkin accepted the offer and, due to Medicare funding constraints that required he first obtain private funding for the residency, set about obtaining the private funding, managing to raise some $150,000 in just two weeks.  This was a humbling and monumental task.  With the understanding he had a position and the necessary funding, Dr. Natkin obtained a license to practice medicine in Pennsylvania, resigned his current position, and even placed a deposit on an apartment in Philadelphia.

39. Although PCOM had already made an offer of employment to Dr. Natkin that he had accepted, the program's Orthopedic Surgery PD, Dr. John. J. "Jack" McPhilemy, DO, decided he wanted to talk with Dr. Vela.  Over two telephone conversations, Dr. Vela repeated his fabricated story about how terrible it was to work with Dr. Natkin and how Dr. Natkin had been placed on probation multiple times, only tritely conceding Dr. Natkin would "probably" do better in a larger, more established program such as PCOM's than he had done in Hospital's

26

program,. A few months later, Dr. Natkin learned the position he had been offered had evaporated.

40. Dr. Vela also repeated his fabricated story about how Dr. Natkin had been terminated after he had been placed on probation multiple times to Dr. Samuel Small, DO, the DME at Community Memorial Hospital in Ventura, California.

### CIVIL CONSPIRACY

41. Hospital, by and through Dr. Vela, who acted on his own behalf as well as on Hospital's behalf, entered into a civil conspiracy with AOA and OPTI-West, by and through Dr. Finley, to commit the wrongful acts herein alleged to have occurred.

### FIRST CLAIM FOR RELIEF

#### COUNTS ONE THROUGH SIX
#### BREACH OF FIDUCIARY DUTY
(AGAINST DEFENDANTS AOA AND OPTI-WEST)

42. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

43. The relationship of Defendants AOA and OPTI-West, and each of them, to its student and resident members, including Dr. Natkin, due to its unique nature as alleged above, is that of a fiduciary.

44. Defendants AOA and OPTI-West, and each of them, breached their fiduciary duty to Dr. Natkin by:

a. Accrediting Hospital's residency program at all, for, among other things, Hospital's failure to include in Hospital's agreement with Dr. Natkin or in Hospital's House Staff Manual the mandatory provisions for due process for disciplinary action against residents as required for accreditation as provided by the *Basic Documents*;

27

b. Failing to advocate on Dr. Natkin's behalf as promised—"What can OPTI-West do for you? … Provide advocacy for residents"-—when each learned of the purported disciplinary actions to which Hospital subjected Dr. Natkin, up to and including his termination and the ad hoc subcommittee's upholding of his termination;

c. Permitting OPTI-West's participation in Hospital's probation/suspension meeting and appeal hearing on Hospital's termination of Dr. Natkin;

d. Failing and refusing to investigate Dr. Natkin's complaint against Hospital's program;

e. Failing to better control the number of students entering colleges of osteopathic medicine or to encourage the establishment of a sufficient number of residencies overall and residencies in particular specialties so as to improve the opportunities of graduating doctors of osteopathic medicine to find a residency and in their desired specialties; and

f. Not requiring colleges of osteopathic medicine to disclose the statistics of graduates finding a residency and failing to find a residency.

45. Defendants AOA and OPTI-West's, and each of them, breach of fiduciary duty to Dr. Natkin was a substantial factor in causing damage to Dr. Natkin.

46. Defendants AOA and OPTI-West's, and each of them, derogation of each's fiduciary duty to Dr. Natkin is despicable conduct carried on with a willful and conscious disregard for the rights of Dr. Natkin, or caused Dr. Natkin cruel and unjust hardship in conscious disregard of his rights, more specifically in that any reasonable oversight of Hospital's program or reasonable investigation into Dr. Natkin's complaint about Hospital's program would have exposed the serious deficiencies in Hospital's program and prevented or limited Dr. Natkin's injury, such that Defendants AOA and OPTI-West, and each of them, should be subjected to exemplary damages.

**COUNTS SEVEN THROUGH TWELVE**
**BREACH OF CONTRACT**
(AGAINST DEFENDANTS AOA AND OPTI-WEST)

47. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

48. The relationship of Defendants AOA and OPTI-West, and each of them, to its student and resident members, including Dr. Natkin, is contractual in nature.

49. Defendants AOA and OPTI-West, and each of them, breached their contractual duty to Dr. Natkin by:

a. Accrediting Hospital's residency program at all, for, among other things, Hospital's failure to include in Hospital's agreement with Dr. Natkin or in Hospital's House Staff Manual the mandatory provisions for due process for disciplinary action against residents as required for accreditation as provided by the *Basic Documents*;

b. Failing to advocate on Dr. Natkin's behalf as promised—"What can OPTI-West do for you? … Provide advocacy for residents"—when each learned of the purported disciplinary actions to which Hospital subjected Dr. Natkin, up to and including his termination and the ad hoc subcommittee's upholding of his termination;

c. Permitting OPTI-West's participation in Hospital's probation/suspension meeting and appeal hearing on Hospital's termination of Dr. Natkin;

d. Failing and refusing to investigate Dr. Natkin's complaint against Hospital's program;

e. Failing to better control the number of students entering colleges of osteopathic medicine or to encourage the establishment of a sufficient number of residencies overall and residencies in particular specialties so as to improve the opportunities of graduating doctors of osteopathic medicine to find a residency and in their desired specialties; and

f.  Not requiring colleges of osteopathic medicine to disclose the statistics of graduates finding a residency and failing to find a residency.

