# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DR. ERIK NATKIN, DO PC**, a Utah corporation; and **DR. ERIK NATKIN, DO**, an individual, | Case No. 3:16-cv-01494-SB |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **AMERICAN OSTEOPATHIC ASSOCIATION**, *et al.*, | |
| Defendants. | |

Benjamin Natkin, LAW OFFICES OF BENJAMIN NATKIN, 3520 Overland Avenue, Suite A1, Los Angeles, CA 90034; Clark E. Rasche, WATKINSON LAIRD RUBENSTEIN, PC, 101 E Broadway, Suite 200, PO Box 10567, Eugene OR 97440. Of Attorneys for Plaintiffs.

John F. McGrory, Jr. and Blake J. Robinson, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland OR 97201. Of Attorneys for Defendants Samaritan Health Services, Inc., Good Samaritan Hospital Corvallis, Albany General Hospital, Mid-Valley Healthcare, Inc., Samaritan Pacific Health Services, Inc., Samaritan North Lincoln Hospital, and Dr. Luis R. Vela, DO.

Michael Porter, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204; Mark H. Meyerhoff and Christopher S. Frederick, LIEBERT CASSIDY WHITMORE, 6033 West Century Boulevard, Fifth Floor, Los Angeles, CA 90045. Of Attorneys for Defendant Western University of Health Sciences.

Michael C. Lewton, Cosgrave Vergeer Kester LLP, 888 SW Fifth Avenue, suite 500, Portland, OR 97204; John R. Danos, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. Of Attorneys for Defendant American Osteopathic Association.

Thomas R. Rask , III, Kell Alterman & Runstein, LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204; Robert P. Johnston, Law Offices of Vera and Barbosa, 223 West Foothill Boulevard, Second Floor, Claremont, CA 91711. Of Attorneys for Defendant Osteopathic Postdoctorial Training Institute, OPTI-West Educational Consortium.

**Michael H. Simon, District Judge.**

United States Magistrate Judge Stacie Beckerman issued Findings and Recommendation ("F&R") in this case on August 30, 2017. ECF 126. Judge Beckerman recommended that the motions to dismiss filed by Defendants Samaritan Health Services, Inc. ("SHS"), Good Samaritan Hospital Corvallis ("Good Sam"), Albany General Hospital, Mid-Valley Healthcare, Inc., Samaritan Pacific Health Services, Inc., Samaritan North Lincoln Hospital, (collectively, the "Samaritan Entities") and Dr. Luis R. Vela, DO (collectively with the Samaritan Entities, the "Samaritan Defendants"), American Osteopathic Association ("AOA"), and Western University of Health Sciences ("Western") (collectively, the "Moving Defendants") be granted in part and denied in part.

Plaintiffs timely filed an objection (ECF 136), as did the Samaritan Defendants (ECF 135). The Court reviews *de novo* those portions of Judge Beckerman's F&R to which Plaintiffs and the Samaritan Defendants have objected. In so doing, the Court has considered the objections, the responses, the F&R, the First Amended Complaint ("FAC"), and the underlying briefing before Judge Beckerman. For the reasons discussed below, the Court adopts in part the F&R. The motions to dismiss are granted in part and denied in part.

## STANDARDS

### A. Review of a Magistrate's Findings and Recommendation

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review *de novo* magistrate's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Magistrates Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate's recommendations for "clear error on the face of the record."

### B. Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint

and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND

The Court adopts the Background section of the F&R, including the terms used therein. Briefly, Plaintiff Dr. Erik E. Natkin was a resident at Good Sam, a subsidiary of SHS and sister-hospital to the other Samaritan Entities. Plaintiffs allege that Dr. Natkin was unfairly targeted by Dr. Vela, a Residency Program Director and Director of Medical Education ("DME") at Dr. Natkin's residency program. After receiving positive performance reviews, Dr. Vela accused Dr. Natkin of colluding with another resident to portray an attending physician in a negative light. Dr. Vela also allegedly violated the bylaws and other governing documents of the

residency program by having Dr. Natkin suspended and ultimately terminated, without appropriate process.

Dr. Vela and SHS allegedly conveyed false and misleading information about Dr. Natkin to the Oregon Medical Board, which required Dr. Natkin to undergo a six-month investigation to clear his medical license. Dr. Vela and SHS also allegedly conveyed false and misleading information about Dr. Natkin to the Federation of State Medical Boards' Credential Verification Service ("FCVS"), which allegedly precluded Dr. Natkin from completing his residency in orthopedic surgery and obtaining Board certification. In addition, these actions have caused difficulty for Dr. Natkin in obtaining medical licenses in other states and in practicing as a covered doctor under certain insurance plans. Finally, Dr. Vela allegedly defamed Dr. Natkin to numerous other doctors throughout the country, preventing Dr. Natkin from obtaining other jobs, including a fourth-year orthopedic surgical residency that was specially-created for Dr. Natkin in Philadelphia. The program director in Philadelphia withdrew the job offer after he contacted Dr. Vela, who allegedly conveyed false and misleading information about Dr. Natkin.[1]

---

[1] Plaintiffs also assert factual allegations relating Dr. Vela's alleged interference with Dr. Natkin's expected contract. Plaintiffs make a passing reference to interference with contract in their response to the Samaritan Defendants' objections and cite *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008), for the proposition that the Court should consider whether the facts alleged support *any* valid claim. In the FAC, Plaintiffs do not allege a specific cause of action for the Oregon tort of intentional interference with economic relations. Although the statute of limitations for this claim is two years, and thus may not be subject to some of the statute of limitations concerns raised in connection with Plaintiffs' defamation claims, at this stage in the proceedings the Court declines to *sua sponte* consider whether the facts alleged by Plaintiffs meet the elements for this tort that has not been alleged. The *Alvarez* case was decided at the summary judgment stage and is distinguishable. The Court is allowing Plaintiffs to file a second amended complaint, and if Plaintiffs believe they have a sufficient basis to allege the tort of intentional interference with economic relations—whether the contract involving Dr. Natkin's position in Philadelphia or any other contract—Plaintiffs may allege such a cause of action in the amended complaint. The validity of any claim for intentional interference with economic relations, however, is not currently before the Court.

**DISCUSSION**

Plaintiffs object to the F&R's analysis and conclusions regarding: (1) sustaining the evidentiary objection to the Declaration of Dr. Natkin submitted in support of Plaintiffs' response brief; (2) dismissing Plaintiffs' antitrust claim; (3) applying Oregon law to, and dismissing, Plaintiffs' breach of fiduciary duty claims against AOA, Osteopathic Postdoctorial Training Institute, OPTI-West Educational Consortium ("Opti-West"), and Western; (4) dismissing Plaintiffs' breach of fiduciary duty claims against the Samaritan Defendants; (5) dismissing the breach of contract claims against the Samaritan Entities other than Good Sam; (6) dismissing Plaintiffs' third-party beneficiary contract claims; (7) dismissing Plaintiffs' defamation claims; and (8) dismissing Plaintiffs' California Fair Practices Act Claim.[2] The Samaritan Defendants object to the F&R's analysis and conclusions regarding: (1) denying their motion to dismiss Dr. Natkin's breach of contract claim against Good Sam; (2) denying their motion to dismiss Dr. Natkin's claim for breach of the covenant of good faith and fair dealing ("GFFD") against Good Sam; and (3) denying their motion to dismiss Plaintiffs' wrongful termination claim. The Court discusses the objections, organized by the claims as alleged in the FAC, after discussing the portions of the F&R to which no objections were filed and the evidentiary objection of Plaintiffs.

**A.  Portions of the F&R to which No Objections Were Filed**

For the portions of the F&R which no party has objected, the Court follows the recommendation of the Advisory Committee and reviews those matters for clear error on the face

---

[2] Plaintiffs also briefly refer to a claim for "conspiracy to breach a contract" in their objections to the F&R. To the extent Plaintiffs intended to make any substantive argument with their two-sentence mention of conspiracy to breach a contract, because there is no claim for conspiracy to breach a contract asserted in the FAC and because conspiracy to breach a contract was not argued or briefed before Judge Beckerman, the Court disregards this two-sentence reference.

of the record. No such error is apparent and the Court adopts these portions of the F&R. For clarity, the Court sets forth below these portions:[3]

1.      The F&R's recommendation to apply Oregon law to all of the Samaritan Defendants' claims—both contract and tort.

2.      The F&R's recommendation to dismiss Plaintiff Natkin PC's breach of contract claim (count 11) as against the Samaritan Defendants.

3.      The F&R's recommendation to dismiss Plaintiff Natkin PC's breach of the implied covenant of GFFD claims (counts 12 and 13).

4.      The F&R's recommendation to dismiss Plaintiff Dr. Natkin's breach of the implied covenant of GFFD claims (counts 12 and 13) as against the Samaritan Defendants other than Good Sam.

5.      The F&R's recommendation to deny AOA's motion to dismiss Plaintiffs' breach of contract claim (counts five through eight) against AOA.

