**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **DR. ERIK NATKIN, DO PC**, a Utah corporation; and **DR. ERIK NATKIN, DO**, an individual,<br><br>    Plaintiffs,<br><br>  v.<br><br>**AMERICAN OSTEOPATHIC ASSOCIATION**, *et al.*,<br><br>    Defendants. | Case No. 3:16-cv-01494-SB<br><br>**OPINION AND ORDER** |

Benjamin Natkin, LAW OFFICES OF BENJAMIN NATKIN, 3520 Overland Avenue, Suite A1, Los Angeles, CA 90034; Clark E. Rasche, WATKINSON LAIRD RUBENSTEIN, PC, 101 E Broadway, Suite 200, PO Box 10567, Eugene OR 97440. Of Attorneys for Plaintiffs.

John F. McGrory, Jr. and Blake J. Robinson, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland OR 97201. Of Attorneys for Defendants Samaritan Health Services, Inc., Good Samaritan Hospital Corvallis, Albany General Hospital, Mid-Valley Healthcare, Inc., Samaritan Pacific Health Services, Inc., Samaritan North Lincoln Hospital, and Dr. Luis R. Vela, DO.

Michael Porter, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204; Mark H. Meyerhoff and Christopher S. Frederick, LIEBERT CASSIDY WHITMORE, 6033 West Century Boulevard, Fifth Floor, Los Angeles, CA 90045. Of Attorneys for Defendant Western University of Health Sciences.

Michael C. Lewton, Cosgrave Vergeer Kester LLP, 888 SW Fifth Avenue, suite 500, Portland, OR 97204; John R. Danos, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. Of Attorneys for Defendant American Osteopathic Association.

Thomas R. Rask , III, Kell Alterman & Runstein, LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204; Robert P. Johnston, Law Offices of Vera and Barbosa, 223 West Foothill Boulevard, Second Floor, Claremont, CA 91711. Of Attorneys for Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium.

**Michael H. Simon, District Judge.**

United States Magistrate Judge Stacie Beckerman issued Findings and Recommendation ("F&R") in this case on October 18, 2018. ECF 174. Judge Beckerman recommended that the motions to dismiss filed by Defendants Samaritan Health Services, Inc. ("SHSI"), Good Samaritan Hospital Corvallis ("Good Sam"), Albany General Hospital, Mid-Valley Healthcare, Inc., Samaritan Pacific Health Services, Inc., Samaritan North Lincoln Hospital, (collectively, the "Sister Hospitals") (SHSI, Good Sam, and the Sister Hospitals are collectively referred to as the "Samaritan Entities") and Dr. Luis R. Vela, DO ("Vela") (collectively with the Samaritan Entities, the "Samaritan Defendants"); American Osteopathic Association ("AOA"); Western University of Health Sciences ("Western"); and Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium ("OPTI-West") be granted in part and denied in part.

Plaintiffs Dr. Erik Natkin, DO ("Natkin") and Dr. Erik Natkin, DO PC ("Natkin PC") timely filed an objection (ECF 183), as did each of the Defendants. ECF 180 (OPTI-West); ECF 179 (Samaritan Defendants); ECF 178 (Western); ECF 177 (AOA). The Court reviews *de novo* those portions of Judge Beckerman's F&R to which Plaintiffs and Defendants have objected. In so doing, the Court has considered the objections, the responses, the F&R, the Second Amended Complaint ("SAC"), and the underlying briefing before Judge Beckerman. For the reasons

discussed below, the Court adopts in part the F&R. The motions to dismiss are granted in part and denied in part.

## STANDARDS

### A.  Review of a Magistrate's Findings and Recommendation

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate's findings and recommendations to which neither party has objected, the Act prescribes no standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review *de novo* magistrate's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Magistrates Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate's recommendations for "clear error on the face of the record."

### B.  Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs.,*

*Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND

A more detailed background was set out in the F&R (ECF 126) on the motions to dismiss the First Amended Complaint. Most of the same factual allegations, along with some new factual allegations, are included in the SAC. Briefly, Plaintiff Dr. Erik E. Natkin was a resident at Good Sam, a subsidiary of SHSI and sister-hospital to the other Samaritan Entity hospitals. Plaintiffs allege that Natkin was unfairly targeted by Vela, a Residency Program Director and Director of

Medical Education ("DME") at Natkin's residency program. After receiving positive performance reviews, Vela accused Natkin of colluding with another resident to portray an attending physician in a negative light. Vela also allegedly violated the bylaws and other governing documents of the residency program by having Natkin suspended and ultimately terminated, without appropriate process.

Vela allegedly conveyed false and misleading information about Natkin to the Oregon Medical Board, which required Natkin to undergo a six-month investigation to clear his medical license. Vela also allegedly conveyed false and misleading information about Natkin to the Federation of State Medical Boards' Credential Verification Service ("FCVS"), which allegedly precluded Natkin from completing his residency in orthopedic surgery and obtaining Board certification. These actions also have caused difficulty for Natkin in obtaining medical licenses in other states and in practicing as a covered doctor under certain insurance plans. Finally, Vela allegedly defamed Natkin to many other doctors throughout the country, preventing Natkin from obtaining other jobs, including a fourth-year orthopedic surgical residency specially-created for Natkin in Philadelphia. The program director in Philadelphia withdrew the job offer after he contacted Vela, who allegedly conveyed false and misleading information about Natkin.

## DISCUSSION

Plaintiffs object that the F&R: (1) improperly concluded that Defendants were not engaged in a conspiracy or joint venture and improperly rejected the alleged agency relationship between the parties; (2) improperly found that Plaintiffs alleged no antitrust injury; (3) improperly dismissed Plaintiffs' fraud claim; (4) improperly dismissed Plaintiffs' fair procedure claim against AOA; (5) improperly concluded that Plaintiffs' wrongful termination claims are not statutory claims; (6) improperly evaluated the contract claims because AOA, OPTI-West, SHSI, Good Sam, and the Sister Hospitals were either parties to certain contracts

through agency or conspiracy and are liable for breach of contract or they are not parties to the contracts and are liable for interference with contract; (7) failed properly to evaluate certain aspects of Plaintiffs' defamation claims and intentional interference with economic relations based on defamation; (8) failed to address all the reasons proffered by Plaintiffs in arguing against OPTI-West's reliance on the *Horowitz* doctrine; and (9) improperly dismissed Plaintiffs' California Fair Practices Act Claim.[1] Plaintiffs also raise the new argument that Defendants should be judicially estopped from disputing their interconnected relationships because they argued this relationship to their benefit in obtaining a transfer of this case to the District of Oregon and in defeating Plaintiffs' motion to retransfer venue back to the Central District of California.

The Samaritan Defendants object to the F&R's analyses and conclusions about: (1) the denial of Vela's and SHSI's motion to dismiss Plaintiffs' wrongful termination claims against them because they were not Natkin's employer; (2) the denial of Vela's motion to dismiss Plaintiffs' Eighth Claim for intentional interference with contract because he was an agent of the contracting party and thus cannot be a third party for purposes of this type of claim; (3) the denial of Good Sam, Vela, and SHSI's motion to dismiss Plaintiffs' defamation claims that rely on the truthful statement that Natkin was terminated from his fourth year of residency; and (4) any dismissals of Plaintiffs' claims recommended to be without prejudice, arguing that they should be with prejudice. Western objects to the F&R's analysis and conclusion that Plaintiffs

---

[1] Plaintiffs also assert a generic objection to "any other finding or recommendation adverse to Plaintiffs." A "general" objection to a Finding and Recommendation does not meet the "specific written objection[ ]" requirement of Rule 72(b) of the Federal Rules of Civil Procedure. *See, e.g.*, *Velez-Padro v. Thermo King de Puerto Rico, Inc.*, 465 F.3d 31, 32 (1st Cir. 2006) ("Conclusory objections that do not direct the reviewing court to the issues in controversy do not comply with Rule 72(b)"). The Court therefore disregards this generic objection as triggering a *de novo* review of anything in the F&R to which Plaintiffs have not specifically objected.

allege sufficient facts from which it can be inferred that Vela is an employee or nonemployee agent of Western, and thus that any claims survive against Western. OPTI-West objects to the F&R's analyses and conclusions that OPTI-West's motion to dismiss not be granted against Plaintiffs' Sixth and Eight Claims for Relief alleging intentional interference with contract, and that the *Horowitz* doctrine does not apply. Finally, AOA objects to the F&R's analysis and conclusion that Plaintiffs' breach of contract claim against AOA not be dismissed.

The Court discusses the objections, organized by the claims as alleged in the SAC, after discussing the portions of the F&R to which no objections were filed and Plaintiffs' arguments about judicial estoppel and joint action.

## A. Portions of the F&R to which No Objections Were Filed

For the portions of the F&R which no party has objected, the Court follows the recommendation of the Advisory Committee and reviews those matters for clear error on the face of the record. No such error is apparent and the Court adopts these portions of the F&R. For clarity, the Court sets forth below these portions:

1. The F&R's recommendation not to dismiss Plaintiffs' claim for unfair procedure (Third Claim) against OPTI-West.

2. The F&R's recommendation not to dismiss Plaintiffs' defamation claims against SHSI, Good Sam, and Vela that are based on representations that Natkin was on probation multiple times.

3. The F&R's recommendation not to dismiss Plaintiffs' intentional interference with prospective economic advantage claims against SHSI.

4. The F&R's conclusion that there is no agency relationship between the various entities, other than between Western and OPTI-West, AOA and OPTI-West, and Good Sam and the other Samaritan Entities to which Plaintiffs objected.

**B. Judicial Estoppel**

Plaintiffs contend that Defendants should be judicially estopped from contesting their joint relationship. The decision to impose judicial estoppel is left to the discretion of the district court. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). In considering whether to apply the doctrine of judicial estoppel, district courts may consider several questions, including:

> (1) Is the party's later position "clearly inconsistent with its earlier position?" (2) Did the party succeed in persuading a court to accept its earlier position, creating a perception that the first or second court was misled? and (3) Will the party seeking to assert an inconsistent position "derive an unfair advantage or impose an unfair detriment on the opposing party?"

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (quoting *New Hampshire*, 532 U.S. at 750-51). This is not an exhaustive enumeration of the factors that a court may consider. *New Hampshire*, 532 U.S. at 751. The Ninth Circuit has explained that the "second *New Hampshire* factor—that one of the courts has been misled—is often dispositive." *Baughman*, 685 F.3d at 1133. Judicial estoppel is appropriate where "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position." *Id.*

Plaintiffs argue that Defendants' positions relating to their interconnected relationships in their motions to dismiss are clearly inconsistent with their positions taken before the U.S. District Court in California in litigating their motions on jurisdiction and venue and before Judge Beckerman in litigating Plaintiffs' motion to retransfer the case back to California. Plaintiffs also contend that Defendants "persuaded" the district court in California and Judge Beckerman of various positions about Defendants' interconnected relationship. This is not an accurate representation of Defendants' arguments or the bases of the courts' decisions.

Regarding the arguments of Defendants before the district court in California, OPTI-West filed no motion before that court and thus did not make any representation or "persuade" that

court of anything. The court instead reviewed Plaintiffs' complaint and underlying documents and concluded that OPTI-West had consented to personal jurisdiction in Oregon by accepting the forum selection clause in the contract it entered with the Samaritan Entities, which the court noted forms the basis of Plaintiffs' third-party beneficiary contract claims. AOA argued that venue was not appropriate in California and that Plaintiffs failed to state a claim against AOA because the wrongdoing involved Vela and Good Sam and had nothing to do with AOA. This is the opposite of arguing that AOA was so interconnected with Good Sam or the Samaritan Entities that they were all essentially one entity for liability purposes. Indeed, AOA asserted no argument or claim that it was connected to any other defendant through agency, joint venture, or conspiracy.

Similarly, Western argued that Plaintiffs' complaint was "devoid" of any allegations that Western was involved in any conspiracy, defamation, unfair business practice, or breach of contract. Western joined in the other defendants' motions to transfer venue if the district court in California decided not to dismiss Plaintiffs' claims against Western, noting that the underlying contracts cited by Plaintiffs had Oregon forum selection clauses, most of the witnesses and documents were in Oregon, and Oregon provided adequate remedies. Western made no argument that it was in a conspiracy, joint venture, agency relationship, or any other interconnected relationship with any other defendant.

The Samaritan Defendants moved to dismiss the claims against them because the district court in California lacked personal jurisdiction over them and venue was improper in California. In the alternative, they moved to transfer the case to Oregon. They presented no argument that they were interconnected with any other defendant.

Before Judge Beckerman, Defendants made similar arguments. They argued that Plaintiffs were making an improper motion for reconsideration, that Plaintiffs' allegations focused on conduct in Oregon, that venue was proper in Oregon, that all defendants had consented to jurisdiction in Oregon, that the district court in California did not have personal jurisdiction over all defendants, that Plaintiffs had consented to jurisdiction in Oregon, and that the district court in California had correctly decided the motion to transfer. In making these arguments they focused on the allegations in Plaintiffs' complaint and the attached documents and the decision of the district court in California. They did not argue that all the defendants were interconnected with one another.

Plaintiffs do not cite or quote any purported assertion by any defendant to support Plaintiffs' argument for judicial estoppel. Plaintiffs cite only portions of the opinions of the courts. The conclusions cited by Plaintiffs, however, were not arguments made by Defendants. As the courts stated in their opinions, the conclusions mainly were based on *Plaintiffs'* allegations, not *Defendants'* assertions and arguments. The courts also relied on the documents incorporated by reference into Plaintiffs' complaint. Accordingly, judicial estoppel is not appropriate.

## C. Joint Action

### 1. Conspiracy

Plaintiffs assert that they allege two conspiracies. Plaintiffs object that the F&R focuses only on the first alleged conspiracy, to wrongfully accredit the Samaritan Entities' residency program, and ignores the second alleged conspiracy, to wrongfully terminate and uphold Natkin's termination without providing fair procedure. Plaintiffs contend that the Court previously found the second alleged conspiracy sufficient to withstand the first motion to dismiss. That is not an accurate characterization of the Court's finding. The Court held that

Oregon law would provide a common law right to fair procedure and that Plaintiffs' First Amended Complaint sufficiently stated a claim for this cause of action against Good Sam, Opti-West, and Vela. The Court expressly found, however, that Plaintiffs did not sufficiently allege a conspiracy or joint action. That a plaintiff alleges a particular cause of action against more than one defendant does not mean that the plaintiff has alleged a conspiracy involving those defendants. Plaintiffs do not allege facts plausibly supporting that Defendants conspired to deprive Natkin of fair procedure, versus independently being involved in that alleged deprivation. For the first alleged conspiracy, the Court agrees with and adopts the reasoning and conclusions of the F&R.

## 2. Joint Venture

Plaintiffs object that the F&R misapplied the law of joint venture and joint enterprise, and that whether a joint venture or enterprise exists is generally a question of fact. In a case involving a hospital residency program, the California Court of Appeals described when this is an issue fact versus an issue of law:

> Whether the parties to a contract have created a joint venture or some other relationship involving cooperative effort, depends upon their actual intention which must be determined in accordance with ordinary rules governing interpretation of contracts. Where the evidence bearing on the issue is conflicting, the existence of a joint venture is primarily a question of fact. On the other hand, where there is no conflicting extrinsic evidence concerning the interpretation of the contract creating the relationship, the issue is one of law.

*Cty. of Riverside v. Loma Linda Univ.*, 118 Cal. App. 3d 300, 313 (Ct. App. 1981) (citations omitted). The court also explained that "[t]he term 'joint venture' usually connotes a commercial objective. It exists where there is 'an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an

understanding as to the sharing of profits and losses, and a right of joint control.'" *Id.* (quoting *Holtz v. United Plumbing & Heating Co.*, 49 Cal. 2d 501, 506-507 (1957)).

The contracts are unambiguous on this issue, and Plaintiffs' allegations do not plausibly suggest any extrinsic evidence concerning the interpretation of the contract. As a result, at this stage in the litigation whether the parties created a joint venture is an issue of law. The Court has reviewed the issue *de novo*. The Court agrees with and adopts the reasoning of the F&R.

### 3. Agency

#### a. AOA and OPTI-West

Plaintiffs contend that OPTI-West is an agent of AOA. There are only a few allegations supporting this contention. Plaintiffs allege that AOA has federal authority as the exclusive agency for accrediting all aspects of osteopathic medical education, from medical school through residency and fellowship, and accrediting osteopathic hospitals. SAC ¶ 2. Plaintiffs also allege that AOA accredits regional OPTIs to oversee and administer the AOA's requirements for medical training. SAC ¶ 5. Plaintiffs further allege that AOA "retains ultimate authority to ensure each program meets AOA requirements." *Id.* Plaintiffs allege that OPTI-West is the applicable regional OPTI accredited by the AOA, and that OPTI-West issued Bylaws requiring medical schools comply with OPTI-West's policies and procedures, as well as procedures required by AOA and federal and state regulations. SAC ¶ 6.

Plaintiffs argue that the F&R did not properly consider AOA's control over OPTI-West as alleged by Plaintiffs. An agency relationship requires (1) that the agent is subject to the principal's control and (2) that the agent work on behalf of the principal. *See Vaughn v. First Transit, Inc.*, 346 Or. 128, 136 (2009). For employee agents, the control element requires "the right to control the physical details of the work being performed by the agent; in other words, the principal directs not only the end result, but also controls *how* the employee performs the work."

*Id.* at 137 (emphasis in original). For nonemployee agents, the control element requires or "*a right to control the physical details of the manner of performance of the conduct that is the basis for the tort claim.*" *Id.* at 139 (emphasis in original).

Plaintiffs' allegations relating to OPTI-West and AOA allege no control. Plaintiffs allege that AOA "accredits" various OPTIs to administer medical training. Plaintiffs do not allege that AOA directs, controls, or monitors the OPTIs in their performance of this administration. Plaintiffs allege that AOA retains ultimate control over whether the governed entity—the medical training program—meets AOA requirements. That, however, says nothing about the AOA's control over its purported agent, the OPTIs. Plaintiffs allege no facts describing AOA having any control over how the OPTIs perform their duties. The Court agrees with the F&R that Plaintiffs fail to allege sufficient facts that OPTI-West is AOA's agent. This portion of the F&R is adopted, as supplemented herein.

### b. Western

Plaintiffs argue that Western is OPTI-West's agent. The Court has reviewed the issue *de novo* and adopts this portion of the F&R.

### c. Good Sam

Plaintiffs argue that Good Sam is the agent of SHSI and the Sister Hospitals, or that all the entities are agents of one another. The F&R rejected this argument, analyzing the documents attached to the complaint. Plaintiffs argue that the F&R ignored many references in the attached documents that support that all six entities collectively are the "base institution" for AOA accrediting. Plaintiffs also argue that the F&R improperly weighed the evidence by evaluating the various references contained in different documents and analyzing their effect. The Court finds that the documents are unclear about what constitutes the "base institution." At this stage of the litigation, the documents provide enough support that Plaintiffs' allegation that SHSI, Good

Sam, and the Sister Hospitals together form the "base institution" is plausible. The Court thus declines to adopt the contrary conclusion in the F&R.

Accepting as true Plaintiffs' allegation that the Samaritan Entities collectively form the "base institution" for purposes of AOA's accreditation, however, does not mean that the entities are the agents of one another. Plaintiffs do not explain how that fact equates to a nonemployee agency relationship among the entities. As noted above, a nonemployee agency relationship requires that the principal has the right to control the physical details of the manner of performance of conduct of the agent. *Vaughn*, 346 Or. at 139. Plaintiffs point to no allegations showing SHSI's or any Sister Hospital's alleged control over Good Sam or over one another. Plaintiffs highlight allegations relating to the general involvement of the Sister Hospitals in the teaching program. Plaintiffs allege that when Good Sam terminated Natkin he lost privileges at all Sister Hospitals. Plaintiffs further allege that some doctors related to Natkin's medical teaching program were not on Good Sam's staff but were on the medical staff of a Sister Hospital, supporting that other Sister Hospitals were involved with the teaching program. These allegations, however, do not support any alleged *agency* relationship with Good Sam or among the Samaritan Entities. The allegations do not show that SHSI or any other entity had the right to control Good Sam or that Good Sam was acting on the behalf of SHSI or any other entity. That the Sister Hospitals also may have been a part of the osteopathic medical school does not make Good Sam an agent of SHSI or an agent of the Sister Hospitals.

**D. Claims**

**1. First Claim—Antitrust**

The Court has reviewed this issue *de novo*. The Court agrees with and adopts the reasoning and conclusions of the F&R.

## 2. Second Claim—Fraud

In the SAC, Plaintiffs added a new claim—fraud. Plaintiffs argue that California law applies to this claim. Some Defendants do not contest the choice of law issue and others assert Oregon law applies. Assuming without deciding that California law applies, the elements of fraud in California are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). Additionally, for state causes of action brought in federal court, the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure applies. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

Under California law, an allegedly fraudulent omission (nondisclosure) is actionable only if the omission is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 144. App. 4th 824, 835 (2006). The Ninth Circuit has set forth the elements of a fraudulent concealment claim under California law:

> The elements of fraudulent concealment are "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or

suppressed fact; and (5) plaintiff sustained damage as a result of
the concealment or suppression of the fact."

*Dent v. Nat'l Football League*, 902 F.3d 1109, 1125 (9th Cir. 2018) (quoting *Hambrick v.*

*Healthcare Partners Med. Grp., Inc.*, 238 Cal. App. 4th 124, 189 (2015)). The second element, a

duty to speak, "may arise when necessary to clarify misleading 'half-truths.'" *Boeken v. Philip*

*Morris, Inc.*, 127 Cal. App. 4th 1640, 1659 (2005). "This is because of the principle that 'where

one does speak he must speak the whole truth to the end that he does not conceal any facts which

materially qualify those stated. One who is asked for or volunteers information must be truthful,

and the telling of a half-truth calculated to deceive is fraud.'" *Pavicich v. Santucci*, 85 Cal. App.

4th 382, 398 (2000). A duty to disclose based on a half-truth, however, arises "only where there

is already a sufficient relationship or transaction between the parties. Where . . . a sufficient

relationship or transaction does not exist, no duty to disclose arises even when the defendant

speaks." *Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 312 (2017).

Plaintiffs allege that Dr. Clinton Adams, former Dean of Western and a mentor of

Natkin's, introduced Natkin in May 2009 to Dr. Alissa Craft, who was going to be the Director

of Medical Education ("DME") for the new residency program being developed at the Samaritan

Entities. SAC ¶ 9. The program was not yet ready, but Dr. Craft asked Natkin to keep in touch.

*Id.* Plaintiffs allege that Drs. Craft and Adams represented to Natkin that the program was

accredited, which impliedly contained representations that the program met the minimum

requirements for due process and fair procedure and that persons involved in the program met

minimum qualifications. SAC ¶ 68. Plaintiffs allege that these implied representations were false

and were material to Natkin's decision to apply to the program. SAC ¶¶ 69-70. Plaintiffs also

allege that "Defendants" (through *respondeat superior* liability for Drs. Craft and Adams'

conduct) intended that Natkin rely on the representations to perform his residency at the

Samaritan Entities. SAC ¶ 70. Plaintiffs further allege that Drs. Craft and Adams knew the representations were false or had no reasonable basis to believe they were true when the implied representations were made. SAC ¶ 71.

It is unclear whether Plaintiffs are alleging a claim for fraudulent concealment or a claim for fraudulent nondisclosure (omission). In any event, Plaintiffs have not alleged fraud with the requisite particularity. If the claim is one for omission, Plaintiffs have not alleged the actual representation that is contradicted by the alleged omitted fact. The representation that the program is accredited is a true statement that is not contradicted by any alleged omitted fact. That the program allegedly had unqualified staff and did not provide adequate procedure or due process for discipline does not contradict the fact that the program was accredited by the AOA.

If the claim is one for fraudulent concealment, Plaintiffs fail to allege with particularity the requisite relationship between Natkin and Dr. Craft creating a duty to disclose. *See Bigler-Engler*, 7 Cal. App. at 312; *see also LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997) ("[W]here material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts. . . . As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties." (emphasis in original)). Plaintiffs also fail to allege that Drs. Craft and Adams had the requisite knowledge that the statements were false or had the requisite intent to defraud Natkin. Plaintiffs may not simply allege the elements of fraud in a conclusory manner, as they have done here. Although knowledge and intent may be alleged generally under Rule 9(b), there must be *some* facts alleged on which plausibly to infer that Drs. Craft and Adams had some basis to know or understand that

the residency program did not or was not going to comply fully with AOA's accreditation requirements and intended to conceal that fact from Natkin.

A person knowing that a program is accredited and telling a student that fact, and the program later not living up to the standards of the accrediting agency is not by itself a sufficient basis to allege fraud against the recommender. For example, a college professor may tell a college student that a law school is accredited by the American Bar Association ("ABA") and the student may attend the law school based on that recommendation. If it later turns out that the law school is not complying with ABA standards, that does not mean the college professor committed fraud by telling the student that the law school was accredited by the ABA. That statement was factually correct. There must be some additional facts alleged to show that the college professor knew that the law school was not complying with ABA standards. Similarly, Plaintiffs cannot simply allege that Drs. Craft and Adams told Natkin that the program at Good Sam was accredited by AOA (which is true) and then allege that the program failed to live up to AOA's standards or to provide Natkin fair procedure, and label it "fraud." Those facts may be true, but they do not mean that Drs. Craft and Adams committed fraud by telling Natkin about an accredited program, even if they intended Natkin to apply to that program. Only if Drs. Craft and Adams knew that the program at Good Sam was inferior or not complying with AOA standards and concealed that information might they be subject to an allegation of fraud (although there would still be the problem of the requisite relationship needed between Dr. Craft and Natkin). This claim is dismissed.

### 3.  Third Claim—Breach of Fiduciary Duty, Right to Fair Procedure

Plaintiffs and various Defendants object to Judge Beckerman's findings and conclusions relating to this claim. The Court previously found that Plaintiffs sufficiently alleged unfair procedure with respect to Natkin's suspension and termination proceedings and against Vela,

Good Sam, and OPTI-West. These proceedings involved Vela and several other doctors. Because the Court rejects Plaintiffs' theory of joint liability against all Defendants, the question for liability on this claim is the employer of the individuals involved in Natkin's suspension and termination. In the Court's previous Opinion and Order, the Court noted that definitions of positions in the documents attached to the complaint were not a sufficient basis, absent any employment allegation in the complaint itself, on which to presume an employment relationship. Plaintiffs have partially cured this deficiency, by alleging in the SAC what entity they believe employs which person. Unfortunately, for many individuals involved, Plaintiffs allege that they are employed by nearly all Defendants based on Plaintiffs' rejected agency and other joint liability theories. For example, Plaintiffs allege that Dr. Jonathan Evans, as a faculty member of the medical school, is employed by the Samaritan Entities, Western, and OPTI-West and as Assistant Program Director ("PD") of the orthopedic surgical program is employed by the Samaritan Entities, Western, OPTI-West, and AOA. Employment allegations based on joint liability are rejected.

For employees of the Samaritan Entities, Plaintiffs argue that every employee of one entity is an employee of all entities because all Samaritan Entities form the "base institution." That six distinct legal entities are alleged collectively to form the base institution to provide medical training does not necessarily mean that every entity within that institution is the legal employer of every single employee. Plaintiffs provide no factual allegations supporting such a contention. Plaintiffs rely on a clause in the contract between Western and SHSI, which notes that the Samaritan Entities would "employ" residents. As the Court has held, this clause "does not mean that literally every single resident at all five hospitals will, for legal employment purposes, be an employee of SHS[I] and all five sister hospitals. An agreement between Western

and SHS[I] or between Opti-West and SHS[I] cannot legally define an employee-employer relationship between a third party such as Dr. Natkin and that third party's purported employer." *Natkin v. Am. Osteopathic Ass'n*, 2018 WL 452165, at *14 (D. Or. Jan. 17, 2018). The contracts do not preclude Good Sam and the Sister Hospitals from participating in the medical training while each having their own employees. Indeed, the contracts relied on by Plaintiffs as plausibly showing that the Samaritan Entities collectively form the base institution support that each hospital has its own separate staff. For example, the contract between the Samaritan Entities and Western defines "Chief of Staff" as "The Chief of Staff or designee from each SHS hospital" and defines "Medical Staff" as "The Medical Staff of each SHS hospital." ECF 145-5 at 3. Additionally, the general guidelines and bylaws of AOA and OPTI-West, although describing the duties, obligations, and responsibilities of a "base institution" in the singular, do not preclude a scenario in which the base institution consists of several distinct legal entities, each using their own separate employees to perform various required duties, obligations, and responsibilities.

Plaintiffs do not allege facts showing that all Samaritan Entities had the requisite control to be an employer of every single employee of every entity. *See Vaughn*, 346 Or. at 137 (noting that an employer must have the right to control the physical details of work, meaning how the work is performed). Nor do Plaintiffs allege that the various individuals had employment contracts with all the Samaritan Entities. For Natkin, as discussed in the F&R, the allegations in and attachments to the SAC show that Natkin was only an employee of Good Sam. The Court therefore rejects Plaintiffs' conclusory assertion that all the Samaritan Entities jointly employ every employee of each entity as implausible. The Court instead considers the specific allegations relating to each individual or to each position.

Defendants argue that Plaintiffs offer no more than a bare allegation of an employee/employer relationship, which is insufficient. Defendants cite the Court's Opinion and Order concluding that the statements in the documents defining employment positions, *absent an allegation of employment in the complaint*, were insufficient. The missing crucial piece was any allegation in the complaint of the purported employment relationship, which Plaintiffs have now added. At this stage in the litigation, an allegation in the SAC of an employment relationship, particularly one accompanied by the documents defining the employment relationship, is sufficient. Given the somewhat confusing and interrelated nature of the entities and the job positions, it is reasonable for Plaintiffs to rely on their best knowledge and the contracts between Defendants in alleging the various employment relationships.[2] Defendants may challenge the alleged employment relationship in a motion for summary judgment, or Plaintiffs may move to amend their complaint if discovery reveals that an individual is employed by a different entity than previously alleged.

The Court adopts the portion of the F&R rejecting the contention that any individual committed torts while in the course and scope of employment as a medical service provider. The Court thus focuses only on the individual's employment as a director, staff, or faculty member at Natkin's residency program. Plaintiffs' allegations relating to this claim support that the DME and PDs are employees of Western and SHSI.[3] Plaintiffs' allegations also support that SHSI was

---

[2] The Court allows more leeway in accepting these allegations than in the allegations that one entity is the agent of another entity, because each individual is employed by at least one of these entities. Plaintiffs are alleging each person's employer to the best of Plaintiffs' knowledge. Each entity, however, is not necessarily an agent of another entity and thus the Court requires sufficient factual allegations supporting the alleged agency relationship.

[3] The current allegations and documentation support that PDs are either OPTI-West faculty members who are appointed by SHSI to work at a specific residency program, approved by AOA, and paid by SHSI, or are Western faculty members who are appointed by Western to work at a specific residency program, approved by AOA, and paid by SHSI. It thus appears that

directly involved in Natkin's termination because Vela signed Natkin's termination letter on

behalf of SHSI. Plaintiffs' allegations involving Nancy Bell support that she is an employee of

SHSI. Plaintiffs' allegations involving Vela support that he is an employee of Good Sam, SHSI,

and Western.[4] As the Court previously held, Plaintiffs' allegations support that OPTI-West is the

employer of Dr. J. Michael Finley. The other persons involved in Natkin's suspension and

termination proceedings are associated with an employer based on the individual's position as a

PD or DME, and not based on direct allegations of employment. The direct allegations of

employment for these individuals assert that they are employed by all or nearly all Defendants

and are rejected as conclusory and based on the rejected theories of agency, conspiracy, or joint

venture.

In sum, the Court finds Plaintiffs' allegations are sufficient against the following

Defendants and based on *respondeat superior* liability with respect to the following individuals:

> Good Sam, as involved in the termination as employer of Natkin
> (direct allegation) and as employer of Vela (direct allegation);
>
> Vela, as involved in the termination (direct allegation);
>
> SHSI, as involved in the termination (direct allegation) and as
> employer of Vela (as PD & DME), Nancy Bell (direct allegation),
> Dr. Jonathan Evans (as PD), Dr. Jacqueline Krumrey (as PD),

---

a PD's employer may be OPTI-West, Western, SHSI, the hospital governing the specific
residency program (*e.g.*, Good Sam or another Sister Hospital), or some combination thereof. At
this point in the litigation, however, Plaintiffs' allegations support only Western and SHSI as the
employer. Because OPTI-West does not appoint its members to be PDs and is not alleged to pay
the PDs, the Court does not find that OPTI-West is sufficiently alleged to have the requisite
control over the PDs. Plaintiffs also allege no facts about the hospital governing the specific
residency program, either because Plaintiffs are unaware of such facts or because Plaintiffs
instead chose to rely on their joint employment theories.

[4] All of Western's objections to the F&R are based on Western's assertion that the SAC
does not sufficiently allege that Vela was employed by Western. Because this argument by
Western is rejected, all of Western's objections are resolved with this determination and they are
not discussed again.

Dr. Caroline Fisher (as PD), Dr. Sugat Patel (as PD), and Dr. Clint Evans (as PD);

Western, as employer of Vela (as PD & DME), Dr. Jonathan Evans (as PD), Dr. Caroline Fisher (as PD), Dr. Sugat Patel (as PD), and Dr. Clint Evans (as PD); and

OPTI-West, as employer of Dr. J. Michael Finley.

### 4. Fourth and Fifth Claims—Wrongful Termination

Plaintiffs object to the F&R interpreting Plaintiffs' claims as common law wrongful termination claims instead of statutory claims under Oregon Revised Statutes §§ 41.675 and 441.057. The Samaritan Defendants object to the F&R's conclusion that the claims for wrongful termination are sufficiently alleged against SHSI, and to the extent any claim is found to survive against Vela. The Samaritan Defendants note that the F&R concludes that only Good Sam was Natkin's employer and that only an employer can be held liable for wrongful discharge, and thus argue that this claim survives only against Good Sam.

The Court adopts the portion of the F&R finding that these claims assert common law wrongful termination in violation of public policy, with the public policy allegedly violated being the cited Oregon statutes. The Court does not adopt the portion finding that claims survive against SHSI or possibly Vela. An employment relationship is a necessary element in a claim for wrongful termination in violation of public policy. *Schram v. Albertson's Inc.*, 146 Or. App. 415, 426 (1997). Even if Natkin's termination letter was signed on behalf of SHSI, because Good Sam was Natkin's employer it is the only defendant against whom these claims survive. That SHSI or Natkin's supervisor Vela was involved in or encouraged Natkin's termination does not negate the requirement for an employment relationship. *Id.* at 428.

### 5. Sixth Claim—Intentional Interference with Contract

Plaintiffs, OPTI-West, and the Samaritan Defendants object to Judge Beckerman's findings and conclusions relating to this claim. The Court has reviewed this issue *de novo* and adopts this portion of the F&R.

### 6. Seventh Claim—Breach of Contract & Conspiracy to Breach Contract

Plaintiffs object to the F&R's conclusions about their breach of contract claim because Plaintiffs continue to assert their joint liability theories. Because the Court has rejected Plaintiffs' joint liability and joint employment theories, Plaintiffs' objections are without merit.

AOA objects to the F&R's conclusion that Plaintiffs sufficiently allege a breach of contract claim against AOA. AOA disagrees with the findings that Plaintiffs have alleged an enforceable relevant contract term against AOA. This portion of the F&R is adopted.

AOA also asserts that the F&R ignores additional arguments raised by the AOA in briefing its original motion to dismiss. AOA argues that Plaintiffs' breach of contract claim is implausible because it alleges some vague contractual duty to ensure that the Samaritan Entities provided adequate procedure and alleges no plausible manner in which that contractual term was breached or could have caused Plaintiff damages. AOA contends that the SAC alleges only two explanations for how AOA breached the purported contract. The first is by accrediting the Samaritan Entities in the first place. AOA argues that this alleged breach cannot support a claim because it occurred before Plaintiffs and AOA entered into their contract when Natkin entered his residency and thus cannot form a basis for breach of that contract. Plaintiffs assert, however, that Natkin was a student member of AOA before he entered the program at Good Sam and thus his contract with AOA predates AOA's accreditation of the Samaritan Entities. Thus, this argument by AOA is rejected.

AOA also challenges the second alleged breach of contract, the failure to investigate Natkin's complaint about the procedure given to him relating to his termination. This breach, argues the AOA, would not have avoided Natkin's alleged harm (his termination) and also is necessarily unreasonable because it would place every other resident in the program in significant harm. At this stage in the litigation, Plaintiffs' allegations are sufficient to support a claim for breach of contract. It is unknown what damages suffered by Plaintiffs may have been avoided had AOA not engaged in the alleged second breach. Although AOA could not have forced a reversal of Natkin's termination, if it had investigated Natkin's claim and determined that Good Sam and SHSI failed to provide adequate procedure, AOA's powerful position as the accrediting agency may have influenced Good Sam and SHSI's conduct and Plaintiffs' resulting damages.

### 7. Eighth Claim—Intentional Interference with Contract

Plaintiffs argue that if the Sister Hospitals are found not to be implied parties to the Residency Agreements between Good Sam and Natkin through agency or as employers as part of the "base institution," then the Sister Hospitals interfered with those contracts and are liable under this claim. Plaintiffs, however, have alleged no conduct by the Sister Hospitals. Because the Court has rejected Plaintiffs' theories of joint liability and joint employment and Plaintiffs have not alleged that the Sister Hospitals are direct employers of any of the individuals involved in the alleged torts, this claim is dismissed against the Sister Hospitals. The Court, however, has found that Plaintiffs adequately allege that Vela is an employee of SHSI, and thus this claim survives against SHSI.

The Samaritan Entities object to the F&R's conclusion that Plaintiffs state a claim against Vela. The Samaritan Entities argue that he cannot be liable because he is an employee of Good Sam, Good Sam is a party to the contract, and a party to the contract cannot interfere with the

contract. The F&R concluded that because Plaintiffs' allegations support that Vela was also

acting in the course and scope of employment for Western, he may be liable individually because

Western is a stranger to the contract. The Samaritan Entities argue that this conflicts with Oregon

law, asserting that "so long as the actor's conduct is within the scope of his or her authority and

is undertaken at least in part to further the best interests of the employer," the employee-actor is

not liable for a claim for intentional interference with economic relations. *Mannex Corp v.

Bruns*, 250 Or. App. 50, 54 (2012). Oregon courts have held that an employee may be personally

liable for intentional interference with an economic relationship of the employer if the employee

acts *solely* for his or her own benefit. *See, e.g. Sims v. Software Sols. Unlimited, Inc.*, 148 Or.

App. 358, 365 (1997).

If Vela were only employed by Good Sam, the line of cases cited by the Samaritan

Entities would be directly on point. The difference here, however, is that Vela is also employed

by Western. Vela thus is in the unique position of both being a party to the contract and immune

from this tort (as an employee-agent of Good Sam, unless Vela acted solely for his own benefit)

and a stranger to the contract and subject to this tort (as an employee-agent of Western,

regardless of whether Vela acted solely for his own benefit). Whether Vela acted solely for his

own benefit is only relevant to whether he can be liable for this tort in the context of his

employment with Good Sam. In the context of his employment with Western, however, it does

not matter whether Vela acted solely for his own benefit. The critical issue is whether the fact

that he was an employee of Good Sam in addition to being an employee of Western is dispositive

and makes Vela an employee-agent to a contracting party for all purposes. The Court does not so

hold and finds that if Vela is an employee of Western he may be liable for this tort. If it is shown

at summary judgment that Western did not have the requisite control over Vela and he was not

an employee of Western, then Vela would only be subject to liability for this tort as an employee of Good Sam if he acted solely for his own benefit.

OPTI-West objects that the alleged passive conduct of Dr. Finley attending Natkin's disciplinary proceedings by telephone but not voting to terminate Natkin is insufficient to state a claim for intentional interference with Natkin's residency agreement. Plaintiffs, however, allege that Dr. Finley participated in at least three disciplinary proceedings involving Natkin, including the meeting in which he was suspended allegedly without appropriate due process, the "emergency" meeting in which Natkin's termination was first voted on, and the appeal in which his termination was upheld and in which it is alleged Natkin was not provided appropriate due process. As a result of these meetings, Natkin was terminated and his termination was upheld. At this stage in the litigation, Dr. Finley's alleged participation is sufficient to state a claim.

### 8. Ninth Claim—Breach of Contract & Conspiracy to Breach Contract

The Court has reviewed the issue *de novo*. The Court agrees with and adopts this portion of the F&R, except the reference to rejecting Plaintiffs' argument about the "base institution."

### 9. Tenth Claim—Breach of the Implied Covenant of Good Faith and Fair Dealing

The Court has reviewed the issue *de novo*. The Court agrees with and adopts this portion of the F&R.

### 10. Eleventh Claim—Breach of Contract, Third-Party Beneficiary

Plaintiffs object to the F&R's conclusion that no third-party beneficiaries are intended in the underlying agreements among OPTI-West, Western, and AOA because the conclusion is based solely on the fact that the contracts contain a boilerplate clause disavowing the intent to create any third-party beneficiaries. The Samaritan Defendants respond that the Oregon Court of Appeals has held that the failure to name third-party beneficiaries, coupled with a contract's express disclaimer of such beneficiaries "is decisive" evidence that the parties did not intend to

create third-party rights. *Stonecrest Props, LLC v. City of Eugene*, 280 Or. App. 550, 557-58 (2016).

Regardless of whether a third-party beneficiary exclusionary clause is dispositive evidence of intent (as argued by the Samaritan Defendants) or evidence of intent to be given some other weight (as argued by Plaintiffs), Plaintiffs' third-party beneficiary allegations fail. Plaintiffs allege that medical training and education cannot exist without contracts between the accreditation agencies, the medical schools, the residency programs, and the hospitals. Plaintiffs allege that AOA, Western, OPTI-West, and the Samaritan Entities have entered into various agreements, some known and some unknown. Plaintiffs further allege, however, that those agreements include as intended beneficiaries the medical students and residents, who are intended beneficiaries because the agreements are to ensure that the students and residents receive from trained personnel a proper education that complies with AOA's requirements and offers fair procedure. It is this allegation that is unsupported by factual allegations or the attached documents.

Merely because OPTI-West entered into an agreement with AOA to handle certain of AOA's accrediting functions, or OPTI-West and Western entered in an agreement with SHSI relating to SHSI's residency program, and as a result medical students and residents will receive an education does not mean that the students are intended third-party beneficiaries to the contract. "Absent an intention *to confer a contract right* upon a third party who has paid no value, the contract will not be interpreted to promise performance to the third-party stranger to the contract even though the stranger may incidentally benefit from the contract." *Aetna Cas. & Sur. Co. v. Oregon Health Scis. Univ.*, 310 Or. 61, 65 (1990) (emphasis added). That medical students and residents will receive training from an accredited institution that is subject to some

guidelines or relationships described in other contracts does not mean that those students have been conferred *contractual rights*. The contracts at issue do not show an intent to confer contractual rights on third parties.

As for the unknown contracts referenced by Plaintiffs, the Court finds that Plaintiffs have not cured the deficiencies previously noted by the Court. Plaintiffs assert they merely needed to allege a basis that unknown contracts existed. The Court, however, found that "[a]bsent some factual basis for Plaintiffs' belief *that residents are an intended third-party beneficiary* in some more specific as-yet-unidentified contract, Plaintiffs' general allegation plausibly does not state a claim that Dr. Natkin is a third-party beneficiary of an unidentified contract." *Natkin*, 2018 WL 452165, at *15 (emphasis added). Plaintiffs allege that some vague contracts are common in the industry, but provide no plausible basis on which the Court can infer that those contracts confer contractual rights to third parties. This claim is dismissed.

### 11. Defamation Claims

Plaintiffs object to Judge Beckerman's findings and recommendations to dismiss the defamation claims against AOA and OPTI-West. The Court adopts these portions of the F&R.[5] Plaintiffs also object to the recommendation that their Twelfth Claim for Relief, the defamation claim based on statements made by Vela on FCVS, is time-barred. The Court adopts the F&R's analysis relating to equitable estoppel. Plaintiffs' arguments regarding the FCVS and the non-application of the "single publication" rule, however, need to be addressed.[6]

---

[5] The Court notes, however, that there is a scrivener's error in the portion of the F&R discussing OPTI-West's motion. On page 59 the F&R states that the SAC and Plaintiffs' briefing on the motion to dismiss "do explain how Dr. Vela's allegedly defamatory statements to decision-makers at other residency programs fell within the scope of Dr. Vela's employment as an Opti-West faculty member." That sentence should read "do *not* explain . . . ."

[6] Plaintiffs also assert that their "last overt act" theory argued to Judge Beckerman needs to be addressed. If Plaintiffs assert this as part of their alleged conspiracy, this theory is rejected

The appellate courts in Oregon have not addressed whether Oregon would apply the "single publication" rule. "Under the single publication rule, 'any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication.'" *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1130 (9th Cir. 2006) (quoting RESTATEMENT (SECOND) OF TORTS § 577A(3) (1977)). Accordingly, "the aggregate communication can give rise to only one cause of action in the jurisdiction where the dissemination occurred, and result in only one statute of limitations period that runs from the point at which the original dissemination occurred." *Id.* The single publication rule has been held to apply to postings on the internet because: (1) "[i]nternet publication is a form of 'aggregate communication' in that it is intended for a broad, public audience, similar to print media"; (2) "[i]n both print and Internet publishing, information is generally considered 'published' when it is made available to the public; and (3) "[o]nce information has been published on a website or print media, there is no further act required by the publisher to make the information available to the public." *Id.* at 1130-31 (footnotes omitted) (citing cases).

The Court finds that the Oregon Supreme Court likely would follow other jurisdictions in adopting the single publication rule. The Court also finds, however, that the Oregon Supreme Court likely would not find that information available on the FCVS is subject to the single publication rule. In so concluding, the Court finds persuasive the reasoning of the U.S. District

---

because the Court has rejected Plaintiffs' allegation of a conspiracy. If Plaintiffs argue that the alleged defamation was part of a continuing tort and the entire tort is subject to the statute of limitations based on the last overt act of the tort, such a theory is also rejected. Plaintiffs cite no Oregon decision applying the continuing tort doctrine to defamation claims, nor could the Court find authority supporting such a contention. Other jurisdictions have rejected such an application of the continuing tort doctrine. *See, e.g.*, *Lewis v. Gupta*, 54 F. Supp. 2d 611, 616 (E.D. Va. 1999) ("Repeated defamations do not constitute a continuing tort; rather, as courts have uniformly recognized, each separate defamatory statement itself constitutes a separate and distinct cause of action.").

Courts for the District of Nevada and the Western District of Tennessee, and the Texas Court of Appeals. *See Ashraf v. Adventist Health Sys./Sunbelt, Inc.*, 322 F. Supp. 3d 879, 882-886 (W.D. Tenn. 2018); *Williams v. Univ. Med. Ctr. of S. Nev.*, 2010 WL 3001707, at *4-6 (D. Nev. 2010); *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 888-89 (Tex. App. 2000).[7] Briefly, the rule is not applicable because the FCVS is not publicly accessible, the information posted is not distributed in the aggregate, and the information is not intended for a broad, public audience. Thus, each request for information is considered a "new" publication. As the Ninth Circuit explained in *Oja*, in distinguishing *Swafford v. Memphis Individual Practice Association*, 1998 WL 281935 (Tenn. App. 1998), an unpublished state court case involving the National Practitioner Data Bank ("NPDB"), a databank similar to the FCVS, such a publication is not subject to the single publication rule because:

> [The NPDB] provided allegedly defamatory information to health care entities which requested the information directly from the electronic data bank maintained by the NPDB. "Each transmission . . . was released in response to an affirmative request by a hospital or other health care entity" and the databank could be accessed only by certified health care entities. Accordingly, the court of appeals found that the single publication rule did not apply because each time a certified entity directly requested the information from the electronic data-bank held by the NPDB, the NPDB itself provided the information directly to the requesting entity.

> *Swafford* is distinguishable from our present concern, and is not inconsistent with application of the single publication rule to the vast majority of Internet publications. Unlike a typical Internet publication, the information at issue in *Swafford* was not available for the general public to access, nor could any unregistered and non-specific entities access the registered databank. Given the exclusive and controlled access to the NPDB "pay-to-play" databank, the release of the offending information could hardly be considered an "aggregate communication" comparable to typical

---

[7] The Court could not find, and the Samaritan Defendants did not cite, any case holding that information available on the FCVS is subject to the single publication rule.

Internet publication, where access is generally available to anyone at any time. Indeed, the limited access scenario set forth in *Swafford* resembles Oja's telephone call analogy where the agency releases the information anew each time there is a request. *Swafford* is much more akin to the release of personal credit reports by those agencies that track and compile credit information; in such cases, it has been widely accepted that the transmission or publication of the information does not warrant application of the single publication rule, and each transmission or publication is actionable.

*Oja*, 440 F.3d at 1133 (citations omitted).

Like the courts in *Ashraf*, *Williams*, and *Stephan*, the Court "concludes that in addition to adopting the single publication rule, [Oregon] also would follow *Oja*, *Swafford*, and the Restatement's comment regarding the difference between general internet publishing and a second publication of the same information to a new audience." *Williams*, 2010 WL 3001707, at *6. As a result, "a report to the [FCVS] database is not the same as a single edition of a newspaper. It can be accessed only by a select group of individuals and only upon their request. It is not widely and generally available and thus is not a single, aggregate publication." *Id.* The Court finds that "[e]ach time the information is released to a requester, it is published anew." *Id.*

Plaintiffs argue that if the single publication rule does not apply, then Plaintiffs' Twelfth Claim for Relief survives with respect to Plaintiffs' application to Pennsylvania for a medical license because Pennsylvania did not issue Natkin's medical license until November 12, 2014, which is within the limitations period. The Samaritan Defendants argue that no matter when Natkin's Pennsylvania medical license was *issued*, the determinative date is when Pennsylvania obtained the information from FCVS. The Samaritan Defendants further argue that because Plaintiffs did not allege in the SAC the date that Pennsylvania received the information from the FCVS (or even the date that Pennsylvania issued Natkin's medical license), Plaintiffs cannot avoid the statute of limitations. The fact that no date is alleged, however, means that the

Samaritan Defendants cannot rely on the statute of limitations on a motion to dismiss. If the allegations in the SAC are insufficient to show that the defense applies, then the Samaritan Defendants must wait to raise this defense in a motion for summary judgment. Plaintiffs, however, concede that the statute of limitations applies to their claim based on Natkin's applications to Utah and Colorado if the Court does not apply equitable tolling or Plaintiffs' last overt act theory. Thus, the Court partially dismisses the Twelfth Claim for Relief, based on those allegations. The Twelfth Claim for Relief survives only with respect to Natkin's application to Pennsylvania.

The Samaritan Defendants object to the F&R's conclusion allowing Plaintiffs' defamation claims to proceed that are based on Vela's alleged statement that Plaintiff was terminated in his fourth year of residency. The Samaritan Defendants argue that such claims must fail because that statement is true. Plaintiff's FCVS claim alleges that Vela posted the following libelous statements:

> Dr. Natkin was placed on academic probation several times for unprofessional behavior and failure to meet academic standards of professional conduct. [D]r. Natkin received no academic credit for PGY4

SAC ¶ 36. The SAC further alleges that Vela made similar allegedly slanderous statements by telephone to various persons, stating that Natkin had been placed on probation multiple times, had presented several "fractures" with the intent of humiliating the attending physician, had difficulties working with junior attending physicians, and that it was terrible to work with Natkin. In the context of the surrounding allegedly false statements, Plaintiffs argue that the truthful statement that Natkin did not receive credit for his fourth year of residency contained a negative connotation that Plaintiffs allege was defamatory. At this stage in the litigation, the Court finds that this claim is adequately alleged.

### 12. Numerous Claims—Intentional Interference with Economic Relations

The Court adopts the reasoning and analysis of the F&R in finding that these claims are stated only against Vela and the entities that have *respondeat superior* liability for Vela (Good Sam, SHSI, and Western).

### 13. 139th Claim—California's Unfair Practices Act

The Court has reviewed the issue *de novo*. The Court agrees with and adopts the F&R's reasoning and analysis.

### 14. The *Horowitz* Doctrine

OPTI-West argues that in finding that the conduct alleged may have equated to "such a substantial departure from accepted academic norms as to demonstrate that the *person or committee* responsible did not actually exercise professional judgment" and thus the *Horowitz* doctrine may not apply, the F&R focused on conduct of Vela and not Dr. Finley. ECF 174 at 70 (emphasis added) (quoting OPTI-West's motion to dismiss). The F&R, however, noted that Dr. Finley was involved in several relevant meetings and that Vela allegedly entered one meeting and stated that he had decided to terminate Natkin and no vote was held. These allegations support the contention that the committee involved simply accepted Vela's statement and demanded no discussion or a vote, and thus the committee members allegedly did not perform their professional obligations, as well as the allegation that Vela failed to perform his professional obligations. Accordingly, at this stage in the litigation the allegations are sufficient to preclude application of the *Horowitz* doctrine against OPTI-West.

Plaintiffs object that they argued several more reasons why the *Horowitz* doctrine should not apply and that the F&R only discussed one potential reason. Plaintiffs assert that the reason applied may leave "issues of fact." The reason found in the F&R is sufficient to deny OPTI-West's motion to dismiss. Whether there are issues of fact is a question best saved for summary

judgment. If OPTI-West moves for summary judgment relying on the *Horowitz* doctrine, Plaintiffs may raise whatever arguments they may have in opposition.

### 15. Dismissal with or without Prejudice

The Samaritan Defendants object to the dismissal of any claim without prejudice. They argue that Plaintiffs previously were given express and detailed guidance by the Court and if Plaintiffs failed properly to allege claims in the SAC they should not be given yet another attempt to allege claims. The F&R recommends dismissing Plaintiffs' antitrust claim with prejudice and is silent with respect to the remaining dismissals. The Court considers this silence to mean that the remaining dismissals are recommended to be without prejudice. The F&R, however, does not grant Plaintiffs leave to file an amended complaint. Thus, if Plaintiffs wish to file a third amended complaint, Plaintiffs will have to request leave and follow Rule 15 of the Federal Rules of Civil Procedure and Local Rule 15-1.

### E. Disposition of Claims

For clarity, the Court describes below what claims remain in the SAC and against which Defendants:

1. Third Claim, Fair Procedure—against Good Sam, SHSI, Vela, Western, and OPTI-West;

2. Fourth and Fifth Claims, Wrongful Termination—against Good Sam;

3. Sixth Claim, Intentional Interference with AOA Contract—against Western, Good Sam, SHSI, Vela, and OPTI-West;

4. Seventh Claim, Breach of AOA Contract—against AOA;

5. Eighth Claim, Intentional Interference Good Sam Contract—against Vela, SHSI, Western, and OPTI-West

6. Ninth Claim, Breach of Good Sam Contract—against Good Sam;

7. Tenth Claim, Breach of Good Sam Contract Implied Covenant—against Good Sam;

8. Defamation Claims—against Vela, Good Sam, SHSI, and Western; Twelfth Claim only for application to Pennsylvania; and

9. Intentional Interference Claims based on Defamation—against Vela, Good Sam, SHSI, and Western.

In addition, the following claims are dismissed:

1. First Claim, Antitrust—against all Defendants, with prejudice;

2. Second Claim, Fraud—against all Defendants;

3. Third Claim, Fair Procedure—against AOA and the Sister Hospitals;

4. Fourth and Fifth Claims, Wrongful Termination—against all Defendants except Good Sam;

5. Sixth Claim, Intentional Interference with AOA Contract—against the Sister Hospitals;

6. Seventh Claim, Breach of AOA Contract—against all Defendants except AOA;

7. Eighth Claim, Intentional Interference Good Sam Contract—against AOA and Sister Hospitals;

8. Ninth Claim, Breach of Good Sam Contract—against all Defendants except Good Sam;

9. Tenth Claim, Breach of Good Sam Contract Implied Covenant—against all Defendants except Good Sam;

10. Eleventh Claim, Breach of Contract, Third Party Beneficiary—against all Defendants;

11. Defamation Claims—against Defendants AOA, OPTI-West, and the Sister Hospitals, Twelfth Claims for applications to Utah and Colorado; and

12. Intentional Interference Claims based on Defamation—against AOA, OPTI-West, and the Sister Hospitals.

## CONCLUSION

The Findings and Recommendation (ECF 174) is adopted in part, as set forth in this

Opinion and Order. The motions to dismiss filed by AOA (ECF 147), Western (ECF 148), OPTI-

West (ECF 149), and the Samaritan Defendants (ECF 150) are GRANTED IN PART and DENIED IN PART, as set forth herein.

**IT IS SO ORDERED**.

DATED this 22nd day of April, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge