# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DR. ERIK NATKIN, D.O. P.C.**, a Utah corporation; and **DR. ERIK NATKIN, D.O.**, an individual<br><br>Plaintiffs,<br><br>v.<br><br>**AMERICAN OSTEOPATHIC ASSOCIATION**, *et al.*,<br><br>Defendants. | Case No. 3:16-v-1494-SI<br><br>**OPINION AND ORDER** |

Benjamin Natkin, LAW OFFICES OF BENJAMIN NATKIN, 9854 National Boulevard, Suite 369, Los Angeles, CA 90034; and Clark E. Rasche, WATKINSON LAIRD RUBENSTEIN PC, P.O. Box 10567, Eugene OR 97440. Of Attorneys for Plaintiffs.

Blake J. Robinson and Caitlin P. Shin, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland OR 97201. Of Attorneys for Defendants Samaritan Health Services, Inc.; Good Samaritan Hospital Corvallis; and Dr. Luis R. Vela, D.O.

J. Michael Porter and Jollee Faber Patterson, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204; and Mark H. Meyerhoff and Christopher S. Frederick, LIEBERT CASSIDY WHITMORE, 6033 West Century Boulevard, Fifth Floor, Los Angeles, CA 90045. Of Attorneys for Defendant Western University of Health Sciences.

Michael C. Lewton, COSGRAVE VERGEER KESTER LLP, 900 SW Fifth Avenue, 24th Floor, Portland, OR 97204; John R. Danos, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071; and Joshua P. Dennis, SCHWABE, WILLIAMSON & WYATT, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant American Osteopathic Association.

PAGE 1 – OPINION AND ORDER

Thomas R. Rask III, KELL ALTERMAN & RUNSTEIN LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204; and Ronald Thomas Vera and Robert P. Johnston, LAW OFFICES OF VERA AND BARBOSA, 223 West Foothill Boulevard, Suite 200, Claremont, CA 91711. Of Attorneys for Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium.

**Michael H. Simon, District Judge.**

Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium (OPTI-West) moves for summary judgment against Plaintiffs' remaining claims, breach of the common law duty of fair procedure and tortious interference with economic relations. OPTI-West argues that the claims are barred under the principles described by the Supreme Court in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978), and its progeny, requiring deference to academic decisions. OPTI-West also argues that Plaintiffs fail to raise a genuine issue of material fact that OPTI-West had a duty to provide Plaintiff Dr. Eric E. Natkin (Natkin) with fair procedure or caused him to be deprived of fair procedure, or that OPTI-West tortiously interfered with Natkin's contracts. For the following reasons, viewing the facts in the light most favorable to Plaintiffs as the Court must at summary judgment, the Court finds that *Horowitz* does not apply and that Plaintiffs have raised issues of fact for the jury on their claims against OPTI-West and thus denies OPTI-West's motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Defendant American Osteopathic Association (AOA) serves as the accrediting agency for osteopathic medical schools and hospitals like Good Samaritan Hospital Corvallis (also known as Good Samaritan Regional Medical Center) (Good Sam), where Natkin was a resident. OPTI-West is a California corporation that oversees and administers the AOA's requirements for medical schools within its region. OPTI-West has oversight over the residency programs within its region, including at Good Sam. Defendant Samaritan Health Services, Inc. (SHS) is the parent company of Good Sam.

SHS started a new orthopedic residency program, including at Good Sam.[1] OPTI-West helped SHS develop its procedures and provided guidance to SHS and Good Sam on how to run its residency program.[2] Natkin was in the first class of orthopedic surgery residents at Good Sam. At the time Natkin began his medical residency, Dr. Luis Vela, D.O. (Vela), was the Program Director (PD) for the orthopedic surgery program, and Dr. Alissa Craft was the Director of

---

[1] There are other hospitals along with Good Sam in the SHS family of hospitals, but only Good Sam is relevant for purposes of this motion.

[2] AOA provides a process under which doctors of osteopathy can become board certified in orthopedic surgery. *See generally* https://certification.osteopathic.org/orthopedic-surgery/.

Medical Education (DME). After one year, Dr. Craft left and Vela became the DME, while also continuing to serve as the PD for the orthopedic surgery program.

During Natkin's fourth year of residency, Dr. Seth Criner, D.O., another orthopedic surgery resident, planned a "fracture conference" for September 27, 2013, during which the medical students and residents examined fracture cases that had come into the emergency department. It is a confidential process in which the more senior residents ask questions of the more junior residents and medical students, and those involved both compliment and criticize the medical treatment that had been performed. It is meant to be a learning process. Dr. Criner chose 12 cases for this fracture conference, most of which involved procedures that he believed had poor outcomes or were otherwise controversial. Dr. Criner believed those type of cases provided the best opportunity for learning. Dr. Criner chose three cases in which Dr. Richard Stanley had performed the procedures. Of the 12 cases Dr. Criner had selected, he was only able to present eight before he had to end the conference because of time constraints. He and Natkin were the only senior residents able to attend this conference. Dr. Criner attests that Natkin asked only appropriate questions and that Dr. Stanley's name was never mentioned.

After this conference, on October 1, 2013, Natkin was directed to meet with Vela and two other management personnel. Vela accused Natkin of "colluding" with Dr. Criner to present cases at the fracture conference to make Dr. Stanley "look bad." Unbeknownst to Natkin until near the end of the meeting, Dr. J. Michael Finley, D.O. (Finley), Chief Academic Officer of OPTI-West during the relevant period, was attending the meeting by telephone. When asked his opinion on the matter, Finley questioned Natkin's professionalism and stated that residents must behave in a professional manner. Natkin was then suspended pending further investigation and a

PAGE 4 – OPINION AND ORDER

meeting of the Graduate Medical Education (GME) Committee. On October 7, 2013, Good Sam terminated Natkin's medical residency.

Dr. Criner states that no one involved in the disciplinary process of Natkin interviewed Dr. Criner about the fracture conference until after Natkin was terminated. Dr. Criner also describes his experience after leaving Good Sam, which includes teaching residents. He explains that Natkin's conduct at the fracture conference should not have resulted in any discipline, let alone being fired from his residency. He explains what he perceives as the problems with Good Sam and SHS's disciplinary process of Natkin and that OPTI-West should have enforced proper due process but failed to do so.

Dr. Todd Lewis, MD, who was a medical staff member at Good Sam for 32 years, including as Chief of Staff, Chief of Surgery, and Chief of Orthopedics, also submitted a declaration in support of Plaintiffs. Dr. Lewis explains that he was a faculty member of the orthopedic residency program at Good Sam and is familiar with the program's procedures and policies. Dr. Lewis explains what he considers to be the deficiencies in the process provided to Natkin and the lack of an underlying basis for disciplinary action.

Natkin appealed his termination to the hospital, following the grievance policy of the hospital. The first level appeal was to the hospital. Vela appointed the appeal committee, which consisted of three members of the GME Committee (the committee that had voted to terminate Natkin). Vela and Finley also attended the appeal committee hearing. Minutes from the hearing reflect that one appeal committee member expressed concern that Natkin had not received sufficient process. Finley then stated that the appeal committee should view Natkin's appeal through an "academic lens" and consider whether Natkin followed the program, whether "evaluations and notifications [were] done, [and] was roadmap followed[.]" ECF 268-5 at 23.

Finley emphasized that Natkin was "not an employee, but resident following learning plan" and that "academic law is a shortened process. Most medical staff issues have a long process because you are talking about a physician in practice. A student gets the mark or does not." *Id.* After that, the meeting wrapped up and the committee decided to meet the next day to make its final decision. The next day the committee affirmed the termination of Natkin's residency.

According to Natkin, the hospital's Grievance Policy provides that after appealing to the hospital, a student may appeal to OPTI-West, and then to AOA. The parties did not provide the Court with a copy of the referenced Grievance Policy. The AOA's Basic Documents for Post-Doctoral Training, which is the model for residency programs, however, provides in its grievance procedure section that appeals to AOA may not be filed until after a resident or medical student first tries to resolve the problem with the hospital, base institution (which, here, is Western University of Health Sciences), or OPTI-West. Natkin states that he believed appealing to OPTI-West would be futile because Finley had already expressed his opinion about Natkin's situation. Still, Natkin asked AOA whether he should take the intermediate step and appeal to OPTI-West. After AOA confirmed that Natkin need not take that step, Natkin appealed directly to AOA. AOA affirmed Natkin's termination.

## DISCUSSION

### A. Challenges Unrelated to the Merits

Plaintiffs make several arguments unrelated to the merits of OPTI-West's motion. Plaintiffs argue that OPTI-West did not properly confer under Local Rule 7-1(a)(2) because OPTI-West did not describe each claim and argument of the summary judgment motion. The Court finds that OPTI-West sufficiently conferred for purposes of this motion.

Plaintiffs also raise many evidentiary objections. The objection to the declaration of Dan Miulli, D.O., is well taken. Plaintiffs point out that Dr. Miulli was not disclosed as potential

witness in OPTI-West's initial disclosures. OPTI-West responds that Dr. Miulli was hired after OPTI-West made its initial disclosures. OPTI-West, however, must supplement its initial disclosures under Rule 26(e)(1) of the Federal Rules of Civil Procedure.[3] This error is harmless, however, because OPTI-West provides the same information through a supplemental exhibit of Finley.

Plaintiffs' remaining objections go the admissibility of the form of the submitted evidence. In evaluating facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that

---

[3] Going forward, however, Plaintiffs are now on notice that Dr. Miulli is a potential witness.

would be admissible in evidence"). Plaintiffs do not object under Rule 56(c)(2) that the material cited *cannot* be presented in a form that *would be* admissible at trial. Thus, the Court overrules the evidentiary objections. The Court will only consider evidence appropriate for consideration at summary judgment.

Finally, Plaintiffs move under Rule 56(d) of the Federal Rules of Civil Procedure that the Court delay or defer ruling on OPTI-West's motion until Plaintiffs can take additional discovery. Because the Court finds that Plaintiffs have raised a genuine dispute of material fact based on the current record before the Court, the Court denies Plaintiffs' motion under Rule 56(d) as moot.

## B. Whether the Decision was Academic or Disciplinary

OPTI-West's first argument is that Plaintiffs' claims are barred by the Supreme Court's decisions in *Horowitz* and *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985). For purposes of this motion, the Court assumes without deciding that *Horowitz* and *Ewing* could potentially apply to Natkin's termination.[4]

---

[4] There are several concerns with the potential applicability of *Horowitz* and *Ewing*. First, the Supreme Court in these cases analyzed whether the institutions provided "at least as much due process as the Fourteenth Amendment requires." *Horowitz*, 435 U.S. at 85. Here, however, Plaintiffs' claims arise under state tort law. Second, these cases involve "Judicial interposition in the operation of the public school system of the Nation." *Horowitz*, 435 U.S. at 91 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). Good Sam is a private institution. Third, these cases involve medical students, and Natkin was a resident. There is a meaningful difference, as OPTI-West's own contract with SHS describes. For example, OPTI-West required SHS to "employ" residents, and to provide residents with "salaries, health insurance, worker's compensation insurance, professional liability insurance, disability insurance, applicable taxes and other fringe benefits, including a Continuing Medical Education expense allocation." ECF 279-1 at 5-6. These are requirements more aligned with a status as an employee rather than as a mere student. In contrast, SHS did not "employ" medical students and was expressly prohibited from compensating students or providing them with benefits. *Id.* at 7-8. SHS was only allowed to ensure that students were covered by professional liability insurance. *Id.* at 8. Because the Court concludes that *Horowitz* and *Ewing* do not apply to the particular circumstances of Natkin's termination, the Court need not decide this threshold legal question at this stage of the litigation.

PAGE 8 – OPINION AND ORDER

*Horowitz* recognized the distinction between "misconduct" and "failure to attain a standard of excellence in studies." 435 U.S. at 87 (quoting *Barnard v. Inhabitants of Shelburne*, 216 Mass. 19, 102 N.E. 1095 (1913)). The Supreme Court in *Horowitz* contrasted "[a]cademic evaluations of a student" with "disciplinary determinations" in terms of the amount of process needed, because academic decisions are by their "nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision." *Id.* at 89-90. The Supreme Court explained:

> [We have] concluded that the value of some form of hearing in a disciplinary context outweighs any resulting harm to the academic environment. Influencing this conclusion was clearly the belief that disciplinary proceedings, in which the teacher must decide whether to punish a student for disruptive or insubordinate behavior, may automatically bring an adversary flavor to the normal student-teacher relationship. The same conclusion does not follow in the academic context.

*Id.* at 90.

OPTI-West repeatedly describes SHS and Good Sam's process with Natkin as a "disciplinary" process. OPTI-West also quotes the "Discipline Involving Residents and Students" clause in its contract with SHS to support its argument that SHS and not OPTI-West had the authority to make the disciplinary decision about Natkin. Yet in asserting that *Horowitz* and *Ewing* apply to bar Plaintiffs' claims, OPTI-West argues that the decision was academic, and not disciplinary.

Viewing the facts in the light most favorable to Plaintiffs, as the Court must do when considering OPTI-West's motion for summary judgment, the Court finds that there is at least a genuine issue of fact as to whether the decision was academic or disciplinary. Natkin was called to a meeting shortly after the fracture conference and the meeting was about Natkin's alleged conduct at the fracture conference of purportedly "colluding" with another resident to make an

PAGE 9 – OPINION AND ORDER

attending physician look bad. Natkin was suspended at that meeting and his medical residency was terminated a few days later. Dr. Lewis describes that Natkin's file does not show any other disciplinary or academic problems, let alone any that would support termination. Natkin also disputes statements made by Vela regarding Natkin's purported history, including that he previously had been put on probation. Further, there is no documentation in the record showing that Natkin had been put on probation. It is a reasonable inference, therefore, that he was suspended and terminated as discipline for his alleged misconduct at the fracture conference.

OPTI-West argued at the hearing on the pending motion that the process was disciplinary for SHS but academic for OPTI-West, because OPTI-West serves the role of an academic advisor to SHS. The Court rejects this argument. The process was either disciplinary or academic—it did not have a different character for Finley as he attended the meetings and appeal hearings and a separate character for all other attendees. Whatever OPTI-West's contracted role, if Finley chose to participate in a disciplinary process, he was participating in a disciplinary process, and it did not change to an academic process only for him because OPTI-West generally plays a role in the academic aspects of SHS.

If the process through which Natkin was terminated was disciplinary, *Horowitz* and *Ewing* do not apply. *See Horowitz*, 435 U.S. at 89-90. Because there is a genuine of issue of fact whether the process was disciplinary, OPTI-West's argument that these cases bar Plaintiffs' claims is rejected at this stage of the litigation.

## C.  Oregon's Common Law Right to Fair Procedure

OPTI-West argues that it is entitled to summary judgment because it did not owe any fair procedure to Natkin, and because even if it did, it did not violate his right to fair procedure. The right to fair procedure does not require a fiduciary duty in the traditional sense, but requires organizations that have the "practical power . . . to affect substantially an important economic

interest." *Ezekial v. Winkley*, 20 Cal. 3d 267 (1977). These interests include licenses such as dental and medical licenses, or unions that can preclude all employment in a field. *Heath v. Redbud Hosp. Dist.*, 620 F.2d 207, 210 (9th Cir. 1980).

There is sufficient evidence in the record to raise a genuine issue of fact as to whether OPTI-West had the practical power substantially to affect Natkin's ability to get a Board certified specialty in orthopedic surgery. OPTI-West helped draft the policies and procedures that SHS and Good Sam used to discipline Natkin. OPTI-West also was responsible for ensuring that SHS and Good Sam complied with AOA's requirements, as well as other legal and licensing requirements. OPTI-West's 2012 contract with Good Sam provides that OPTI-West will perform oversight over the quality of Good Sam's program for AOA's accreditation purposes, including performing reviews of the program, collecting and reporting data, and having oversight over corrective action plans to correct deficiencies. OPTI-West's 2008 contract with SHS provides similar oversight.

Indeed, OPTI-West could begin a process that would result in SHS and its affiliated hospitals no longer being able to recruit residents and medical students. Additionally, although the 2008 contract provides that discipline involving residents and students shall be in the "sole opinion" of SHS, the contract also requires that any investigation and disciplinary proceedings must be conducted pursuant to "applicable statutory, procedural, or common law rule as outlined in the OPTI-West approved resident contract." Further, OPTI-West was responsible to ensure that SHS and Good Sam followed all applicable rules and laws.

OPTI-West could affect SHS and Good Sam's accreditation and status as a teaching hospital. OPTI-West also had oversight over whether SHS and Good Sam complied with the applicable rules and laws when conducting disciplinary investigations and proceedings. It is thus

a reasonable inference that OPTI-West had substantial influence over SHS and Good Sam and Finley's participation and comments in Natkin's disciplinary process would have substantial sway, even though under the contract, SHS makes disciplinary decisions on its own.

OPTI-West also is involved on the resident-side of the equation. OPTI-West is the entity to whom residents file their second-level appeal after appealing to the hospital. OPTI-West thus has a direct role in providing residents potential recourse when their license or specialization is on the line. This also supports the inference that OPTI-West has the practical power to affect the substantial economic interest of residents. Here, Natkin believed it would be futile to appeal to OPTI-West because Finley had repeatedly expressed his opinion about Natkin's situation, both in the initial meeting and at the appeals hearing. Natkin asked AOA whether he should nonetheless appeal to OPTI-West and AOA had Natkin skip that step and appeal directly to AOA. That Natkin did not appeal to OPTI-West does not detract from OPTI-West's role and its practical power to affect Natkin's economic interest. Natkin did not take advantage of OPTI-West as a direct appeal because Natkin believed Finley to be too biased.

OPTI-West also argues that even if it did have the requisite duty, or practical power, Finley was merely a neutral observer making factual statements. Plaintiffs provide sufficient evidence at this stage, viewing the facts in the light most favorable to Plaintiffs, to raise a triable issue regarding Finley's conduct in the asserted deprivation of Natkin's right to fair procedure. Plaintiffs contend that: (1) OPTI-West admitted that it receives copies of complaints before they get elevated to AOA and must assess the allegations; (2) OPTI-West did not produce any documents demonstrating that SHS notified OPTI-West about issues with any other resident but SHS shared many details about Natkin's situation with OPTI-West before key meetings; (3) Finley sat in on all the disciplinary meetings involving Natkin; (4) Finley specifically

commented on Natkin's "lack of professionalism" during the first meeting; and (5) Finley suggested to the appeals committee that Natkin did not need any added process when the appeals committee was questioning whether Natkin received adequate process. The appeals committee then adjourned, and the next day the appeals committee affirmed Natkin's dismissal. Plaintiffs also provide the declaration of Dr. Lewis, who states that Nakin was not provided sufficient process and that SHS and Good Sam failed to follow their own procedures, and Dr. Criner, who states that OPTI-West failed in its duty to ensure that proper process was followed in the discipline of Natkin.

Finley told the appeals committee that the process was academic, when it may have been disciplinary, that Natkin was not an employee, even though the OPTI-West contract requires that SHS and Good Sam "employ" residents, and that the process for Natkin was "shortened." Finley essentially told the appeals committee that Natkin did not require any further process. Given this level of participation, along with the other evidence of OPTI-West's role, Natkin has raised factual issues for the jury as to whether OPTI-West deprived Natkin of fair process by its role in the disciplinary process.

**D.  Intentional Interference with Contract**

OPTI-West argues that Plaintiffs cannot show that OPTI-West "intentionally" interfered with Natkin's contracts, that the interference was causally connected to any harm to the contractual relationship or economic advantage, or that OPTI-West acted through an improper means or with an improper purpose. These arguments are based on OPTI-West's position that Finley was merely a passive observer sitting on the phone who played no role in Natkin's termination. The Court, however, has rejected this argument, finding triable issues regarding Finley's role in the deprivation of Natkin's right to fair procedure. This also provides both the

"improper means" element and the intentionality required for this tort. Thus, the Court denies OPTI-West's motion on this claim.

## CONCLUSION

The Court DENIES OPTI-West's motion for summary judgment, ECF 261.

**IT IS SO ORDERED**.

DATED this 23rd day of January, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge