IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DR. ERIK NATKIN, DO PC, a Utah corporation; and DR. ERIK NATKIN, DO, an individual,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>AMERICAN OSTEOPATHIC ASSOCIATION *et al.*,<br><br>　　　　　　　Defendants. | Case No. 3:16-cv-01494-SI<br><br>**SUPPLEMENTAL DISCOVERY ORDER ON PLAINTIFFS' MOTION TO COMPEL** |

**BECKERMAN, U.S. Magistrate Judge.**

This matter comes before the Court on the district judge's remand of plaintiffs Dr. Erik Natkin ("Dr. Natkin") and Dr. Erik Natkin, DO PC's (together, "Plaintiffs") motion to compel defendants Samaritan Health Services, Inc. ("SHS"), Good Samaritan Hospital Corvallis, and Dr. Luis R. Vela, DO ("Dr. Vela") (together, the "Samaritan Defendants") to produce additional documents responsive to Plaintiffs' First Request for Production of Documents. (*See* ECF No. 258.)

///

PAGE 1 – SUPPLEMENTAL DISCOVERY ORDER

The Court previously entered an order on May 11, 2022 granting in part and denying in part Plaintiffs' motion to compel (Discovery Or., ECF No. 238), which Plaintiffs appealed to the assigned district judge (ECF No. 251). The district judge adopted the discovery order in part, but remanded in part to allow this Court to explain its proportionality analysis in greater detail with respect to Plaintiffs' Requests for Production Nos. 8-11, 17, and 19-21. (ECF No. 258.) This Court heard oral argument on the remanded portion of the discovery order on December 2, 2022 (ECF No. 267), and thereafter both parties filed supplemental briefs in support of their respective positions. (ECF Nos. 275-77.) For the reasons discussed below, the Court now supplements its prior discovery order.

## BACKGROUND

In the remand order, the district judge noted that Plaintiffs generally objected that this Court did not perform a sufficiently thorough proportionality analysis because it did not expressly consider whether Plaintiffs could obtain the requested evidence elsewhere, and it did not require the Samaritan Defendants to provide specific evidence of the burden to produce the requested discovery. (ECF No. 258 at 15-16.) The district judge remanded the matter in part for this Court to make express findings regarding the relevant proportionality factors, and to address more explicitly whether the burden on the Samaritan Defendants outweighed the likely benefit of the requested discovery. (*Id.*)

## LEGAL STANDARDS

Federal Rule of Civil Procedure 26(b)(1) provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" FED. R. CIV. P. 26(b)(1). Rule 26 lists the relevant proportionality factors: "the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*; *see also DelVecchia v. Frontier Airlines, Inc.*, No. 2:19-cv-01322-KJD-DJA, 2022 WL 3143322, at *5 (D. Nev. Aug. 5, 2022) (denying the plaintiffs' motion to compel the defendant to produce evidence of unrelated complaints because the plaintiffs did not make a threshold showing that the evidence was "relevant and proportional").

Although the federal rules have always required proportionality in discovery, Rule 26(b)(1) was amended in 2015 to "emphasize the need to impose 'reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *Eagle Air Med Corp. v. Sentinel Air Med. All.*, No. 2:18-cv-00680-JCM-PAL, 2018 WL 3370528, at *5 (D. Nev. July 10, 2018) (quoting Chief Justice John Roberts' 2015 Year-End Report on the Federal Judiciary). The goal of the amendments was to "provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery[,]" which "requires active involvement of federal judges to make decisions regarding the scope of discovery." *Id.* (noting that Chief Justice Roberts "beseeched judges and lawyers to 'engineer a change in our legal culture that places a premium on the public's interest in speedy, fair, and efficient justice[,]" and denying the plaintiffs' motion to compel in part because they did not demonstrate that the requested discovery was proportional to the needs of their case) (citation omitted).

///

///

///

# DISCUSSION

## I. PLAINTIFFS' PROPORTIONALITY OBJECTIONS

Plaintiffs focused their appeal of this Court's original discovery order on their complaints about the Court's finding that the discovery Plaintiffs seek is not proportional to the needs of the case. (Pls.' Appeal at 10, ECF No. 251, appealing the Court's proportionality rulings with respect to RFP Nos. 8-11, 17, and 19-21.) Plaintiffs generally argue that the discovery they seek is proportional because they are seeking damages in excess of $160 million, "against which any undue expense pales in comparison." (*Id.* at 5.) Plaintiffs further argue that they cannot obtain the requested discovery from another source, and that the Samaritan Defendants have "vastly greater resources" than Plaintiffs. (*Id.* at 6.) Plaintiffs also assert that the "importance factor" is satisfied where "the probative value of the sought after discovery is potentially substantial because it may be relevant to factual issues at the heart of [the parties' claims or defenses]." (*Id.*)

With respect to Plaintiffs' argument that the discovery they seek is proportional to the needs of the case because they are seeking $160 million in damages, the Court does not necessarily restrict its proportionality analysis to Plaintiffs' evaluation of the amount in controversy. While $160 million may be Plaintiffs' demand at trial, that number represents $10 million in economic damages and $150 million in emotional distress and punitive damages. Plaintiffs' disproportionate emotional distress and punitive damage numbers should not open the door to unlimited discovery here. The Court considers Plaintiffs' estimated economic damages of $10 million to be a more realistic gauge of the amount in controversy here.

Furthermore, Plaintiffs argue that they are entitled to the discovery they seek because the Samaritan Defendants have "vastly greater resources" than Plaintiffs. Although the parties' resources are a valid proportionality factor the Court must consider, a responding party's

resources will rarely tip the proportionality scale if the requested discovery is not particularly relevant. In other words, where the requested discovery is only marginally relevant to the case, even a modest burden of production may outweigh its benefit.

Any proportionality analysis must acknowledge that federal court litigation is costly for even the most well-resourced parties, and the court serves an important gatekeeping role to ensure that parties do not use far-reaching discovery requests as a weapon or for a punitive purpose. *See* FED. R. CIV. P. 1 (providing that courts have a duty to administer the federal rules to secure the "just, speedy, and inexpensive determination of every action and proceeding"); *see also Updike v. Clackamas Cnty.*, No. 3:15-CV-00723-SI, 2016 WL 111424, at *1 (D. Or. Jan. 11, 2016) ("There is a tension, however, among the objectives of Rule 1. As more discovery is obtained, more is learned. But at some point, discovery yields only diminishing returns and increasing expenses. In addition, as more discovery is taken, the greater the delay in resolving the dispute. Finding a just and appropriate balance is the goal, and it is one of the key responsibilities of the court in managing a case before trial to assist the parties in achieving that balance.").

## II.    REQUEST FOR PRODUCTION NOS. 8-9

Plaintiffs requested "[t]he files of any medical students, interns, residents, or fellows who were subjected to any disciplinary action, up to and including termination" (No. 8) and "[t]he files of any medical students, interns, residents, or fellows who resigned" (No. 9).[1] The Samaritan Defendants agreed to produce the files of any other orthopedic surgery residents who

---

[1] The Court assumes the common meaning of "intern" in this context to mean a physician in their first year of residency.

were subjected to formal discipline (including those who resigned in lieu of discipline) during Dr. Natkin's tenure.

### A. Original Discovery Order

In its original discovery order, the Court found that the discipline of other interns and residents in any SHS osteopathic residency program (i.e., not just orthopedic surgery) during the relevant time period is relevant to Dr. Natkin's claim that he was not provided due process and was treated differently than similarly situated individuals, because all of SHS's osteopathic residency programs appear to be governed by the same residency program sponsorship agreement and the American Osteopathic Association's Basic Document for Postdoctoral Training Programs, and all interns and residents appear to be supervised by the same director of medical education and subject to the same employment contract and rules in the House Staff Manual. (Discovery Or. at 3.) However, the Court found that medical students and fellows are not as closely situated to Dr. Natkin and therefore discovery of medical students' and fellows' files are only marginally relevant and not proportional to the needs of this case. (*Id.*) In any event, the Samaritan Defendants represented they do not maintain medical student files, and therefore only the files of fellows remain at issue. (*Id.* at 4; *see also* Defs.' Resp. at 5-6, ECF No. 257, confirming the Samaritan Defendants do not maintain medical student files.)

With respect to Request for Production No. 9, although the Court noted that files of individuals who resigned for reasons other than discipline are not necessarily relevant to Plaintiffs' claims, it understood that the request is intended to capture those individuals who resigned in lieu of disciplinary action and any such files may not be responsive to Request for Production No. 8. (Discovery Or. at 4.) Therefore, the Court found that files of any interns and

residents who resigned in lieu of disciplinary action are also relevant and proportional and must be produced. (*Id.*)

Thus, in its original order, the Court ordered the Samaritan Defendants to produce the files of any interns or residents in any SHS residency program who were subjected to any disciplinary action, up to and including termination, or who resigned in lieu of disciplinary action, from the date Dr. Natkin began his residency through June 30, 2015.[2] (*Id.*)

### B.  Plaintiffs' Appeal and the Parties' Supplemental Briefing

In Plaintiffs' appeal, they argued that: (a) the start and end dates are too narrow and there is no evidence that the cost of producing the broader range of documents is unwarranted and outweighs the other proportionality factors; and (b) excluding medical students and fellows as not closely situated to Dr. Natkin was improper because all are governed by the same rules and supervised by the same director of medical education, and there is no evidence that the cost of producing the documents is unwarranted and outweighs the other proportionality factors. (Pls.' Appeal at 12-15.)

The Samaritan Defendants responded that Dr. Natkin entered into his first residency contract with Good Samaritan Hospital Corvallis on December 16, 2009, and was terminated from the residency program on October 7, 2013, and therefore the Court's original order required the Samaritan Defendants to produce the files of all disciplined or terminated interns and residents for a five-and-a-half-year period, including nearly two years after Dr. Natkin was no longer with the program. (Defs.' Resp. at 4.) The Samaritan Defendants argue that Plaintiffs have

---

[2] June 30, 2015 is the approximate date on which Dr. Natkin would have graduated had he remained in the residency program, and the Court found it is a reasonable end date for Plaintiffs' document requests in light of Dr. Natkin's October 7, 2013, termination date.

not explained the relevance of the file of a resident terminated before Dr. Natkin entered the program or years after he was terminated, and that any due process the other residents received has no bearing on whether the process Dr. Natkin received was fair. (*Id.* at 6.) Specifically, the Samaritan Defendants argue that the experience of other individuals has no bearing on whether they provided Dr. Natkin an adequate opportunity to defend himself during the termination process. (*Id.* at 7.)

Following oral argument on the district judge's remand order and at the Court's request, the Samaritan Defendants filed the declaration of Marcus Alderman, the Director of Academic Affairs for SHS, to address the burden of responding to Plaintiffs' discovery requests. (ECF No. 275.) Alderman reports that there were six fellows who trained at Good Samaritan Hospital during Dr. Natkin's tenure, and none of the six fellows resigned. (Decl. Marcus Alderman ("Alderman Decl.") ¶ 2.) Alderman estimates it would take approximately two hours to review their files to determine if any received a disciplinary sanction. (*Id.*) Based on billing records to date, the Samaritan Defendants estimate it would incur a relatively modest amount of attorney's fees to review and produce the relevant documents from the fellows' files if all of the fellows were disciplined (and obviously less than that if only one or two fellows were disciplined).[3] (Decl. Blake J. Robinson ("Robinson Decl.") ¶ 11, ECF No. 276.) The Samaritan Defendants also note that they have already produced the files of six residents who were terminated or resigned in lieu of termination (containing over 600 pages), as well as the file of Dr. Natkin's alleged co-conspirator, Dr. Seth Criner. (Robinson Decl. ¶¶ 2-3.)

---

[3] The Court does not include the specific fee estimates in this publicly filed opinion because the Samaritan Defendants filed those estimates under seal. (*See* ECF No. 276.) The Court also acknowledges that Plaintiffs take issue with all of the Samaritan Defendants' fee estimates. (Pls.' Resp. at 2-3, ECF No. 277.)

PAGE 8 – SUPPLEMENTAL DISCOVERY ORDER

### C. The Court's Supplemental Order

In light of the new information the parties have submitted, the Court modifies its prior discovery order to require the Samaritan Defendants to produce the files of any of the six fellows who were subjected to disciplinary action, from the date Dr. Natkin began his residency through June 30, 2015. The Samaritan Defendants represent that it will take at most two hours to review the six fellows' files for any evidence of disciplinary action, and the attorney's fees associated with producing any files that *may* contain such evidence are not substantial. Thus, although the Court finds that the files of any disciplined fellows are not as relevant to Plaintiffs' claims as the files of any disciplined residents because fellows serve in a different role, the insignificant amount of time and money to review the files of these six fellows, and the fact that Plaintiffs cannot obtain the files from another source, tips the proportionality balance such that the Court will require the document review of the six fellows' files and, if necessary, a supplemental production if any of the six fellows were disciplined.

The Court will not modify its holding that the relevant time period for discovery of other trainees' discipline (and evaluations, as discussed below) should begin when Dr. Natkin joined the residency program and end on June 30, 2015, the date on which he would have graduated. The experience of other individuals in the same or closely related programs is potentially relevant to whether the Samaritan Defendants treated Dr. Natkin differently than similarly situated trainees. However, any potential relevance diminishes in the years before and following Dr. Natkin's termination. Although the amount in controversy here is high, Plaintiffs cannot obtain these files from another source, and the Samaritan Defendants have more resources than Plaintiffs, the importance of this discovery from a time period before Dr. Natkin arrived and more than two years following Dr. Natkin's termination is insignificant, and the Samaritan

Defendants would incur substantial time and attorney's fees to review and produce the relevant information. (*See* Robinson Decl. ¶ 9.) Reasonable minds may disagree as to where to draw the line, but the Court drew the line at June 30, 2015, and continues to believe that was a reasonable cutoff. In addition, the Court's parameters resulted in the Samaritan Defendants' production of the files of seven comparators, which should be a sufficient sample size for Dr. Natkin to demonstrate whether the Samaritan Defendants treated him differently. Accordingly, the Court stands by its prior proportionality analysis with respect to the relevant date range of the Samaritan Defendants' document production.

## III.   REQUEST FOR PRODUCTION NO. 10

Plaintiffs requested "[t]he files of any medical students, interns, residents, or fellows on whom 360 evaluations were taken, including those 360 evaluations."

### A.   Original Discovery Order

The Court found that discovery of Dr. Natkin's 360 evaluations is relevant and proportional to the needs of the case. (Discovery Or. at 4.) The Court also noted that Plaintiffs will receive 360 evaluations for any other intern or resident (and now fellow) subject to disciplinary action or who resigned in lieu of discipline, in response to Request for Production Nos. 8 and 9, which will allow Plaintiffs to compare how the SHS residency programs used 360 evaluations with respect to similarly situated individuals. (*Id.* at 4-5.) The Court found that the files and 360 evaluations of all other medical students, interns, residents, or fellows (i.e., those who were not subject to disciplinary action or resigned in lieu of discipline) are only marginally relevant to Plaintiffs' claims and not proportional to the needs of the case. (*Id.* at 5.)

///

///

### B.     Plaintiffs' Appeal and the Parties' Supplemental Briefing

Plaintiffs argued in their appeal that limiting the production of 360 evaluations to interns and residents subjected to discipline or who resigned in lieu of discipline provides only a partial picture of how the program used 360 evaluations, it is necessary to compare how the program used 360 evaluations with all of its trainees (medical students, interns, residents, and fellows), and there is no evidence that the cost of producing these documents is unwarranted and outweighs the other proportionality factors. (Pls.' Appeal at 15-16.)

Alderman reports in his declaration that approximately 119 individuals trained during Dr. Natkin's tenure, and determining which received 360 evaluations would require approximately sixteen hours for personnel to gather, review, and scan the relevant files. (Alderman Decl. ¶ 3.) The Samaritan Defendants estimate they will incur substantial attorney's fees to review and produce the requested 360 evaluations of all 119 trainees. (Robinson Decl. ¶ 12.)

### C.     The Court's Supplemental Order

The Court again finds that files containing 360 evaluations of all other medical students, interns, residents, and fellows (i.e., those who were not subject to disciplinary action or resigned in lieu of discipline) are only marginally relevant to Plaintiffs' claims and not proportional to the needs of the case. Specifically, how colleagues evaluated other trainees during the relevant time period, and how the hospital used those evaluations, as well as the complete file of any such trainee, is not probative of whether Dr. Natkin received due process under Oregon law or the relevant agreements. In other words, whether another individual received or was disciplined following a 360 evaluation does not make it more or less likely that Dr. Natkin's discipline following a negative 360 evaluation violated due process or the relevant agreements.

///

PAGE 11 – SUPPLEMENTAL DISCOVERY ORDER

In any event, the Samaritan Defendants have already produced the files of six other residents who were disciplined, as well as Dr. Criner's file, and therefore Plaintiffs already have seven comparators' files from which to determine how the program utilized 360 evaluations for similarly situated residents.

In addition, the Court finds that Plaintiffs can obtain the same information more efficiently by deposing Dr. Vela, the Samaritan Defendants' designated representative, or others about the program's use of 360 evaluations during the relevant time period. Neither the amount in controversy nor the parties' relative resources justifies sixteen hours of document review or substantial attorney's fees to produce the 360 evaluations of 119 other trainees who did not face any discipline. Accordingly, the Court stands by its prior proportionality analysis.

## IV.     REQUEST FOR PRODUCTION NO. 11

Plaintiffs requested "[a]ny and all rotational evaluations of any and all orthopedic surgery residents from the inception of the program through the present." During the meet and confer, the Samaritan Defendants agreed to produce the rotational evaluations of the other orthopedic surgery residents during Dr. Natkin's tenure.

### A.     Original Discovery Order

The Court found that the rotational evaluations of other orthopedic surgery residents are relevant to Dr. Natkin's claims, and that an end date of June 30, 2015, is a reasonable and proportional end date for this request. (Discovery Or. at 5.) The Court ordered the Samaritan Defendants to produce all rotational evaluations of orthopedic surgery residents from the first day of Dr. Natkin's residency through June 30, 2015. (*Id.*)

### B.     Plaintiffs' Appeal and the Parties' Supplemental Briefing

Plaintiffs argued in their appeal that the Court's date limitations are too narrow, and that the limitations do not capture all twenty-three graduates of the orthopedic surgery residency

PAGE 12 – SUPPLEMENTAL DISCOVERY ORDER

program (as of June 30, 2022), against whom Dr. Natkin would like to compare his record to determine whether the program treated him differently than similarly-situated individuals. Plaintiffs also argued that there is no evidence that the cost of producing a fully-responsive set of documents is unwarranted or outweighs the other proportionality factors. (Pls.' Appeal at 16-17.)

The Samaritan Defendants report that they have already produced evaluations for all orthopedic surgery residents from 2010 through 2015, including 1,800 pages of evaluations from fourteen orthopedic surgery residents. (Robinson Decl. ¶ 4.) In addition, they report that there have been 36 orthopedic surgery residents since June 30, 2015 (i.e., the end date for evaluations produced to date), and each resident participates in thirteen rotations per year, or 195 rotational evaluations per year, for a total 1,365 rotational evaluations from June 30, 2015, to June 30, 2022. (Alderman Decl. ¶ 4.) The Samaritan Defendants estimate it would take approximately four hours to gather and send all of the additional rotational evaluations. (*Id.*) Based on the billing records for that production, the Samaritan Defendants anticipate it would incur substantial attorney's fees to produce the additional evaluations that Dr. Natkin requests.[4] (*Id.* ¶ 10.)

### C. The Court's Supplemental Order

The Court again finds that the rotational evaluations of other orthopedic surgery residents are relevant to Dr. Natkin's claims, and that an end date of June 30, 2015, is a reasonable and proportional end date for this request. (Discovery Or. at 5.) The relevance of other residents' rotational evaluations diminishes in the years after Dr. Natkin left the program. Thus, even a minimal burden to produce the discovery would not be proportional to the needs of the case, but

---

[4] The Samaritan Defendants' counsel also notes that its estimated fees are merely a starting point, and producing hundreds of additional employment files would also increase attorney's fees with respect to preparing for depositions and expert witness reports and depositions. (Robinson Decl. ¶ 13.)

PAGE 13 – SUPPLEMENTAL DISCOVERY ORDER

here the Samaritan Defendants estimate substantial attorney's fees to produce the requested rotational evaluations for more recent years. Even in light of the amount in controversy, the parties' relative resources, and Plaintiffs' inability to obtain the files from another source, the potential benefit of the discovery does not outweigh the burden of production. Accordingly, the Court stands by its prior proportionality analysis.

## V. REQUEST FOR PRODUCTION NO. 17

Plaintiffs requested "Dr. Richard Stanley, DO's file with SHS, including any and all resident evaluations of Dr. Stanley." During the meet and confer, the Samaritan Defendants agreed to produce the parts of Dr. Stanley's file regarding interactions with Dr. Natkin, but no such responsive documents exist and therefore the Samaritan Defendants did not produce any documents in response to Request For Production No. 17.

### A. Original Discovery Order

The Court noted that Dr. Natkin was terminated for, among other things, allegedly colluding with another resident to highlight quality issues with two of Dr. Stanley's cases at a fracture conference. (Discovery Or. at 8.) Dr. Natkin denies colluding with the other doctor and denies any intent to disrespect Dr. Stanley. (*Id.*) The Court agreed with the Samaritan Defendants that neither Dr. Stanley's skills generally (aside from the two cases Drs. Natkin and Criner presented) nor his professionalism have any bearing on the merits of Dr. Natkin's claims in this case, especially in light of Dr. Natkin's denial that he intended to criticize Dr. Stanley. (*Id.*) Thus, the Court found that discovery of Dr. Stanley's file is not relevant nor proportional to the needs of the case. (*Id.*)

### B. Plaintiffs' Appeal and the Parties' Supplemental Briefing

Plaintiffs argued in their appeal that Dr. Stanley's file is "crucial to demonstrating that any criticism directed at him was deserved, regardless of Dr. Natkin's intent[,]" and that

PAGE 14 – SUPPLEMENTAL DISCOVERY ORDER

Dr. Stanley's behavior, reputation, and credibility are central issues in this case. (Pls.' Appeal at 13.) Specifically, Plaintiffs hope to corroborate Dr. Natkin's allegations that Dr. Stanley bullied trainees, had a physical altercation with the nurse, and had negative interactions with other residents. (*Id.* at 14.) Plaintiffs also argue that there is no evidence that the cost of producing these records is unwarranted and outweighs the other proportionality factors. (*Id.*)

The Samaritan Defendants responded that Dr. Stanley learned that Dr. Natkin and another resident had picked cases to present at the fracture conference with the goal of making Dr. Stanley look bad, Dr. Stanley reported this to Dr. Vela, and Dr. Natkin continues to deny any attempt to disparage Dr. Stanley. (Defs.' Resp. at 9-10.) Thus, Dr. Stanley's only relevant involvement in this case is that he complained about Dr. Natkin to Dr. Vela. (*Id.*) Plaintiffs' allegations about Dr. Stanley's reputation are not relevant because Dr. Natkin did not address those matters at the fracture conference, and Plaintiffs do not dispute that Dr. Stanley merely reported Dr. Natkin to Dr. Vela. (*See id.*, stating "In short, whether Dr. Stanley is the world's best or worst doctor, or nicest or meanest person, makes no difference to any issue in the case. That would have no bearing on what role, if any, Dr. Natkin played in organizing the fracture conference, and if he did have a role, whether his actions were appropriate.").

### C. The Court's Supplemental Order

The Court again finds that discovery of Dr. Stanley's file is not relevant nor proportional to the needs of the case. Aside from the two matters Drs. Natkin and Criner presented at the fracture conference, this case is not otherwise about Dr. Stanley's skills, qualifications, or professionalism, and therefore discovery of his entire file and all resident evaluations are not relevant to Dr. Natkin's claims. As such, even a minimal burden outweighs the benefit of the discovery, despite the amount in controversy, the parties' relative resources, and Plaintiffs'

inability to obtain the files from another source. Accordingly, the Court stands by its prior proportionality analysis.

## VI. REQUEST FOR PRODUCTION NOS. 19-21

Plaintiffs requested production of Dr. Vela's file as an intern, resident, and fellow. The Samaritan Defendants objected on the ground that Dr. Vela's experience as a trainee was too remote in time to the events giving rise to the claims asserted in this action to be relevant.

### A. Original Discovery Order

The Court agreed that any such discovery is only marginally relevant and is not proportional to the needs of the case. (Discovery Or. at 11.)

### B. Plaintiffs' Appeal and the Parties' Supplemental Briefing

Plaintiffs argued on appeal that the discovery is more than marginally relevant because they allege Dr. Vela lacked the requisite experience to serve as the program director or the director of medical education and therefore his training experience is the only frame of reference from which Dr. Vela could draw as to how a residency program may impose discipline. (Pls.' Appeal at 15.)

The Samaritan Defendants respond that it is undisputed that Dr. Vela completed his internship, residency, and fellowship in 1990, 1994, and 1995 respectively, and that Plaintiffs are therefore seeking documents from nearly eighteen to twenty-three years prior to Dr. Natkin's termination. (Defs.' Resp. at 11.) The Samaritan Defendants argue that even if Dr. Vela was disciplined during his training period, whether he received no process or a lengthy, elaborate process has no bearing on whether the process Dr. Natkin received twenty years later met the standard required under Oregon law or the governing contracts. (*Id.*) The Samaritan Defendants' declaration also confirms that they do not have any copies of Dr. Vela's intern, residency, or fellowship files, because he completed those programs at other institutions.

PAGE 16 – SUPPLEMENTAL DISCOVERY ORDER

### C.    The Court's Supplemental Order

The Court again finds that discovery of Dr. Vela's files from his training nearly twenty years ago is not relevant nor proportional to the needs of the case. (Discovery Or. at 11.) The process Dr. Vela may have received with respect to discipline, if any, during his training in the late 1980s and early 1990s has no bearing on whether the Samaritan Defendants provided Dr. Natkin with due process in 2013. As such, even a minimal burden outweighs the benefit of the discovery, despite the amount in controversy and the parties' relative resources. Accordingly, the Court stands by its prior proportionality analysis.

In any event, the Samaritan Defendants represent that the requested files are not in their possession because Dr. Vela trained at other institutions. The Court cannot compel the Samaritan Defendants to produce files maintained by other institutions.

### CONCLUSION

For the foregoing reasons, the Court supplements its prior discovery order as discussed herein, and orders the Samaritan Defendants to review the files of the six relevant fellows employed from the date Dr. Natkin began his residency through June 30, 2015, and produce by March 22, 2023, the file of any fellow who was subjected to any disciplinary action.

DATED this 1st day of March, 2023.

HON. STACIE F. BECKERMAN
United States Magistrate Judge