50. Defendants AOA and OPTI-West's, and each of them, breach of contract with Dr. Natkin caused damage to Dr. Natkin.

## SECOND CLAIM FOR RELIEF
### UNFAIR BUSINESS PRACTICES
### (CAL. BUS. & PROF. CODE §§ 17250, 17500)
(AGAINST DEFENDANTS AOA AND OPTI-WEST

51. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 46, inclusive.

52. Defendants AOA and OPTI-West's, and each of them, breach of fiduciary duty, by which Dr. Natkin suffered an injury in fact, constitutes a violation of California Business and Professions Code sections 17250 and 17500, entitling Plaintiff to injunctive relief and attorney's fees.

## THIRD CLAIM FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT
(AGAINST DEFENDANT HOSPITAL)

53. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

54. Defendant Hospital entered into a contract with Dr. Natkin.

55. Defendant Hospital breached this contract by terminating the contract without cause as provided by the contract.

56. Defendant Hospital's breach of the contract caused damage to Dr. Natkin.

/////

**COUNTS TWO AND THREE**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(AGAINST DEFENDANT HOSPITAL)

57. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

58. Defendant Hospital entered into a contract with Dr. Natkin.

59. In every contract is an implied covenant of good faith and fair dealing.

60. Defendant Hospital breached the implied covenant of good faith and fair dealing in its contract with Dr. Natkin by:

   a. Basing the termination of Dr. Natkin's contract on disciplinary action Dr. Vela falsely claimed to have imposed against Dr. Natkin; and,

   b. Basing the termination of Dr. Natkin's contract on disciplinary action Dr. Vela imposed against Dr. Natkin without providing the due process required by the *Basic Documents*, incorporated by reference into the contract.

61. Defendant Hospital's breach of the implied covenant of good faith and fair dealing caused damage to Dr. Natkin.


**COUNTS FOUR AND FIVE**
**BREACH OF CONTRACT—THIRD-PARTY BENEFICIARY**
(AGAINST DEFENDANTS AOA AND OPTI-WEST AND HOSPITAL)

62. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

63. Defendants AOA and OPTI-West and Hospital, and each of them, entered into various contracts, in which, and in each of which, osteopathic medical students and osteopathic residents, including Dr. Natkin, were intended beneficiaries, in particular, to ensure each received proper training and ensure each was subjected to discipline only according to a comprehensive and fair procedure.

64. Defendants AOA and OPTI-West and Hospital, and each of them, breached their agreements, and each of them, to the detriment of the intended beneficiaries, including Dr. Natkin by:

31

a.  Opening a residency program that did not meet the standards or mandatory requirements imposed by the *Basic Documents*; and,

b.  Maintaining a residency program that did not meet the standards or mandatory requirements imposed by the *Basic Documents*.

65. Defendants AOA and OPTI-West and Hospital's, and each of them, breach of their respective contracts of which Dr. Natkin, among others, was an intended third-party beneficiary, caused damage to Dr. Natkin.

**FOURTH CLAIM FOR RELIEF**
**LIBEL**
(AGAINST DEFENDANTS HOSPITAL AND DR. VELA)

66. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

67. Defendants Hospital and Dr. Vela, and each of them, published remarks to FCVS about Dr. Natkin that were false.

68. At the time of publication of these remarks, which is ongoing, Defendants Hospital and Dr. Vela, and each of them, knew the remarks were false, or had no reasonable basis for believing the remarks to be true.

69. Defendants Hospital and Dr. Vela's, and each of them, remarks were a substantial factor in causing damage to Dr. Natkin.

70. Defendants Hospital and Dr. Vela, and each of them, intended to cause injury to Dr. Natkin, or each's conduct is despicable and carried on with a conscious disregard for the rights of Dr. Natkin, or is despicable conduct that subjects Dr. Natkin to cruel and unjust hardship in conscious disregard for Dr. Natkin's rights, such that Defendants Hospital and Dr. Vela, and each of them, should be subjected to exemplary damages, or Defendants Hospital and Dr. Vela, and each of them has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference

to the health safety and welfare of others, such that they, and each of them, should be subjected to punitive damages.

71. Defendants Hospital and Dr. Vela's, and each of them, wrongdoing is ongoing, entitling Plaintiff to injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**SLANDER/SLANDER PER SE**
(AGAINST DEFENDANTS HOSPITAL AND DR. VELA)

72. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

73. Defendants Hospital and Dr. Vela, and each of them, acting by and through Dr. Vela, who uttered remarks to Dr. McPhilemy about Dr. Natkin that were false.

74. At the time of the utterance of these remarks, the threat of repetition of which by Defendants Hospital and Vela, and each of them, is ongoing, Defendants Hospital and Dr. Vela, and each of them, knew the remarks were false, or had no reasonable basis for believing the remarks to be true.

75. Defendants Hospital and Dr. Vela's, and each of them, remarks that were injurious to Dr. Natkin in his profession and that were a substantial factor in causing damage to Dr. Natkin.

76. Defendants Hospital and Dr. Vela, and each of them, intended to cause injury to Dr. Natkin, or each's conduct is despicable and carried on with a conscious disregard for the rights of Dr. Natkin, or is despicable conduct that subjects Dr. Natkin to cruel and unjust hardship in conscious disregard for Dr. Natkin's rights, such that Defendants Hospital and Dr. Vela, and each of them, should be subjected to exemplary damages, or Defendants Hospital and Dr. Vela, and each of them has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health safety and welfare of others, such that they, and each of them, should be subjected to punitive damages.

33

77. Defendants Hospital and Dr. Vela's, and each of them, threaten to repeat these remarks at anything, thus their, and each's, wrongdoing is ongoing, entitling Plaintiff to injunctive relief.

**SIXTH CLAIM FOR RELIEF**
**SLANDER/SLANDER PER SE**
(AGAINST DEFENDANTS HOSPITAL AND DR. VELA)

78. Plaintiff refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41, inclusive.

79. Defendants Hospital and Dr. Vela, and each of them, acting by and through Dr. Vela, who uttered remarks to Dr. Smalls about Dr. Natkin that were false.

80. At the time of the utterance of these remarks, the threat of repetition of which by Defendants Hospital and Vela, and each of them, is ongoing, Defendants Hospital and Dr. Vela, and each of them, knew the remarks were false, or had no reasonable basis for believing the remarks to be true.

81. Defendants Hospital and Dr. Vela's, and each of them, remarks that were injurious to Dr. Natkin in his profession and that were a substantial factor in causing damage to Dr. Natkin.

82. Defendants Hospital and Dr. Vela, and each of them, intended to cause injury to Dr. Natkin, or each's conduct is despicable and carried on with a conscious disregard for the rights of Dr. Natkin, or is despicable conduct that subjects Dr. Natkin to cruel and unjust hardship in conscious disregard for Dr. Natkin's rights, such that Defendants Hospital and Dr. Vela, and each of them, should be subjected to exemplary damages, or Defendants Hospital and Dr. Vela, and each of them has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health safety and welfare of others, such that they, and each of them, should be subjected to punitive damages.

34

83. Defendants Hospital and Dr. Vela's, and each of them, threaten to repeat these remarks at anything, thus their, and each's, wrongdoing is ongoing, entitling Plaintiff to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prays for:

1. Against all Defendants, and each of them, jointly and severally:  Actual damages, including:

    a.  Lost income in the amount of $53,000.00;

    b.  Future lost income in the amount of $10,100,000.00;

    c.  Attorney's fees incurred in prosecuting Dr. Natkin's grievance and complaint to Defendant AOA under the *Basic Documents*, which fees were a reasonably foreseeable consequence of Defendants', and each of them, wrongdoing, in the amount of $6,700.00;

2. Against all Defendants, and each of them, jointly and severally:  General damages for pain and suffering in the amount of $51,000,000.00;

3. Against Defendants AOA and OPTI-West, and each of them, jointly and severally:  Exemplary damages in the amount of $25,000,000.00

4. Against Defendants Hospital and Dr. Vela, and each of them, jointly and severally:  Exemplary or punitive damages in the amount of $50,000,000.00;

5. Against Defendants AOA and OPTI-West, and each of them:  A permanent injunction prohibiting them, and each of them, from allowing Hospital's residency program to continue without complying with all of the requirements imposed by the *Basic Documents*;

6. Against Defendant Hospital:  A permanent injunction prohibiting Hospital from disseminating or continuing to disseminate information that Dr. Natkin was terminated by Hospital, subjected to any disciplinary action while employed by

Hospital, denied any academic credit, or any other information tending to injure Dr. Natkin in his profession.

7. Against Defendant Hospital:  A permanent mandatory injunction requiring it to remove from FCVS that Dr. Natkin was terminated by Hospital, subjected to any disciplinary action while employed by Hospital, denied any academic credit, or any other information tending to injure Dr. Natkin in his profession.

8. Against Defendant Vela:  A permanent prohibitory injunction prohibiting him from speaking about Dr. Natkin at all.

9. Against all Defendants, and each of them, where authorized by statute or contract: Attorney's fees according to proof;

10. Costs of suit incurred herein; and

11. Such other relief as the Court deems necessary and proper.


Date:  26 October 2015                    /s/ Benjamin Natkin
                                          Benjamin Natkin
                                          Attorney for Plaintiff


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Federal Rules of Civil Procedure, Rule 38(a).


Date:  26 October 2015                    /s/ Benjamin Natkin
                                          Benjamin Natkin
                                          Attorney for Plaintiff