6.      The F&R's recommendation to dismiss counts 12 and 13 as against AOA, for breach of the implied covenant of GFFD. In counts 12 and 13, Plaintiffs do not allege against AOA the breach of the covenant of GFFD with respect to the alleged contract between Plaintiffs and AOA as set forth in counts five through eight. Instead, counts 12 and 13 focus solely on the contract between the Samaritan Entities, specifically, Good Sam and Dr. Natkin. If Plaintiffs

_____

[3] In Plaintiffs' response (ECF 140) to the Samaritan Defendants' objections, Plaintiffs appear to challenge many of the F&R's findings and recommendations to which Plaintiffs did not object in their objections. The Court rejects Plaintiffs' late attempt to raise objections in this fashion to the F&R. Thus, the items listed in this section are considered items to which no objection was raised, even if Plaintiffs argue that the F&R made a mistake in law or fact for that particular finding or recommendation in Plaintiffs' filing in response to the Samaritan Defendants' objections. In other words, if a finding or recommendation was not objected to in either Plaintiffs' objections (ECF 136) or the Samaritan Defendants' objections (ECF 135), it is deemed unobjected-to for purposes of the Court's review of the F&R and considered only for clear error.

intend to allege breach of the covenant of GFFD by AOA with respect to the contract between AOA and Dr. Natkin, Plaintiffs must specifically so plead. The allegations relating to the alleged breach of the duty of GFFD contained in counts 12 and 13 do not encompass the alleged contract between AOA and Dr. Natkin.

7.      The F&R's recommendation to dismiss counts five through eight (breach of contract) as against Western. The Court notes for clarification that for the same reasons Judge Beckerman dismissed these counts against Western, the Court also dismisses counts five through eight against the Samaritan Defendants and Opti-West. Thus, counts five through eight only remain against AOA.

8.      The F&R's recommendation to dismiss counts 12 and 13 (breach of the implied covenant of GFFD) as against Western.

9.      The F&R's recommendation to dismiss Plaintiffs' wrongful termination claim (count 10) against all Defendants other than Good Sam.

10.     The F&R's conclusion to consider the additional evidence offered by the Moving Defendants, as evidence appropriate under the incorporation-by-reference doctrine.

**B.  Evidentiary Objection**

The F&R sustained the Samaritan Defendants' objections to Plaintiffs' proffered evidence because Plaintiffs provided no argument why the evidence should be considered. In their objection, Plaintiffs explain that the motions to dismiss were briefed in California, before this case was transferred, and under the local rules in California Plaintiffs were not provided an opportunity to file a response to the evidentiary objections raised by the Samaritan Defendants in their reply filings (unlike in this District). Plaintiffs therefore object to the F&R's sustaining the Samaritan Defendants' objection to the declaration of Dr. Natkin and provide their argument for why the evidence should be considered.

Plaintiffs argue that Dr. Natkin's declaration introduces the "compendium" of the Samaritan Entities' written policies in effect during the year of Dr. Natkin's termination and are referenced in the FAC, and that declaration avers facts that could be alleged in an amended complaint. Whether the facts stated by Dr. Natkin in his declaration could be alleged in an amended complaint is irrelevant to whether the declaration is admissible in response to a motion to dismiss. Dr. Natkin's declaration primarily discusses his ties to California and his personal belief about the facts of his experience at Good Sam and the underlying factual encounters that were the basis of his termination. *See, e.g.*, ECF 46 at 2-4 ¶¶ 3-13 (discussing Dr. Natkin's connections to California); 15 ("I think it was wrong for me to get fired"); 16 ("I have *never* deliberately set out to make any attending physician look bad or incompetent: not Dr. Richard Stanley, DO, nor any other attending." (emphasis in original)); 18 ("I have never met or seen or seen Doug Boysen"). These are facts outside the pleadings and are not properly considered in motion under Rule 12 of the Federal Rules of Civil Procedure.

Dr. Natkin's declaration does, however, attach as an exhibit a copy of the written policies of the Samaritan Entities, and Dr. Natkin authenticates the exhibit in paragraph 17 of his declaration. The Samaritan Defendants object that paragraph 17 lacks authentication and foundation. Dr. Natkin avers, however, that he makes his declaration based on personal knowledge and there is no indication that a resident would not have knowledge (or copies) of the Resident Handbook or the Good Sam medical staff rules and regulations. To the contrary, it makes sense that a resident would have knowledge of, and copies of, these documents. Further, the Samaritan Defendants do not state that the exhibit does not contain accurate copies of the

policies in place during Dr. Natkin's residency.[4] The Court therefore finds that the authentication of the document is not sufficiently challenged. Accordingly, the exhibit attached to the declaration of Dr. Natkin is properly considered on a motion to dismiss because it is incorporated by reference in the FAC.

Plaintiffs also object to the F&R sustaining the objection to the declaration of Plaintiffs' counsel and its attached exhibit, an agreement between Opti-West and Good Samaritan Regional Medical Center. Plaintiffs argue that the agreement supports Plaintiffs' third-party beneficiary claim and that the declaration demonstrates Plaintiffs' diligence in attempting to obtain documents in discovery. This agreement, however, is not incorporated by reference in the FAC. If Plaintiffs choose to file a second amended complaint, Plaintiffs may incorporate this document by reference (or attach it as an exhibit). More importantly, however, Plaintiffs' efforts in discovery are outside the pleadings and not germane to the consideration of a motion under Rule 12.

The Samaritan Defendants' objection is sustained in part and overruled in part. It is sustained with respect to the declaration of counsel and its exhibit and the declaration of Dr. Natkin, except for paragraph 17 authenticating the written policies of the Samaritan Defendants. It is overruled with respect to the written policies themselves.

## C. Claims

The Court notes that Defendant Opti-West did not file a motion to dismiss, but instead filed an answer. Nonetheless, the Court *sua sponte* applies its analyses below to the claims

---

[4] For example, the Resident Handbook is dated for academic year 2013-14, the fourth year of Dr. Natkin's residency; several other policies have last revised dates before or during Dr. Natkin's fourth year of residency, and have effective dates of printing of May 28, 2013; the GSRMC Medical Staff Rules and Regulations booklet is dated October 31, 2013, containing various rules that have last revised dates in 1996, 2005, 2008, and 2012.

alleged against Opti-West. A trial court may *sua sponte* dismiss claims under Federal Rule of

Civil Procedure 12(b)(6), even shortly before trial. *See, e.g.*, *Omar v. Sea-Land Serv., Inc.*, 813

F.2d 986, 991 (9th Cir. 1987). Moreover, a trial court "may properly on its own motion dismiss

an action as to defendants who have not moved to dismiss where such defendants are in a

position similar to that of moving defendants or where claims against such defendants are

integrally related." *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981).

Although *Silverton* involved a nonmoving defendant who had not yet appeared, the decision did

not limit its holding, and the cases it cited to support its holding involved defendants who had

appeared but had not filed a motion or joined in the motions filed by other defendants. Thus, the

Court does not find *Silverton* and its progeny limited only to cases where the nonmoving

defendant has not yet appeared, which is also consistent with *Omar*.

    **1.  First Claim—Antitrust**

    Plaintiffs allege that Defendants collectively acted to prevent Dr. Natkin from completing

his residency, which precluded him from becoming board certified, from obtaining a fellowship

in orthopedic hand surgery, and from entering the market anywhere in the United States as an

orthopedic surgeon, with or without a subspecialty in orthopedic hand surgery or other

orthopedic subspecialty. Plaintiffs also allege that the actions by Defendants have prevented

patients from receiving the benefit of Dr. Natkin's care as an orthopedic surgeon, orthopedic

hand surgeon, or other orthopedic surgical specialty. Plaintiffs further allege that Dr. Natkin and

patients have been harmed because a growing number of medical insurance companies require a

physician with whom they contract to have board certification. Thus, Dr. Natkin cannot contract

with those insurers, and their insureds do not have the option of being treated by Dr. Natkin.

Plaintiffs claim that the actions by Defendants constitute an unlawful combination in restraint of

trade affecting interstate commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

The Moving Defendants argue that Plaintiffs fail to state a claim for an antitrust violation because Plaintiffs fail to allege "antitrust injury." The Samaritan Defendants also argue that Plaintiffs fail to allege a restraint of trade because Dr. Natkin is free to practice medicine anywhere other than with the Samaritan Defendants. Western also argues that Plaintiffs fail to sufficiently allege facts demonstrating that Western was part of any conspiracy or engaged in conduct that unreasonably restrained trade.

### a. Antitrust Injury

"To have standing as an antitrust plaintiff, a party must demonstrate antitrust injury, meaning it must show 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1186 (9th Cir. 2017) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). "An injury caused by an antitrust violation will not count as an antitrust injury 'unless it is attributable to an anti-competitive aspect of the practice under scrutiny.'" *Id.* (quoting *Atl. Richfield*, 495 U.S. at 334). "The antitrust laws were enacted for the protection of *competition*, not *competitors*." *Atl. Richfield*, 495 U.S. at 338 (emphasis in original) (quotation marks omitted). Thus, personal economic injury, such as loss of income from market exclusion, is not enough to support a claim under Section 1 of the Sherman Act. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). When considering antitrust standing on a motion to dismiss, the Court must determine whether Plaintiffs "could show any set of facts, consistent with the allegations of [the] complaint, that would constitute a violation of the antitrust laws." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) (quotation marks omitted).

In *Summit Health, Ltd. v. Pinhas*, the Supreme Court addressed the issue of the interstate commerce requirement in a Section 1 antitrust claim with regard to the alleged exclusion of a single ophthalmologist from the Los Angeles market. 500 U.S. 322 (1991). Although *Summit Health* involved the interstate commerce requirement of an antitrust claim, it touched upon the anticompetitive effect of the alleged conduct, noting that:

> For if a violation of the Sherman Act occurred, the case is necessarily more significant than the fate of "just one merchant whose business is so small that his destruction makes little difference to the economy." The case involves an alleged restraint on the practice of ophthalmological services. The restraint was accomplished by an alleged misuse of a congressionally regulated peer review process, which respondent characterizes as the gateway that controls access to the market for his services. The gateway was closed to respondent, both at Midway and at other hospitals, because petitioners insisted upon adhering to an unnecessarily costly procedures. The competitive significance of respondent's exclusion from the market must be measured, not just by particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded.

*Id.* at 332 (citation omitted).

After *Summit Health*, courts sometimes have struggled with when, in the context of a doctor or other medical professional being denied privileges at hospital or similar circumstances, a claim will be sufficient under Section 1 of the Sherman Act. The Court has reviewed numerous cases involving allegations in the medical context similar to Plaintiffs' claim. The Court notes that most of these cases arise in the context of summary judgment, because "[a]fter *Summit Health*, the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995). Circumstances may, however, warrant dismissing

antitrust claims on a motion to dismiss, particularly after *Iqbal* and *Twombly*, when the allegations do not show antitrust injury or one of the other elements of a Section 1 claim.

Courts continue to rely on *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hospital Ass'n* in concluding that "the staffing decision at a single hospital [is] not a violation of section 1 of the Sherman Act." 36 F.3d 664, 667 (7th Cir. 1994). *See, e.g.*, *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 550 (5th Cir. 2009) (citing and quoting *BCB Anesthesia*). Courts continue to caution that:

> A staffing decision does not itself constitute an antitrust injury. "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from being so trivialized, *the reasonableness of a restraint is evaluated based on its impact on competition as a whole* within the relevant market."

*Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012) (emphasis added in *Cohlmia*) (quoting *BCB Anesthesia*, 36 F.3d at 669).

Thus, courts primarily find that an antitrust injury is sufficiently alleged in the medical context under two different circumstances. First, when the plaintiff alleges that the defendants are competitors of the plaintiff and engaged in a conspiracy or concerted action to not only terminate the plaintiff from a particular hospital or hospital group, but also "blackballed" the plaintiff and prevented the plaintiff from obtaining employment at other employers in the particular geographic market, thereby eliminating the plaintiff as a competitor. *See Brader*, 64 F.3d at 875-77; *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991); *Cohlmia v. Ardent Health Servs., LLC*, 448 F. Supp. 2d 1253, 1263-65 (N.D. Okla. 2006); *cf. Patrick v. Burget*, 486 U.S. 94, 98 (1988) (finding that state-action doctrine did not protect the defendants from a jury verdict finding an antitrust violation when other doctors allegedly "initiated and participated in the hospital peer-review proceedings to reduce competition from petitioner rather

than to improve patient care"). Thus, although the restraint of trade may only be restricted to the plaintiff (unlike in *Summit Health*, where the restraint of trade was viewed as encompassing not only the plaintiff but also other participants and potential participants in the market), it is still an improper restriction on competition by improperly eliminating a competitor.

Second, antitrust injury is sufficiently pleaded when the plaintiff alleges that there is an injury to competition in the form of increased cost, reduced supply of services, reduced quality of care, or other harm to patients or competition. *See Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3d Cir. 1999); *Reddy v. Puma*, 2006 WL 2711535, at *4-5 (E.D.N.Y. Sept. 21, 2006); *N.Y. Medscan LLC v. N.Y.U. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006); *cf. Lie v. St. Joseph Hosp. of Mt. Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir. 1992) (affirming summary judgment against antitrust claim because doctor showed only his own economic injury and "no evidence to suggest an injury to competition in the form of increased cost or reduced supply of services or harm to the consumer" or anything "that suggests an illegal restraint of trade"); *Frantzides v. Northshore Univ. HealthSystem Faculty Prac. Assocs., Inc.*, 787 F. Supp. 2d 725, 732 (N.D. Ill. 2011) (granting motion to dismiss when the plaintiffs did not allege any decrease in laparoscopic surgery services available to consumers, because so long as patients were being treated by another qualified physician there was merely a reduction in suppliers, not in the output of patient care); *Patel v. Scotland Mem'l Hosp.*, 1995 WL 319213, at *5-6 (M.D.N.C. Mar. 31, 1995), *aff'd* 91 F.3d 132 (4th Cir. 1996) (granting motion to dismiss and finding no antitrust injury in part because doctor did "not allege injury to competition in the form of increased costs, reduced supply of services, or harm to the patient"). This constitutes a harm that is not centered on the plaintiff as a competitor, but on competition, and thus is cognizable as an antitrust injury.

Further, a plaintiff must plausibly allege some facts supporting these contentions. "A plaintiff doctor may not survive a motion to dismiss by making sweeping assertions about the impact her exclusion from the marketplace will have on competition generally." *Salamon v. Our Lady of Victory Hosp.*, 1999 WL 955513, at *3 (W.D.N.Y. Oct. 5, 1999) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)). For example, in *Reddy* the plaintiff alleged that he and his partner accounted for 35 to 40 percent of the overall volume of interventional cardiac services and thus displacing them from the market led to a marked decline in the overall provision of qualified services. *Reddy*, 2006 WL 2711535, at *4. The court found this allegation sufficient at the pleading stage because more detailed statistics regarding market-wide quality of care would only be available after discovery. *Id.* at *5.

In *Cohlmia*, the plaintiffs alleged that they were improperly driven out of the market by competitors to reduce competition. 448 F. Supp. 2d at 1263. The court noted that: "'[T]he elimination of a competitor by means other than the economic freedom of participants in the relevant market' is an antitrust injury." *Id.* (alteration in original) (quoting *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 755 (10th Cir. 1999). The court also noted that the plaintiffs had alleged that the defendants had interfered with the plaintiffs existing and potential patients, including those with high risk medical or financial profiles, to prevent those patients from receiving the best medical care and that the defendants used leverage to force cardiology patients to use only "approved" surgeons even when their actions compromised patient care. *Id.* at 1263-64. The court recognized the defendants' argument that the "ouster of one physician and the resulting injury to his practice does not equal harm to competition, but merely harm to that competitor" but decided at the "early stage of litigation" to give the plaintiffs the benefit of the doubt for the sake of their "high risk and low income" patients who may have "difficulty

securing comparable services." *Id.* at 1264. In affirming the district court's later grant of summary judgment against the plaintiffs' antitrust claim for failure to state an antitrust injury, the Tenth Circuit agreed that the plaintiff had "alleged facts in his complaint sufficient to survive a motion to dismiss" but concluded he had not provided sufficient evidence to survive summary judgment. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1282 (10th Cir. 2012).

Here, Plaintiffs allege that as a result of Defendants' concerted action, Dr. Natkin has been subject to some level of restraint of trade, in that he cannot finish his residency, cannot become an orthopedic surgeon, and cannot become board certified. Plaintiffs' allegations do not, however, support that other market participants and potential participants are or will be subject to the same treatment. Thus, Plaintiffs' allegations are unlike the allegations in *Summit Health*, which provided a broader reach by which to measure the competitive significance of the restraint of trade beyond the destruction of the business of "just one merchant."

Plaintiffs also do not allege that Dr. Natkin was in competition with any defendant or that Defendants terminated Dr. Natkin to reduce competition. To the contrary, Plaintiffs' allegations demonstrate that Dr. Natkin had not yet completed his residency and was not in competition with Dr. Vela, and that the other defendants are institutions and not competitors. Thus, the alleged restraint of trade was not intended to, and as alleged did not, improperly eliminate a competitor. Plaintiffs' allegations are thus unlike the *Brader* and *Fuentes* line of cases.

Plaintiffs also do not allege any facts relating to any adverse effect on competition in the market. Plaintiffs do not define the relevant market. In a footnote in their objections to the F&R, Plaintiffs contend that because the Samaritan Defendants admit that there is a shortage of doctors in Oregon and that fact was a motivating factor in opening the Western campus in Oregon, it can be inferred that the shortage of doctors includes orthopedic surgeons. Regardless of whether this

is a proper inference, none of this is alleged in the FAC. Nor is Oregon defined as the relevant geographic market. Nor is the product market defined as being a doctor versus being an orthopedic surgeon versus being an orthopedic hand surgeon. Plaintiffs must allege the relevant product and geographic markets and how the conduct relating to Dr. Natkin affected the market—for example, did it reduce the quality of care, reduce the supply, increase costs, or cause some combination thereof? Without such allegations, Plaintiffs do not sufficiently allege an effect on competition and thus do not allege an antitrust injury.

### b.  Remaining Arguments

The remaining argument by the Samaritan Defendants is rejected. The allegations in the FAC are sufficient to allege a restraint of trade because Dr. Natkin alleges that he cannot complete his residency, cannot become an orthopedic surgeon, and cannot become board certified. The fact that he can practice some other type of medicine does not mean that no restraint of trade has occurred. He is restrained from practicing the type of medicine he desires— orthopedic surgery.

The argument by Western is well-taken. Although the allegations may be sufficient against Western if Dr. Vela is a Western employee, as discussed in detail below in Section C.2, Plaintiffs do not allege who employs Dr. Vela. Otherwise, the allegations involving Dr. Natkin's termination do not involve any direct action or alleged inaction by Western or its employees. Plaintiffs offer only a general allegation that all Defendants are the agents, employees, and joint ventures of one another, which the Court rejects as conclusory. Plaintiffs argue in their objections that based on the "interconnected relationships" between Defendants they are all jointly liable for everything related to Dr. Natkin, which the Court also rejects. Other than these conclusory arguments, Plaintiffs' antitrust allegations do not implicate Western. For example there is no alleged act or omission by the Dean of Western or some other Western employee

relating to Plaintiffs' termination or alleged "blackballing." Plaintiffs do not allege that a Western employee should have done something differently during Dr. Natkin's termination process but failed to do it as a part of the conspiracy. There also is no allegation that at any point in its relationship with the other Defendants, Western participated in a conspiracy to terminate Dr. Natkin, defame Dr. Natkin, or otherwise prevent Dr. Natkin from finishing his residency, at Good Sam or elsewhere, or practice as an orthopedic surgeon.

## 2. Second Claim, Counts One through Four and Nine[5]—Breach of Fiduciary Duty

As currently pleaded, counts one through four involve duties allegedly owed based on AOA's position as a professional organization "that has monopoly power" and owed duties to Dr. Natkin because he was an active member of AOA. FAC ¶¶ 56-58. Plaintiffs also allege that Western and Opti-West owed the same fiduciary duties to Dr. Natkin as AOA because Western was AOA's sponsor of the residency program at Good Sam and Opti-West was AOA's agent with respect to the residency program at SHS. *Id.* at ¶¶ 59-60. Count nine alleges a violation of the common law duty of fair procedure owed to Dr. Natkin during his termination process.

Plaintiffs indicate in their response to the motions to dismiss that they intend to focus only on the common law duty of fair procedure and that counts one through four and nine should be considered together. Plaintiffs state that if they amend their complaint they will file their breach of fiduciary duty claims "in conjoined counts." The focus on the common law duty of fair procedure, however, is alleged only on count nine. Thus, the Court dismisses counts one through four.

Plaintiffs object to the F&R's recommendation that Plaintiffs' breach of fiduciary duty claims be dismissed. Plaintiffs do not dispute that Oregon law applies to these claims as against

---

[5] Second Claim, Counts Five through Eight (Breach of Contract) were addressed in the portion of the F&R to which no party objected.

the Samaritan Defendants, although Plaintiffs argue that California law applies to their claims against AOA, Western, and Opti-West. The F&R found that Oregon law would not recognize a claim for violation of a common law right to fair procedure. Plaintiffs argue in their objection that Oregon has established a *statutory* right for doctors of medicine, osteopathy, and podiatric medicine to fair procedure in peer review actions that affect their privileges at a health care facility, citing Oregon Revised Statutes § 441.055. Plaintiffs did not, however, allege a violation of any statutory right, so the Court will not consider whether Plaintiffs can state a valid claim under § 441.055 (or whether there is even a private right of action under this statute). Plaintiffs alleged the violation of a common law right to fair procedure, so the Court must determine whether Oregon law recognizes such a common law right.

The Court must determine what the Oregon Supreme Court likely would decide on the question if raised before that court. *See Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145, 1154 (9th Cir. 2011) (noting that the role of a federal court sitting in diversity jurisdiction is to "to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum" (quotation marks omitted)). "Federal courts should hesitate prematurely to extend the law in the absence of an indication from the state courts or the state legislature that such an extension would be desirable." *Id.* (quotation marks and alterations omitted). Federal courts are "at liberty to predict the future course of a state's law" but plaintiffs in federal court "are not entitled to trailblazing initiatives under state law." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1043 (9th Cir. 2011) (quotation marks and alterations omitted).

The Oregon Supreme Court has twice assumed, without expressly deciding, that physicians are entitled to a fair procedure in the context of peer-review decisions relating to

hospital privileges. *See Straube v. Emanuel Lutheran Charity Board*, 287 Or. 375 (1979);

*Huffaker v. Bailey*, 273 Or. 273 (1975). The Oregon Court of Appeals has also acknowledged

that the Oregon Supreme Court has assumed "that physicians are entitled to a fair procedure in

this context as a matter of common law." *Straube v. Larson*, 73 Or. App. 501, 506 n.3 (1985).

The Oregon Court of Appeals then reversed a summary judgment granted against a claim

alleging a due process violation. *Id.* at 506. Additionally, when the Oregon Supreme Court stated

in *Straube v. Emanuel Lutheran Charity Board* that the court had never expressly decided

whether there was a duty of fair procedure in Oregon in suspending hospital privileges, it noted

in a footnote that subsequent to the actions at issue in that lawsuit, the Oregon legislature had

passed § 441.055, which requires hospitals to have procedures in place for granting, restricting,

and terminating privileges, and that those procedures comply with applicable law. The Oregon

legislature's creation of a requirement that hospitals have procedures in place that comport with

the law (including due process) is an indication from the legislature that it supports a duty of fair

procedure in Oregon.

When the Oregon Supreme Court was faced with cases claiming a violation of fair

procedure in the admission and suspension of hospital privileges, the court assumed without

expressly deciding a common law duty of fair procedure and a right to judicial review of that

procedure. This supports the conclusion that if the Oregon Supreme Court were expressly to

decide the question, the court likely would decide that Oregon recognizes a common law right of

fair procedure. If the court did not believe such a right existed, it would not have reviewed those

cases on the merits but would have rejected them based on the fact that no such right existed.

The Oregon Court of Appeals has assumed the same. Although the U.S. Supreme Court noted

that the law in Oregon is not "clear" on this issue, *Patrick v. Burget*, 486 U.S. 94, 104 (1988), the

question before this Court is not whether Oregon law currently is clear, but how the Oregon Supreme Court likely would decide if directly confronted with the question. Accordingly, finding that Oregon law would recognize a common law right to fair procedure with respect to admission, suspension, and termination of hospital privileges is not "trailblazing" because the legislature, the Oregon Court of Appeals, and the Oregon Supreme Court have all given an "indication" that such a right exists. Thus, the Court concludes that there is a common law right to fair procedure under Oregon law under these circumstances.

Next, the Court must consider the contours of this right and whether Plaintiffs' allegations suffice to allege a violation of that right. In *Huffaker*, the Oregon Supreme Court noted that hospital decisions need to be made in good faith and with an adequate factual basis supporting them. 273 Or. at 280-81. In *Straube*, the Oregon Supreme Court reviewed with more detail the procedures employed by a hospital in suspending a physician's privileges. 287 Or. at 380-82. The court found that the "plaintiff did not carry the burden of proving that the members prejudged the charges against him or that the proceeding was basically unfair" when the hearing was conducted by approximately 20 doctors, those doctors questioned the plaintiff and other witnesses, the plaintiff was allowed to cross examine the witnesses, the plaintiff was represented by counsel, and the plaintiff was given information in connection with particular hospital records from which he could determine all relevant information relating to his disciplinary charges but did not request those hospital records. *Id.*

Plaintiffs allege that with respect to Plaintiffs' suspension and termination, there were several meetings, none of which comported with due process or fairness. First, Dr. Vela called a

meeting of the Orthopedic Advisory Committee, attended only by Dr. Vela, Dr. Jonathan Evans,[6] and Dr. Jacqueline Krumrey. Plaintiffs allege that this hearing was essentially a sham, that Dr. Vela announced Dr. Natkin's termination, and that there was no discussion or vote at that meeting. FAC ¶ 18.

The next meeting was between Dr. Natkin, Dr. Vela, Dr. Evans, Ms. Nancy Bell, and, unknown to Dr. Natkin for the first 20 minutes, on the telephone was Dr. J. Michael Finley, the Chief Academic Officer of Opti-West. *Id.* ¶ 19. Dr. Natkin was asked to discuss the "fracture" meeting during which Dr. Vela believed Dr. Natkin maligned an attending physician, but no one informed Dr. Natkin that he was being accused of any wrongdoing until after Dr. Natkin finished his report on the fracture meeting. Only then was Dr. Natkin accused of collusion, informed he was being placed on probation and suspended, and handed a document to sign that had already been prepared, stating that he had previously been counseled and placed on probation, has demonstrated an unwillingness to correct his unprofessional behavior, his behavior is detrimental to the program and patient care, and he is suspended from all clinical duties pending investigation. *Id.* Plaintiffs allege that there were no factual underpinnings for this decision because Dr. Natkin had not previously been placed on probation and had received positive reviews, and that this decision was not made in good faith.

Dr. Vela then called what he termed an "emergency GME Committee Meeting," or "GME Executive Committee Meeting," where Dr. Vela served as the chair of the meeting and DME and presented an allegedly biased version of events relating to Dr. Natkin. There appears to be at least one other meeting in which Dr. Natkin's situation was discussed. *Id.* ¶ 22. The vote

---

[6] Dr. Evans is an attending physician at Good Sam, member of the Orthopedic Advisory Committee, and Associate Program Director for the orthopedic surgery residency program.

at these meetings was to terminate the relationship with Dr. Natkin. *Id.* ¶ 24. Dr. Natkin was

asked to sign a letter of resignation, which he refused to sign. He was then terminated. *Id.*

Dr. Natkin appealed his termination. Plaintiffs allege that, in a clear conflict of interest,

Dr. Vela selected three members of the committee charged with hearing Dr. Natkin's appeal and

assuring Dr. Natkin's due process—Drs. Clint Evans, Caroline Fisher, and Sugat Patel. *Id.* ¶ 26.

Ms. Bell purportedly served as the moderator and Dr. Finley attended by telephone. *Id.* ¶ 28.

Plaintiffs allege that Dr. Natkin was not allowed counsel, the appeal was closed, Good Sam's

counsel was allowed to attend, Dr. Natkin was allowed a medical staff representative but that

representative was interrupted numerous times, Ms. Bell stated that the members of the

committee would not consider the truthfulness of the charges against Dr. Natkin, Ms. Bell would

not allow the medical staff representative to object to that limitation or make statements

regarding the truthfulness (or lack thereof) of the charges against Dr. Natkin, Dr. Vela was

allowed to make several statements regarding truthfulness of the charges against Dr. Natkin and

repeated the false statements against Dr. Natkin, and Dr. Natkin requested the minutes of the

earlier hearings and other documentation supporting his purported earlier probation, but this

documentation was not given to Dr. Natkin. *Id.* ¶¶ 26-32.

These allegations are sufficient to state a claim for unfair procedure under Oregon law for

both Dr. Natkin's suspension and termination. The facts here are unlike the procedure provided

in *Straube*. First, Dr. Natkin was not allowed counsel for either his suspension or termination.

Second, it is a reasonable inference that Dr. Natkin's suspension already was decided by

Dr. Vela before the meeting with Dr. Natkin and the other members began (because the form was

pre-prepared). Further, unlike the 20 doctors involved in the hearing in *Straube*, which diluted

the claim of bias, there were only three members involved in Dr. Natkin's appeal, all of whom

are alleged to have been selected by Dr. Vela. Third, Dr. Natkin was not allowed to present his side of the story or challenge the underlying factual bases for his suspension or termination. Fourth, Dr. Natkin was not provided with the documentation he requested to help him defend against the charges. Finally, it is alleged that the factual bases underlying Dr. Natkin's suspension and termination are demonstrably false and thus the decision was not made in good faith. Thus, drawing all reasonable inferences in favor of Plaintiffs, as the Court must on a motion to dismiss, there is a reasonable inference of bias and a reasonable inference that Oregon's law of fair procedure has been violated.[7]

The F&R also found that even if California law applied, which recognizes the common law right of fair procedure, Plaintiffs failed to state a claim because Plaintiffs have not alleged that Dr. Natkin was permanently excluded from his profession. The F&R noted that Dr. Natkin can still practice medicine. This conclusion is not adopted. First, the Court notes that the Oregon Supreme Court cases that discuss fair procedure have not included any requirement that the plaintiff be permanently excluded from his profession. Second, even if Oregon were to follow California law, it is not quite so restrictive. *Ezekial v. Winkley* is instructive on this point. 20 Cal. 3d 267 (1977).

In *Ezekial*, a licensed physician practicing medicine decided to attend a residency program for a surgical specialty, just like Dr. Natkin. *Id.* at 270. The physician was then expelled from his residency program before finishing the program, preventing him from being able to be board certified as a surgeon or practicing in a surgical specialty (but not affecting his ability to practice medicine as he was practicing before he began the residency program). *Id.* at 270-71.

---

[7] Because the Court finds that Oregon law recognizes the common law right to fair procedure and that Plaintiffs state a claim under Oregon law, the Court does not reach whether Plaintiffs' purported claims against Western, AOA, and Opti-West should be considered under Oregon law or California law. The result would be the same under either.

The court in *Ezekial* found that the physician under these circumstances had a common law right to fair procedure before he could be expelled from his residency, in part because the hospital had "the power to permit or prevent [the residents'] practice of a surgical specialty and to thwart the enjoyment of the economic and professional benefits flowing therefrom" and because the plaintiff had an "expectation that the requirements for full utilization of [his] medical license will be met through his attainment of specialty status." *Id.* at 274-76. Thus, although the plaintiff still had his general medical license, the loss of his ability to obtain *specialty* status or to become a board certified surgeon was a sufficient loss to trigger the fair procedure requirement. Notably, the court emphasized "that defendants are not precluded from dismissing plaintiff for incompetence. We hold only that, in doing so, they must afford him rudimentary procedural and substantive fairness." *Id.* at 278.

Accordingly, even if Oregon were to follow California law, Plaintiffs would still sufficiently allege this tort. Plaintiffs' allegations are nearly identical to those in *Ezekial*. Plaintiffs allege that Dr. Natkin was expelled from his residency without proper procedures, is unable to finish his fourth year of residency, cannot become an orthopedic surgeon, and cannot become board certified.

The next question for the Court is against which Defendants Plaintiffs sufficiently allege a claim for the violation of fair procedure. Plaintiffs' allegations support that Good Sam and the individuals involved in Dr. Natkin's hearings (Drs. Vela, Finley, Clint Evans, Patel, and Fisher, and Ms. Bell) breached the common law duty of fair procedure with respect to Dr. Natkin. Under Oregon law, employers are vicariously liable for the torts of employees when the employee acts in the course and scope of employment. *See Harkness v. Platten*, 359 Or. 715, 732 (2016) ("Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when

the employee acts within the scope of employment. Negligence or other tortious conduct by the *employer* is not required." (emphasis in original) (quoting *Chesterman v. Barmon*, 305 Or. 439, 442 (1988))). An employee acts in the course of scope of employment when: (1) "the act occurred substantially within the time and space limits authorized by the employment"; (2) "the employee was motivated, at least partially, by a purpose to serve the employer"; and (3) "the act is of a kind which the employee was hired to perform." *Id.* (quoting *Chesterman*, 305 Or. at 442).

The allegations support that the individuals were acting in the course and scope of employment. Accordingly, Plaintiffs may allege this claim against the individuals' employers. It appears that Dr. Patel, Dr. Fisher, and Clint Evans, are employees of Good Sam. Plaintiffs allege that Mr. Finley was employed by Opti-West. Plaintiffs, however, do not allege who employs Ms. Bell or Dr. Vela. Plaintiffs generally allege that each Defendant is the agent, employee, or joint venturer of the other, but the Court disregards this vague and conclusory allegation.

Plaintiffs make no allegations regarding the employment of Ms. Bell, other than to state that her title is Vice President of Academic Affairs and Administrative Director of Medical Education. It is unclear whether these are positions at Western, SHS, or Good Sam.

Plaintiffs also allege that Dr. Vela was the DME and a Residency Program Director of Dr. Natkin's program at Good Sam. Plaintiffs allege that under the contract between Western and the Samaritan Entities, the DME of the Samaritan Entities "shall" be nominated by Western from its faculty and "shall" be an employee of Western. FAC ¶ 7. The contract actually provides, however, that the DME "may" be an employee of Western. ECF 34-2 at 8. The Court does not accept as true allegations characterizing documents in a manner contrary to the documents themselves. Plaintiffs do not allege that upon information and belief Dr. Vela, in his position as DME, was an employee of Western.

The contract between Western and the Samaritan Entities does, however, provide that Residency Program Directors are Western faculty members. ECF 34-2 at 6. It also provides that Western faculty members can apply for membership in the medical staff at the affiliated SHS hospitals. *Id.* at 7. But these contractual provisions do not suffice, absent allegations in the FAC regarding who employed Dr. Vela, whether it was Western, Good Sam, SHS, or some combination, to show that Dr. Vela's employer is vicariously liable for Dr. Vela's torts. Simply alleging that Dr. Vela was a program director, without more, is insufficient to allege vicarious liability against Western for Dr. Vela's alleged torts. Therefore, at this time, the only Defendants against whom the claim for breach of the duty to provide fair procedure survives are Good Sam, Opti-West, and Dr. Vela.

### 3. Second Claim, Count 10—Wrongful Termination

The Samaritan Defendants object to the F&R's conclusion that Plaintiffs adequately allege a wrongful termination claim against Good Sam. The Samaritan Defendants argue that Plaintiffs fail to allege a wrongful termination claim because: (1) Plaintiffs do not allege that Dr. Natkin engaged in any protected activity, but instead allege that Dr. Natkin did not say anything *disparaging* about Dr. Stanley at the fracture conference; (2) Plaintiffs do not allege that Good Sam terminated Dr. Natkin for what he said at the fracture conference, but instead for colluding to make Dr. Stanley look bad at the fracture conference; and (3) the fracture conference is not a peer-review setting.

The Court adopts the F&R's analysis and conclusion that Plaintiffs sufficiently allege that the fracture conference constitutes a peer-review setting. The Court also rejects the argument that Plaintiffs allege that Good Sam did not terminate Dr. Natkin for what he said at the fracture conference but instead for colluding to make Dr. Stanley look bad. Plaintiffs allege that the senior residents are the presenters at the fracture conferences. FAC ¶ 16(c). Plaintiffs further

allege that Dr. Stanley complained to Dr. Vela "that Dr. Natkin had colluded with Dr. Criner to select *and present* cases with the intention of making Dr. Stanley look bad." *Id.* ¶ 17(e) (emphasis added). Plaintiffs also allege that, unbeknownst to Dr. Stanley, there were additional cases of his, "had there been time to *present*" them, that would have made Dr. Stanley "look good." *Id.* (emphasis added). The Court must draw all reasonable inferences in favor of Plaintiffs on a motion to dismiss, not the Samaritan Defendants. Thus, the issue that bothered Dr. Stanley is not simply that Dr. Natkin "colluded," but that he selected and presented cases that made Dr. Stanley look bad.

Finally, the Court disagrees with the Samaritan's Defendants' narrow interpretation of Plaintiffs' allegations regarding whether Dr. Natkin engaged in a protected activity. Plaintiffs allege Dr. Natkin presented at the fracture conference and that presentation is what triggered the disciplinary action against him. Although Plaintiffs allege that only Dr. Krumrey made any remarks at the fracture conference "that might be considered disparaging," making disparaging remarks is not the alleged protected activity by Dr. Natkin at the fracture conference. Participating in the peer-review process of selecting and presenting the cases is the alleged protected activity. Viewing the allegations with all reasonable inferences drawn in favor of Plaintiffs, they are sufficient.

### 4. Second Claim, Count 11—Breach of Contract

#### a. Good Sam

The Samaritan Defendants object to the F&R's conclusion that Dr. Natkin sufficiently alleges a claim for breach of the residency agreement between himself and Good Sam. The Samaritan Defendants argue that the breach found by the F&R necessarily had to have been a breach of the contract entered into between Dr. Natkin and Good Sam for Dr. Natkin's second year of residency and that Dr. Natkin's claim for relief in count 11 is limited to the contract

entered into for his fourth year of residency. The Court does not read the FAC as being so limited.

Plaintiffs allege that Dr. Natkin "entered into the first of a series of five anticipated one-year contracts, as required by the *Basic Documents*." FAC ¶ 11. Count 11 incorporates this paragraph, among others, by reference. *Id.* ¶ 81. Plaintiffs specifically allege in count 11 that "Defendants SHS, by and through Defendant Good Samaritan Hospital Corvallis, entered into a contract with Dr. Natkin, the essential terms of which required SHS/Good Samaritan Hospital Corvallis [to] provide Dr. Natkin with due process in each and all disciplinary action taken against him and terminating him only for cause." *Id.* ¶ 82. Nothing in this paragraph indicates that the alleged contract is limited only to the fourth-year residency contract, as opposed to the series of one-year contracts referenced in paragraph 11 being considered together. Moreover, the reference to "each and all disciplinary actions" indicates a broader time frame than merely Dr. Natkin's fourth year of residency. This broader interpretation is particularly reasonable given that Plaintiffs allege that Dr. Natkin was subject to some form of disciplinary action during his second year. Accordingly, drawing all reasonable inferences in favor of Plaintiffs, the Court rejects the Samaritan Defendants' limited interpretation of the relevant contract as only including the fourth year residency contract. Thus, the F&R is adopted with respect to the breach of contract claim against Good Sam.

### b. Other Samaritan Entities

Plaintiffs object to the F&R's findings and conclusion that Plaintiffs' breach of contract claim in Count 11 should be dismissed against the other Samaritan Entities. Plaintiffs argue that the agreements between SHS and Western and SHS and Opti-West each describe that residents are employees of the Samaritan Entities collectively.

The agreements cited by Plaintiffs define SHS (the "parent") and the various specific hospitals (Good Sam and its "sister" hospitals, the "subsidiaries"), collectively as one term— "SHS." The agreements include provisions indicating that residents will be employed by "SHS." The fact that the agreements chose to use a single term that included both the parent and all the subsidiaries for ease in reference for that particular contract, however, does not mean that literally every single resident at all five hospitals will, for legal employment purposes, be an employee of SHS and all five sister hospitals. An agreement between Western and SHS or between Opti-West and SHS cannot legally define an employee-employer relationship between a third party such as Dr. Natkin and that third party's purported employer.[8] The only interpretation that would be reasonable is that Opti-West and Western (and SHS) expected that the residents would be employees of the specific Samaritan hospital in whose program the resident had enrolled, and that employment relationship would be defined by its own employment agreement. In this case, Dr. Natkin's employment relationship was defined by his residency agreement, which was between him and Good Sam. This section of the F&R is adopted, and Plaintiffs' objections are overruled.

### c. Other Defendants

Count 11 is brought against all Defendants, even though its substantive allegations focuses only on the Samaritan Defendants. The Court clarifies that this count is also dismissed against the non-Samaritan Defendants.

---

[8] For example, if Samaritan Albany General Hospital had attempted to terminate Dr. Natkin's residency at Good Sam, claiming to be Dr. Natkin's employer and citing to the agreements between Opti-West and SHS and Western and SHS, Dr. Natkin would likely be challenging that termination on the grounds that Samaritan Albany General Hospital was not his employer and had no authority to terminate his residency at a different hospital.

### 5. Second Claim, Counts 12 & 13—Breach of the Implied Covenant of GFFD

The Samaritan Defendants object to the F&R's conclusion that Plaintiffs adequately alleged a claim for breach of the implied covenant of GFFD against Good Sam. The Samaritan Defendants' raise the same objections that they raised in their arguments relating to the breach of contract claim. The Court has rejected these arguments. This portion of the F&R is adopted.

### 6. Second Claim, Counts 14 & 15—Third Party-Beneficiary

Plaintiffs object on two grounds to the F&R's recommendation that their third-party beneficiary claim be dismissed. Plaintiffs' first objection is that there are unidentified contracts that Plaintiffs alleged exist based on information and belief under which Plaintiffs believe Dr. Natkin is a third-party beneficiary. Plaintiffs' second objection is that Dr. Natkin is a third-party beneficiary of both the agreement between SHS and Opti-West and the agreement between SHS and Western, despite the "boilerplate" clause disavowing any third-party beneficiaries in each of those contracts.

Plaintiffs' first argument is based on a vague, conclusory, and speculative allegation in the FAC that simply states that Plaintiffs believe that there are contracts between AOA, Opti-West, Western, and SHS under which medical students and residents, including Dr. Natkin were intended beneficiaries and that were intended to ensure proper training and proper procedures for discipline. FAC ¶ 92. No facts are alleged to support Plaintiffs' information and belief on this point. For example, there is no allegation that such contracts are normal in the industry, reference to a previous court case in which a similar contract was found to create third-party beneficiary rights in residents or medical students, or that the agreements between Opti-West and SHS or Western and SHS were somehow incomplete. Absent some factual basis for Plaintiffs' belief that residents are an intended third-party beneficiary in some more specific as-yet-unidentified

contract, Plaintiffs' general allegation plausibly does not state a claim that Dr. Natkin is a third-party beneficiary of an unidentified contract.

Plaintiffs' second argument cites to clauses in the Opti-West and Western agreements with SHS that recite how discipline involving residents will need to be conducted by the Samaritan Entities. The agreement between SHS and Western requires that Western's Dean be notified and that the corrective course of action be agreed upon by the Dean and SHS's CEO, or their respective designees. The agreement between SHS and Opti-West requires that the Opti-West CEO or designee be notified, and that the corrective action be decided by the program director, the Samaritan Entities' Education Committee, SHS's CEO, or designee, and the DME. Both contracts require that disciplinary proceedings comply with applicable statutory, procedural, or common law rules. These provisions do not support a finding that residents are intended third-party beneficiaries.

There are three types of third-party beneficiaries—donee, creditor, and incidental. *Sisters of St. Joseph of Peace, Health, and Hosp. Servs. v. Russell*, 318 Or. 370, 374-75 (1994). Only donee and creditor beneficiaries can enforce a contract to which they are not a party. *Id.* at 375. These three types of intended beneficiaries have been described by the Oregon Supreme Court:

> For a plaintiff to be a donee beneficiary, it must appear that the promisee's intent in obtaining the promisor's promise to perform was to make a gift to the plaintiff or to confer a right to performance upon the plaintiff, which performance was not due or claimed to be due by the promisee to the plaintiff. For a plaintiff to be a creditor beneficiary, the performance by the promisor must be to satisfy an actual or supposed or asserted duty of the promisee to the plaintiff. Finally, if the third party has paid no value and there is no intention to confer a contract right on that party, then the party is an incidental beneficiary who is not entitled to an action on the contract. In those circumstances, the contract will not be interpreted to promise performance to the third-party stranger to the contract even though the stranger may incidentally benefit from the contract.

*Id.* (quotation marks, citations, emphasis, and alterations omitted).

The clauses cited by Plaintiffs demonstrate that Dr. Natkin, and the other residents, are no more than incidental beneficiaries to the Western and Opti-West agreements with SHS. This interpretation is further enforced by the clause in each contract that expressly disavows the intent to create any third-beneficiaries with enforcement rights. This section of the F&R is adopted and this claim is dismissed.

### 7. Third through 91st Claims—Defamation

Plaintiffs allege 89 claims of libel, slander, and slander *per se*. Plaintiffs allege that Dr. Vela made verbal and written remarks about Dr. Natkin that were false and disparaging and were injurious to Dr. Natkin's professional reputation. Plaintiffs allege that statements were made by Dr. Vela to Drs. McPhilemy, Small, Horvath, Provenzano, Trzeciak, Garrison, Faerber, and an extensive list of additional doctors. FAC ¶¶ 40-58, ¶¶ 101-144. Plaintiffs allege that Dr. Vela was repeating his "fabricated story about how Dr. Natkin had been terminated after he had been placed on probation multiple times or caused to be repeated that Dr. Natkin had been terminated from his fourth year of residency, which in the medical profession, carries the innuendo of gross incompetence such that one should not be hired." *Id.* ¶ 48. Plaintiffs further allege that the Samaritan Defendants had caused to be published on the FCVS that Dr. Natkin was placed on probation, was disciplined, had negative reports for behavioral reasons filed, and that "Dr. Natkin was placed on academic probation several times for unprofessional behavior and failure to meet academic standards of professional conduct." *Id.* ¶ 35. Plaintiffs also allege that as a result of the alleged defamation, among other things, Dr. Natkin lost a fourth-year residency position that was specially created for him.

To state a claim for defamation under Oregon law, a complaint "must state facts sufficient to establish that the defendant published to a third person a defamatory statement about

plaintiff." *Marleau v. Truck Ins. Exch.*, 333 Or. 82, 94 (2001). "A defamatory statement is one that would subject another to "'hatred, contempt or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other].'" *Id.* (alterations in original) (quoting *Reesman v. Highfill*, 327 Or. 597, 603 (1998)). Plaintiffs allege defamation through both libel (written) and slander (oral). "Spoken words are actionable *per se* in Oregon only if they are words tending to injure the plaintiff in his or her profession or business, or if they impute to plaintiff the commission of a crime involving moral turpitude." *Id.* at 95. Because Plaintiffs allege that Defendants' alleged defamation harms Dr. Natkin in his profession or business, Plaintiffs allege defamation *per se* under Oregon law.

To state a claim in federal court, a plaintiff must comply with Rule 8 of the Federal Rules of Civil Procedure. Courts have held that the requirements of Rule 8 are met with respect to libel and slander claims so long as the allegations provide the defendant with "sufficient notice of the communications complained of to allow [the defendant] to defend itself." *McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 955-56 (10th Cir. 1989).

The Moving Defendants argue that Plaintiffs' allegations are insufficient to state a claim for defamation because Plaintiffs do not allege *when* the alleged defamatory statements were made. But allegations of when the defamation occurred are not required under Oregon law or Rule 8. Under some circumstances they may be necessary, particularly when other facts regarding the alleged defamatory statements are lacking. But the Moving Defendants cite to no case requiring that a plaintiff must always allege precisely when the alleged defamatory statements took place. The Moving Defendants argue that *Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002), contains such a requirement, but they read too much into that case. The court in

*Flowers* merely found that a complaint that "lists the precise statements alleged to be false and defamatory, who made them and when" is *sufficient* to state a claim for defamation. *Id.* at 1131. The court did not hold that such allegations were *necessary* in order to state such a claim.

The Moving Defendants also rely on *PAI Corp. v. Integrated Science Solutions, Inc.*, 2007 WL 1229329 (N.D. Cal. Apr. 25, 2007). The court in *PAI Corp.* found that the counterclaims of libel and slander were too vague, the plaintiffs could not frame a responsive pleading, and thus the plaintiffs were entitled to a more definite statement. *Id.* at *7. In so holding, the court noted that although some courts found defamation claims adequately alleged "even where the specific statements were not provided," "countless [other] district courts have found that the requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege the substance of the statements and/*or* the time and place in which they were made." *Id.* at *8 (emphasis added). The court then cited to numerous cases with parentheticals, all of which involved situations where the deciding court found lacking identification of the substance or the speaker of the alleged defamatory statement, although some of which involved situations where the court also found lacking the "when" of the alleged defamation. The Court does not interpret *PAI Corp.* as holding that "when" an alleged defamation occurred must always be alleged. The Court reads *PAI Corp.* as supporting the longstanding principle that defamation must be sufficiently alleged for a defendant to be put on notice of the communications complained of to be able to defend itself, and that sometimes that notice will require allegations of when the defamation occurred.

A similar argument to what the Moving Defendants argue here was made in *Symantec Corp. v. CD Micro, Inc.*, 2002 WL 31112178 (D. Or. Sept. 17, 2002). In that case, the defendant raised a counterclaim for trade libel and the plaintiffs moved to dismiss the counterclaim,

arguing that it was not alleged with sufficient particularity. Specifically, the plaintiffs argued "that CD Micro has not alleged the actual statements made, the time and place when they were made, and to whom they were published. They also contend that they are unable to discern whether CD Micro alleges disparagement to its product or to its name." *Id.* at *5. Judge King denied the motion to dismiss, finding the counterclaim adequately alleged at the pleading stage, and noted that "[d]etails can be ascertained during discovery." *Id.* Here, Plaintiffs have alleged with detail the substance of the alleged defamatory statements, to whom they were made, and the context in which they were made. The fact that Plaintiffs did not allege the precise date is not fatal to their defamation claims. Defendants have more than sufficient information to know what specific communications are alleged to be at issue, who is alleged to have said them, and to whom they were alleged to be said. Defendants can formulate a defense and seek additional details in discovery.

The Moving Defendants argue that the real reason Plaintiffs do not allege the date of the alleged defamatory statements is because the statements occurred outside the statute of limitations. Defendants, however, will have the opportunity to file a motion for summary judgment and provide evidence if this assertion is correct.[9] It does not render Plaintiffs' pleadings inadequate. Notably, the Samaritan Defendants have access to this information—they know when Dr. Vela spoke with the doctors to whom Dr. Vela allegedly provided the false information and when Dr. Vela or someone else from Good Sam or one of the Samaritan Defendants published the information on FCVS.[10] Additionally, the discovery rule applies to

---

[9] Defendants can always file an early partial motion for summary judgment. The Court does not require that all summary judgment motions be filed at one time.

[10] Defendants argue that Plaintiffs also have access to this information because the statements were made to third parties and are on a database. Plaintiffs state in their objections that the third parties will not provide information absent a subpoena. Further, there is no

defamation claims under Oregon law when the defamatory statements are made in confidence (as alleged here with respect to the conversations and possibly the FCVS, depending on how accessible it is). *See Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1236 n.7 (D. Or. 2017) (citing *White v. Gurnsey*, 48 Or. App. 931, 936 (1980) (holding that the discovery rule applies to defamation actions when the initial publication was confidential and not something that a plaintiff would be presumed to have known about, even exercising reasonable diligence)). Thus, when the statements were published might not be dispositive of the statute of limitations question, because there may also be the question of when did Dr. Natkin become aware of the publication of the alleged defamatory statements. Further, whether there may be a statute of limitations defense is not dispositive of whether the claims as alleged are sufficient to withstand a motion to dismiss under Rule 12(b)(6).[11] As discussed, the issue is whether the pleading puts the defendants on sufficient notice of the communications at issue such that the defendants can formulate their defense.

---

evidence in the record that Plaintiffs have access to the FCVS—indeed according to the allegations in the FAC it was a potential employer who brought the statements on the FCVS to Dr. Natkin's attention. Regardless, whether Plaintiffs could perform additional investigation and obtain more detail to include in their defamation claims is not the standard for evaluating whether the claims as alleged are sufficient.

[11] The Court notes, however, that it is concerned about an attempt to plead in an artful manner to avoid early dismissal of claims. For example, the FAC does not allege any dates relating to Dr. Natkin—such as when Dr. Natkin started his residency at Good Sam, when he was terminated, when his medical license was cleared in Oregon, when he was able to obtain medical licenses elsewhere, when he spoke with persons to whom Dr. Vela had allegedly defamed Dr. Natkin, when he learned of the FCVS posting, when he was able to obtain the allegedly specially-created fourth-year position in Philadelphia, and when that position was revoked after Dr. Vela allegedly defamed Dr. Natkin. The striking lack of dates in a complaint otherwise replete with detail raises concern that inclusion of dates might implicate statute of limitations issues. The Court further notes that if Plaintiffs pursue patently invalid claims, including in any second amended complaint, the Court may consider Rule 11 sanctions against Plaintiffs and their counsel, including granting Defendants' attorney's fees required to pursue summary judgment motions against frivolous claims.

The Samaritan Defendants also argue that Plaintiffs' defamation claims fail because the statements were privileged. Accepting Plaintiffs' allegations as true and drawing all inferences in favor of Plaintiffs, this argument is rejected at this stage of the litigation.

The Samaritan Defendants further argue that the alleged defamatory statements did not contain any false statements of fact. This argument is without merit. Plaintiffs' allegations must be accepted as true. Plaintiffs allege that, among other things, Dr. Vela and the Samaritan Defendants informed third parties that Dr. Natkin was placed on probation multiple times when that was untrue. As alleged, that is a false statement of fact.

Finally, the Moving Defendants argue that if the defamation claims are not dismissed, they should proceed only against Dr. Vela, who is the defendant who allegedly spoke with the other doctors. First, although Plaintiffs allege that Dr. Vela spoke personally with most of the doctors, Plaintiffs do not allege that it is Dr. Vela who published the information on FCVS. At this stage in the litigation, it is reasonable that Plaintiffs do not know the identity of who published the information on FCVS. It is not reasonable at this stage, however, to assume that the person who published the information on FCVS was an employee of one of the other Samaritan Entities, who did not directly employ Dr. Natkin. Thus, the allegation relating to FCVS is reasonably alleged against Good Sam and Dr. Vela, but not the other Samaritan Entities or other Defendants. If in discovery it is disclosed that an employee of one of the other Samaritan Entities published the information on FCVS, Plaintiffs can amend this claim.

Second, as noted above, employers are vicariously liable for the torts of employees acting in the course and scope of employment, including defamation. *See Coney v. Cynthia Fagan Landa S Inc.*, 195 Or. App. 282, 286 (2004). The allegations support that Dr. Vela was acting in the course and scope of employment. Accordingly, Plaintiffs may allege defamation claims

against Dr. Vela's employer. Also as discussed above, however, Plaintiffs sufficiently do not allege who employs Dr. Vela and thus vicarious liability cannot be imputed to Western or any of the Samaritan Entities. Accordingly, at this time only the direct defamation claims against Good Sam and Dr. Vela adequately are alleged, and any vicarious liability for Dr. Vela's alleged defamation has not adequately been alleged.

The Court agrees with AOA that there is no allegation of defamation against AOA, direct or vicarious. There is no allegation that AOA or any of its employees published false statements to third parties regarding Dr. Natkin. Accordingly, the defamation claims against AOA are dismissed. Similarly, the defamation claims against Opti-West are dismissed.

### 8.  92nd Claim, Counts One through 96—California Unfair Practices Act

Plaintiffs object to the F&R's conclusion that Plaintiffs' claim under California's Unfair Practices Act (or Unfair Competition Law "UCL") should be dismissed. As explained by the Eastern District of California:

> Because violation of California's UCL is a state law claim, "the UCL reaches any unlawful business act or practice committed *in California*." There is a presumption against extraterritorial application. "[T]he presumption against extraterritoriality applies to the UCL in full force." California's UCL may only be applied extraterritorially where the unlawful conduct that forms the basis of the out-of-state plaintiff's claim occurs in California.

*Fontenberry v. MV Transp., Inc.*, 984 F. Supp. 2d 1062, 1067 (E.D. Cal. 2013) (emphasis and alteration in original) (quoting *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1208 (2011)).

The F&R concluded that the actions of the Samaritan Defendants' emanated from Oregon. Plaintiffs object to this conclusion. Plaintiffs' objections on this point rely on Plaintiffs' theory that all Defendants' actions are so intertwined and their relationships are so interconnected that even though the nexus of the alleged wrongdoing all occurred in Oregon by Oregon actors affecting a person residing in Oregon, because Opti-West and Western are

California corporations and SHS contracted with those California corporations, that makes the Samaritan Defendants' conduct linked to California. Plaintiffs also argue that the Samaritan Defendants could not have opened their residency program without the California corporations. In discussing Plaintiffs' antitrust allegations, the Court rejected Plaintiffs' vague and conclusory assertions that all Defendants are the agents and joint venturers of one another and have an "interconnected relationship" creating joint liability for all of one another's actions.

Moreover, even if the Samaritan Defendants' policies and procedures did emanate from California through Opti-West and Western (which the Court does not find is supported by the allegations in the FAC), that would not render the UCL applicable. *See Sullivan*, 51 Cal. 4th at 1208 (finding that California's UCL does not apply when a company adopted a policy in its California headquarters that improperly exempted employees from overtime pay in violation of the Fair Labor Standards Act, because the unlawful act was not adopting an erroneous policy, which occurred in California, but actually failing to pay the overtime, which occurred out of state). As alleged in the case at bar what would be considered improper conduct under the UCL is the actual proceedings provided to Dr. Natkin and their alleged unfairness (all of which occurred in Oregon). Thus, even if any Defendant adopted or failed to adopt proper policies and procedures in California, that alone would not confer UCL standing. Stated another way, Defendants might adopt an improper policy, but if they still provided Dr. Natkin with a fair procedure despite that policy, then the mere fact that they had adopted an erroneous policy would not support a claim under the UCL. It is the unlawful *act* not the erroneous *policy* that supports the claim. *Id.* (noting that "for an employer to adopt an erroneous classification policy is not unlawful in the abstract" but that "[w]hat is unlawful, and what creates liability under the FLSA,

is the failure to pay overtime when due"). Here, the allegedly unlawful *acts* all occurred in Oregon. Thus, the UCL is inapplicable.

**D. Disposition of Claims**

For clarity, the Court describes below what claims remain in the FAC and against which Defendants:

1.   Second Claim for Relief, Counts Five through Eight, Breach of Contract—Plaintiffs against AOA.

2.   Second Claim for Relief, Count Nine, Breach of Fiduciary Duty (the Common Law Right to Fair Procedure)—Plaintiffs against Good Sam, Opti-West, and Dr. Vela.

3.   Second Claim for Relief, Count Ten, Wrongful Termination—Plaintiffs against Good Sam.

4.   Second Claim for Relief, Count 11, Breach of Contract—Plaintiff Dr. Natkin against Good Sam.

5.   Second Claim for Relief, Counts 12 & 13, Breach of the Implied Covenant of GFFD—Dr. Natkin against Good Sam.

6.   Third through 91st Claims for Relief, Defamation—Plaintiffs against Good Sam and Dr. Vela.

In addition, the following claims are dismissed:

1.   First Claim for Relief, Antitrust—against all Defendants.

2.   Second Claim for Relief, Counts One through Four, Breach of Fiduciary Duty—against all Defendants.

3.   Second Claim for Relief, Counts Five through Eight, Breach of Contract—against all Defendants except AOA.

4.         Second Claim for Relief, Count Nine, Breach of Fiduciary Duty (Fair Procedure)—against Defendants Western, AOA, SHS, Albany General Hospital, Mid-Valley Healthcare, Inc., Samaritan Pacific Health Services, Inc., and Samaritan North Lincoln Hospital.

5.         Second Claim for Relief, Count Ten, Wrongful Termination—against all Defendants except Good Sam.

6.         Second Claim for Relief, Count 11, Breach of Contract—all claims by Plaintiff Natkin PC, Plaintiff Dr. Natkin's claims against all Defendants except Good Sam.

7.         Second Claim for Relief, Counts 12 & 13, Breach of the Implied Covenant of GFFD—all claims by Plaintiff Natkin PC, Plaintiff Dr. Natkin's claims against all Defendants except Good Sam.

8.         Second Claim for Relief, Counts 14 & 15, Third Party Beneficiary Claims—against all Defendants.

9.         Third through 91st Claims for Relief, Defamation—against all Defendants except Good Sam and Dr. Vela.

10.       92nd Claim for Relief, Counts One through 96, California Fair Practices Act—against all Defendants.

## E.  Leave to Amend

The Court grants Plaintiffs leave to amend. The Court, however, urges Plaintiffs to take this opportunity to draft a more thoughtful and streamlined complaint, both structurally and substantively. For example, it is unclear why the Second Claim for Relief is broken into many different causes of action, why one cause of action for breach of fiduciary duty is broken into four different "counts," why one cause of action for breach of contract is broken into four different "counts," or why a claim for defamation has 89 separate claims for relief. The structure

of the complaint makes it more difficult to track and organize, as can be seen in this Opinion and Order.

The Court also urges Plaintiffs to be more thoughtful in what causes of action are alleged against which Defendants. The FAC alleges all causes of actions against all Defendants. Yet Plaintiffs make some allegations that appear to be directed only against specific Defendants. For example, counts one through four of the second claim for relief appear to focus breach of fiduciary duty allegations against only AOA, Opti-West, and Western, but then assert the claims against all Defendants (whereas count nine appears to focus breach of fiduciary duty allegations against only SHS but then asserts the claim against all Defendants). The Court has rejected Plaintiffs' theory that all Defendants are jointly liable for all the actions of one another.

## CONCLUSION

The Findings and Recommendation (ECF 126) is adopted in part, as set forth in this Opinion and Order. The Samaritan Defendants' motion to dismiss (ECF 34) and AOA's motion to dismiss (ECF 36) are GRANTED IN PART and DENIED IN PART, as set forth herein. Western's motion to dismiss (ECF 95) is GRANTED. Plaintiff has leave to file an amended complaint, within 21 days of the date of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 17th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge