# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DR. ERIK NATKIN, D.O. P.C.**, a Utah corporation; and **DR. ERIK NATKIN, D.O.**, an individual | Case No. 3:16-cv-1494-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **AMERICAN OSTEOPATHIC ASSOCIATION**, *et al.*, | |
| Defendants. | |

Benjamin Natkin, LAW OFFICES OF BENJAMIN NATKIN, 9854 National Boulevard, Suite 369, Los Angeles, CA 90034; and Clark E. Rasche, WATKINSON LAIRD RUBENSTEIN PC, P.O. Box 10567, Eugene OR 97440. Of Attorneys for Plaintiffs.

Blake J. Robinson and P. Andrew McStay, Jr., DAVIS WRIGHT TREMAINE LLP, 560 SW Tenth Avenue, Suite 700, Portland OR 97205. Of Attorneys for Defendants Samaritan Health Services, Inc.; Good Samaritan Hospital Corvallis; and Dr. Luis R. Vela, D.O.

J. Michael Porter and Katherine M. Bennett, MILLER NASH LLP, 1140 SW Washington Street, Suite 700, Portland, OR 97205; and Mark H. Meyerhoff and Christopher S. Frederick, LIEBERT CASSIDY WHITMORE, 6033 W Century Boulevard, Fifth Floor, Los Angeles, CA 90045. Of Attorneys for Defendant Western University of Health Sciences.

Michael C. Lewton, COSGRAVE VERGEER KESTER LLP, 900 SW Fifth Avenue, Suite 2400, Portland, OR 97204; John R. Danos, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. Of Attorneys for Defendant American Osteopathic Association.

Thomas R. Rask III, KELL ALTERMAN & RUNSTEIN LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204; and Ronald Thomas Vera and Robert P. Johnston, THE VERA LAW GROUP, 300 W Foothill Boulevard, Suite 100, Claremont, CA 91711. Of Attorneys for Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium.

**Michael H. Simon, District Judge.**

Pending before the Court are three motions for summary judgment. The first is by Defendant Western University of Health Sciences (Western), against all remaining claims asserted by Plaintiffs Dr. Erik Natkin, DO (Natkin) and Dr. Erik Natkin, DO PC (Natkin PC). As discussed below, these claims are based on *respondeat superior* liability and require that Western be the legal employer of individuals alleged to have engaged in wrongful conduct. Western argues that there is no evidence that it is the employer of any relevant individuals.

The second motion is brought by Defendant American Osteopathic Association (AOA). AOA seeks summary judgment on the sole remaining claim asserted against it, Plaintiffs' Sixth Claim for Relief, alleging breach of contract. AOA argues that it is not a party to any contract with Natkin.

The final motion is brought by Defendants Samaritan Health Services, Inc. (SHS), Good Samaritan Hospital Corvallis (Good Sam),[1] and Dr. Luis R. Vela, DO (Vela) (collectively, the "Samaritan Defendants"). The Samaritan Defendants move for partial summary judgment on three claims: violation of Natkin's common law right to fair procedure, intentional interference with Natkin's alleged contract with AOA, and wrongful discharge based on the public policy reflected in Oregon Revised Statutes (ORS) § 441.044.[2] The Samaritan Defendants argue that: (1) as stated by AOA, there was no enforceable contract, and regardless, the undisputed evidence

---

[1] In referring to SHS's hospital in Corvallis, the parties sometimes refer to the legal entity "Good Samaritan Hospital Corvallis" (Good Sam) and sometimes refer to Good Sam's assumed business name, "Good Samaritan Regional Medical Center," which is the name of the hospital itself. Both are referenced in this opinion simply as "Good Sam."

[2] Plaintiffs allege violations of "ORS § 441.057," in the Second Amended Complaint, but that statute was renumbered in 2019, after the filing of the Second Amended Complaint. It is now codified at ORS § 441.044.

shows that the Samaritan Defendants did not interfere with any purported contract; (2) Oregon's common law right to fair procedure does not apply to Natkin, who was only a resident and not medical staff and did not have hospital privileges; and (3) Natkin's claim based on ORS § 441.044 fails because he did not bring any evidence of improper care to the "appropriate authority" and, independently, he was not terminated "solely" because of such action. Plaintiffs respond that disputed facts, viewed in the light most favorable to Plaintiffs, preclude summary judgment for all motions. For the following reasons, the Court grants Western and AOA's motions and grants in part the Samaritan Defendants' motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that

there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION[3]

### A.  Evidentiary Objections

Plaintiffs raise many evidentiary objections. These include objections based on: (1) relevance, hearsay, and authentication; and (2) for exclusion under Rule 37(c) of the Federal Rules of Civil Procedure because a document or its author was not previously disclosed by a party in initial disclosures, although the document was produced in discovery. At summary

---

[3] The Court does not set out a separate statement of facts, instead discussing facts as relevant to each pending motion. For a more comprehensive discussion of the underlying facts, see the previous opinions in this case. *Dr. Eric Natkin, DO PC v. Am. Osteopathic Ass'n* (*Natkin I*), 2017 WL 9049880 (D. Or. Aug. 30, 2017), *report and recommendation adopted in part sub nom. Natkin v. Am. Osteopathic Ass'n* (*Natkin II*), 2018 WL 452165 (D. Or. Jan. 17, 2018) (resolving motion to dismiss first amended complaint); *Dr. Erik Natkin, DO PC v. Am. Osteopathic Ass'n* (*Natkin III*), 2018 WL 6920122 (D. Or. Oct. 18, 2018), *report and recommendation adopted in part, rejected in part*, 2019 WL 1763242 (D. Or. Apr. 22, 2019) (*Natkin IV*) (resolving motion to dismiss second amended complaint (SAC)); *Dr. Erik Natkin, DO PC v. Am. Osteopathic Ass'n* (*Natkin V*), 2023 WL 359589, at *6 (D. Or. Jan. 23, 2023) (resolving earlier motion for summary judgment filed by AOA).

judgment, a court may consider "evidence submitted in an inadmissible form, so long as the

underlying evidence could be provided in an admissible form at trial, such as by live testimony."

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also*

*Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (noting that at summary judgment a

court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es]

on the admissibility of its contents"). "Rule 56 is precisely worded to exclude evidence only if

it's clear that it cannot be presented in an admissible form at trial." *Comite de Jornaleros de*

*Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011); *cf.* Fed. R. Civ.

P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence"). Plaintiffs do not object

under Rule 56(c)(2) that the material cited *cannot* be presented in a form that *would be*

admissible at trial. Additionally, objections on the grounds of relevance "are inappropriate,

because the Court must determine whether a fact is relevant and material as part of 'the summary

judgment standard itself.'" *Sidhu v. California*, 2021 WL 411149, at \*7 (E.D. Cal. Feb. 5, 2021)

(quoting *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

As for Plaintiffs' objections to exclude evidence as a sanction under Rule 37(c)(1) for

failing to comply with initial disclosures, the Court makes some general observations.[4] Rule 26

disclosure obligations are enforced by Rule 37(c), which "gives teeth to these requirements by

---

[4] The parties should keep these standards in mind when submitting evidentiary objections to trial evidence. Objections based on lack of disclosure in initial disclosures to documents that have been produced in discovery and made known will not be well taken. Objections to witnesses for lack of disclosure in initial disclosures when documents "revealing [the witness] as one with knowledge pertinent to [Plaintiffs'] claims" has been produced, *Mack v. Cal. Dep't of Corr. & Rehab.*, 790 F. App'x 846, 848 (9th Cir. 2019), or there has been deposition testimony or responses to interrogatories indicating that the witness has relevant information, *see Anigbogu v. Mayorkas*, 2023 WL 8115046, at \*5 (N.D. Cal. Nov. 22, 2023), similarly will be unavailing.

forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). According to Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). Under Rule 37(c)(1), if the party's failure to make a Rule 26(a) disclosure either "was substantially justified or is harmless," exclusion is not required. *Id.*

Under Rule 26(a)(1), a party is only obligated to make initial disclosures and supplements relating to information in that party's possession, custody, or control. *See* Fed. R. Civ. P. 26(a)(1)(A). This means, for example, that if Western provides as an exhibit a document produced in discovery by SHS, Plaintiffs may not rely on Rule 37(c)(1) to exclude that document. *Western* is not subject to sanctions for failing to provide that document in *Western's* initial disclosures if that document was not originally in Western's possession, custody, or control. Because it was produced in discovery to all parties and came to Western the same time it came to Plaintiffs, then it is no basis to sanction Western.

Additionally, even if a document may be subject to Rule 37(c)(1) because it is offered by a party who produced it and the party did not disclose the document in its initial disclosures or supplementation, there are limits to when supplementation is required, and Rule 37(c) sanctions are not appropriate if the violation is "harmless." A party is only obligated to supplement a disclosure if in "some material respect" the disclosure is incomplete or incorrect *and* the additional information "has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Subsequent discovery responses or document production may obviate the need to, or render harmless, any failure to supplement

initial disclosures. *See, e.g.*, *Evanston Ins. v. Footprints Behav. Interventions, Inc.*, 2024 WL 3338308, at *2 (9th Cir. July 9, 2024) (discovery responses indicating the plaintiff had incurred damages sufficient); *Mack v. Cal. Dep't of Corr. & Rehab.*, 790 F. App'x 846, 848 (9th Cir. 2019) (documents produced that reveal a witness has pertinent knowledge sufficient); *HH Assocs., U.S., Inc. v. Evans*, --- F. Supp. 3d ---, 2024 WL 727044, at *5 (D. Haw. Jan. 11, 2024) (declarations previously submitted by witnesses in a parallel litigation sufficient); *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 501 F. Supp. 3d 886, 896 (E.D. Cal. 2020) (facts discussed in deposition testimony and expert report sufficient).

The Court will not separately resolve each of the voluminous evidentiary objections raised by Plaintiffs. The Court, however, only considers relevant, appropriate, factual contentions in resolving the pending motions.

## B.  Western's Motion

Both Western and Plaintiffs recite many irrelevant facts in briefing Western's motion. The only relevant facts relate to whether Vela, Dr. Jonathan Evans, Dr. Caroline Fisher, Dr. Sugat Patel, or Dr. Clint Evans were employees of Western.

### 1.  New Theories of Liability

Plaintiffs attempt to assert new bases of liability in responding to Western's motion for summary judgment. Plaintiffs contend that Western has "direct liability" with respect to Plaintiffs' fair procedure claim and that Vela as the Director of Medical Education (DME) and the other doctors as the Program Directors (PD) were nonemployee agents of Western with respect to that claim. Those theories of liability, however, are foreclosed. In resolving Western's motion to dismiss the Second Amended Complaint (SAC), the Court dismissed the fair procedure claim against Western except to the extent it was based on a theory of *respondeat*

*superior* liability.[5] *See Natkin IV*, 2019 WL 1763242, at \*8-9 (explaining that for Plaintiffs' fair

procedure claim liability applies to "the employer of the individuals involved in Natkin's

suspension and termination" and describing the allegations of employment that suffice to assert a

claim); *id.* at \*9 ("[A]n allegation in the SAC of an employment relationship, particularly one

accompanied by the documents defining the employment relationship, is sufficient. Given the

somewhat confusing and interrelated nature of the entities and the job positions, it is reasonable

for Plaintiffs to rely on their best knowledge and the contracts between Defendants in alleging

the various employment relationships. Defendants may challenge the alleged employment

relationship in a motion for summary judgment . . . ." (footnote omitted)); *id.* (explaining that the

Court "focuses only on the individual's employment as a director, staff, or faculty member at

Natkin's residency program" and that "Plaintiffs' allegations relating to this claim support that

the DME and PDs are employees of Western and SHS[]"); *id.* at \*10 ("In sum, the Court finds

Plaintiffs' allegations are sufficient against the following Defendants and based on *respondeat*

*superior* liability with respect to the following individuals: . . . . Western, as employer of Vela

---

[5] Plaintiffs cite the Court's opinion denying the summary judgment motion filed by
Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium
(OPTI-West) against Plaintiffs' fair procedure claim to support the proposition that Plaintiffs
have a direct claim against Western. In denying that motion, however, the Court rejected OPTI-
West's general argument that it did not owe a duty of fair procedure to Natkin by explaining
OPTI-West's general influence over SHS and the residency program, and then connected OPTI-
West's potential liability to the alleged conduct of OPTI-West's employee, Dr. J. Michael
Finley, DO. *See Natkin V*, 2023 WL 359589, at \*6 ("It is thus a reasonable inference that OPTI-
West had substantial influence over SHS and Good Sam and Finley's participation and
comments in Natkin's disciplinary process would have substantial sway, even though under the
contract, SHS makes disciplinary decisions on its own."); *id.* ("Here, Natkin believed it would be
futile to appeal to OPTI-West because Finley had repeatedly expressed his opinion about
Natkin's situation, both in the initial meeting and at the appeals hearing. . . . Natkin did not take
advantage of OPTI-West as a direct appeal because Natkin believed Finley to be too biased.");
*id.* ("Plaintiffs provide sufficient evidence at this stage, viewing the facts in the light most
favorable to Plaintiffs, to raise a triable issue regarding Finley's conduct in the asserted
deprivation of Natkin's right to fair procedure.").

(as PD & DME), Dr. Jonathan Evans (as PD), Dr. Caroline Fisher (as PD), Dr. Sugat Patel (as PD), and Dr. Clint Evans (as PD)").

The remaining claims that the Court accepted as adequately alleged against Western also survived solely based on *respondeat liability*. *See id.* at *10 (adopting Judge Beckerman's recommendations relating to the Sixth Claim, *Natkin III*, 2018 WL 6920122, at *22, which included that the Sixth Claim survives against Western because "Plaintiffs have adequately alleged that Dr. Vela was an employee-agent of Western"); *id.* at *11 (discussing for Plaintiffs' Eighth Claim alleging intentional interference with contract that it turns with respect to Vela and Western's liability on whether "Vela is also employed by Western" and "if Vela is an employee of Western he may be liable for this tort" but "[i]f it is shown at summary judgment that Western did not have the requisite control over Vela and he was not an employee of Western, then Vela would only be subject to liability for this tort as an employee of Good Sam if he acted solely for his own benefit"); *Natkin III*, 2018 WL 6920122, at *27 (stating for Plaintiffs' defamation claims that "Western can therefore be held vicariously liable for defamatory statements Dr. Vela made in the course and scope of his employment as the DME"); *Natkin IV*, 2019 WL 1763242, at *15 (stating for Plaintiffs' intentional interference with economic relations claims that "these claims are stated only against Vela and the entities that have *respondeat superior* liability for Vela (Good Sam, SHS[], and Western)").

For Plaintiffs' contention that Vela and Drs. J. Evans, Fisher, Patel, and C. Evans were nonemployee agents instead of employees, this argument is foreclosed by the Court's opinion resolving the motion to dismiss the SAC, as discussed above. This argument also is foreclosed by Plaintiffs' allegations in the SAC. Against Drs. J. Evans, Fisher, Patel, and C. Evans, Plaintiffs allege that they were "employed" by Western (and other entities). Plaintiffs' allegations relating to Vela are more vague, alleging clauses of the Sponsorship Agreement and

that the DME position and Vela were subject to the control of Western, without using the term "employed." The Court, however, repeatedly stated in *Natkin III* that the claims against Western survived based on *respondeat superior* liability through Vela and an alleged employment relationship.

The Court dismissed the insufficiently alleged claims in Plaintiffs' SAC without prejudice. Plaintiffs, however, never moved for leave to file a Third Amended Complaint and did not file new claims against Western based on nonemployee agency. Nor did Plaintiffs request reconsideration or clarification of the Court's determination that the only claims remaining against Western were claims based on *respondeat superior* versus nonemployee agency. Plaintiffs may not now attempt to avoid summary judgment by raising a new claim (with respect to the PDs' nonemployee liability) or resurrect a dismissed claim (direct liability and to the extent the SAC could be interpreted as having originally alleged nonemployee agency with Vela), and essentially amend their pleading at this late stage.[6] *See, e.g.*, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (stating that the plaintiff "may not effectively amend its Complaint by raising a new theory of standing in its response to a motion for summary judgment"); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (stating that when allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court"),

---

[6] At oral argument, counsel for Plaintiffs argued that any lack of clarity in the SAC should not be held against Plaintiffs. The primary basis for the Court's decision here, however, is that the Court's opinion in *Natkin III* was unambiguous in retaining against Western claims based only on *respondeat superior*. The Court was not unaware of the possibility of Plaintiffs' contention of nonemployee status—the Court described Western's objections to the underlying Findings and Recommendation as including whether Vela was an "employee or nonemployee agent" of Western. *Natkin IV*, 2019 WL 1763242, at *3. The Court, however, concluded that Plaintiffs only sufficiently alleged claims against Western based on Vela's purported *employment*.

*overruled in part on other grounds by Apache Stronghold v. United States*, 95 F.4th 608 (9th

Cir. 2024); *Wasco Prods., Inc. v. Southwall Techs., Inc*., 435 F.3d 989, 992 (9th Cir. 2006)

("Simply put, summary judgment is not a procedural second chance to flesh out inadequate

pleadings." (quoting *Fleming v. Lind-Waldock & Co*., 922 F.2d 20, 24 (1st Cir. 1990))). The

Court rejects Plaintiffs' arguments about direct liability and nonemployee agency.[7]

---

[7] After oral argument, Plaintiffs directed the Court to Plaintiffs' brief in response to Western's motion to dismiss the SAC as providing notice to Western that Plaintiffs raised nonemployee agency. This argument fails for several reasons. First, it is the Court's opinion in *Natkin III* that is binding, which was after the briefing before Judge Beckerman and unambiguously allowed only *respondeat superior* claims to proceed. The Court rejected any nonemployee agency theory. Second, as previously noted, Western was aware of Plaintiffs' possible nonemployee agency contentions, as stated in Western's objections. Notice to Western at that time is not dispositive. It is the fact that in the five years since the Court's *Natkin III* Opinion, this case has been litigated as only including *respondeat superior* claims against Western that raises concern. Third, Plaintiffs' brief at the motion to dismiss stage is not as Plaintiffs now characterize. That brief only mentions nonemployee agents to highlight the difference between an employee and nonemployee agent. Plaintiffs *argued* that Western was liable as the *employer* of Vela (along with joint liability positions the Court rejected) and highlighted Plaintiffs' *allegations* stating as much. *See* ECF 153 at 8 ("Plaintiffs do allege that Dr. Vela is an employee of Western"); *id.* ("To be clear, Vela is alleged to be an employee of Western . . . ."); *id.* at 13-14 (distinguishing between employee and nonemployee agents and then asserting that "Vela, Bell, GME Committee members, J. Evans, Krumrey, Newman, Malkin, Ballinger, Fisher, Patel, and C. Evans are employee-agents of AOA, OPTI-West, and Western"); *id.* at 14 ("Thus, wholly apart from the liability for the acts of these individuals as employee-agents of the joint venture, these individuals are separately the employee-agents of AOA, OPTI-West, Western, and Samaritan Entities."); *id.* at 19 ("Western is liable as . . . an employer of Vela . . . ."); *id.* at 20 ("The allegations now establish Vela as an employee-agent of Western . . . ."); *id.* at 26 ("Plaintiffs allege that . . . Western is Vela's employer."). Plaintiffs' brief from April 30, 2018, provides no help to avoid summary judgment.

       Plaintiffs also asserted after oral argument that the Court could not "grant" summary judgment on the grounds that Vela and the others were not nonemployee agents because those were grounds not raised by Western in its motion and thus Plaintiffs required more notice than the discussion at oral argument. Plaintiffs misunderstand the Court's point. The Court is granting summary judgment on the ground raised by Western—that Vela and Drs. J. Evans, Fisher, Patel, and C. Evans were not employees of Western in the relevant context (as DME and PDs). What the Court is rejecting is Plaintiffs attempt to avoid summary judgment in their *response* by improperly asserting new theories that were dismissed (that Western is directly liable for the fair procedure claim and that Western is liable for the individuals' conduct as principal of nonemployee agents) and effectively attempting to amend their complaint. The Court need not give notice to Plaintiffs to reject Plaintiffs' improper assertions in response to summary

## 2. *Respondeat Superior* Liability

"Whether a party has the legal status of employee, or employer, is a question of law." *McClusky v. City of N. Bend*, 308 Or. App. 138, 142 (2020). That legal conclusion, however, "depends on a factual determination of the extent to which the purported employer has the right to control the performance of services by the individual." *Schaff v. Ray's Land & Sea Food Co.*, 334 Or. 94, 99-100 (2002). When facts are disputed, the question of right to control and employment status may need to go the jury. *Id.* at 101-03. "If the facts and any reasonable inferences that a jury could draw from those facts would not support a conclusion that the putative employer had the right to control the putative employee's work performance, then there is no triable issue of fact, and a defendant is entitled to have the issue decided as a matter of law." *Id.* at 103.

The employer must have the "right to control the physical details of the work being performed," meaning "not only the end result, but also . . . *how* the employee performs the work." *Vaughn v. First Transit, Inc.*, 346 Or. 128, 137 (2009) (emphasis in original). Oregon Courts "have identified four nonexclusive factors for consideration in assessing the right to control: '(1) direct evidence of the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire.'" *McClusky*, 308 Or. App at 142-43 (quoting *Or. Country Fair v. Nat'l Council on Comp. Ins.*, 129 Or. App. 73, 78 (1994)).

---

judgment. But even if Plaintiffs needed notice, Western repeatedly argued that the Court already had ruled against Plaintiffs on these points in Western's reply, before alternatively addressing Plaintiffs' arguments on the merits. *See* ECF 431 at 10, 11, 16. Plaintiffs did not request leave to file a surresponse addressing this point in Western's reply. The Court asked Plaintiffs to address the issue at oral argument.

Western argues that there is no evidence that it is the legal employer of Vela, or Drs. J. Evans, Fisher, Patel, and C. Evans. Western asserts that Plaintiffs only rely on the Sponsorship Agreement between Western and SHS, which provides that the DME at SHS's residency program may be an employee of Western and that the PD is appointed from Western's faculty. Western argues that simply because a position *may* be filled with a Western employee does not mean that it *was* filled with a Western employee.

Although Western may move for summary judgment by pointing to the absence of evidence for a claim on which Plaintiffs have the burden of proof, Western also cites evidence that it argues shows it is not the employer for the relevant persons in their role as DME or PD. Western cites evidence that: (1) Good Sam oversaw its PDs and residency program: (2) Vela was unaware of the Sponsorship Agreement between Western and SHS until this litigation; (3) a Good Sam employee recommended Vela as DME, not Western; (4) Vela did not involve Western in Natkin's disciplinary process;[8] (5) Natkin was never told Western provided direction to the committee that was involved in Natkin's termination and Natkin believed the problem was that Western should have been involved in Natkin's termination proceedings;[9] (6) Vela testified

---

[8] Plaintiffs object that this evidence is irrelevant, but Vela's exclusion of Western from Natkin's disciplinary process tends to show that Western was not Vela's employer. Vela would more likely than not include, or at least notify, his employer in a contentious disciplinary process. Plaintiffs also broadly contend that "it is not relevant whether Western is a principal to the DMEs, PDs, or faculty." This is incorrect. The Oregon Supreme Court has instructed that for purposes of vicarious liability, employees are "'servant' agents." *Vaughn v. First Transit, Inc.*, 346 Or. 128, 137 (2009). Further, "[a]ll servants are agents and all masters, principals. However, all principals and agents are not also masters and servants." *Id.* (quoting *Kowaleski v. Kowaleski*, 235 Or. 454, 457 (1963)). It is relevant whether Western is the employer (or "master" principal as characterized in *Vaughn* in the agency context) of the relevant DME and PDs—*respondeat superior* liability is the only way in which Plaintiffs can attach liability to Western.

[9] Plaintiffs object that this evidence is irrelevant, but Natkin's belief that Western was not involved in and had no direction over his termination proceedings, and indeed *should* have been involved in the termination proceedings, is evidence that tends to show that Western was not the employer of Vela. Natkin believed that Vela had essentially unilateral control over Natkin's

that he was employed by Good Sam as DME and PD and that Western did not exercise control over him as DME;[10] and (7) Vela and Dr. J. Evans signed the letter terminating Natkin on behalf of SHS in their official capacity as DME and PD, without mentioning Western.[11]

Plaintiffs' response mostly focuses on the contractual documents between AOA, Western, and SHS.[12] In resolving both motions to dismiss, the Court explained that the contracts alone are insufficient to show employment status.[13] They establish a framework. The Court

termination proceedings. As discussed in the previous footnote, that Western was not involved at all in this contentious disciplinary process would tend to show that it was not Vela's employer.

[10] Plaintiffs object that this is improper opinion evidence under Rule 701. The Court disagrees. Vela's belief about who employed him is not an expert opinion and the Court does not consider it to be a legal conclusion. *Cf. Doe v. Holy See*, 557 F.3d 1066, 1081 (9th Cir. 2009) (declining to construe allegations that a priest was an "employee" of the defendant as a legal conclusion because "employee" is "a word used in everyday speech" and allows the defendant to "understand[] the factual basis for the claim"). The Court considers this a statement based on Vela's personal knowledge about who directed his day-to-day work and who paid him.

[11] Plaintiffs object that this evidence is irrelevant, but the fact that Vela and Dr. Evans signed the termination letter in their official capacity and did not purport to be employed by or affiliated with Western tends to show that Western did not employ them.

[12] Plaintiffs also cite allegations in the SAC. Statements in an unverified complaint, however, are not evidence properly considered on a motion for summary judgment. *See Moran v. Selig*, 447 F.3d 748, 759 (9th Cir. 2006) ("[T]he complaint in this case cannot be considered as evidence at the summary judgment stage because it is unverified."); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (stating that the nonmoving party "cannot defeat summary judgment with allegations in the complaint"); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (stating that "the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial" (quotation marks omitted)).

[13] Even focusing on the Sponsorship Agreement does not help Plaintiffs. That agreement shows that: (1) Western had the option of employing the DME, but there is no evidence Western took advantage of that option with Vela; (2) Western, in consultation with SHS, would nominate a Western faculty member to be DME, but the evidence shows that Western did not do so with Vela; (3) SHS had sole authority to approve the DME; (4) Western and SHS would evaluate the DME, but there is no evidence Western did so with Vela; (5) the DME served at the will of Western; (6) SHS could "compel" Western to remove a DME for cause; (7) Western had its own chairs to supervise the educational activities and curricula of Western's departments and SHS supervised its own—if there was overlap at SHS the two entities would work together to implement joint curricula; (8) SHS recruited, assigned, paid, and employed residents, including

accepted some claims against Western at the motion to dismiss stage because the documents were alleged *along with* allegations on information and belief that Vela and Drs. J. Evans, Fisher, Patel, and C. Evans as DME and PDs were employees of Western. Western challenges those allegations, and Plaintiffs now must offer some *evidence* that these persons were employees of Western *in their roles as DME and PDs*.[14] This is because "*[r]espondeat superior* is the doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of employment or agency." *United States v. Town of Colo. City*, 935 F.3d 804, 808 n.3 (9th Cir. 2019) (cleaned up). The actions against Natkin were taken by Vela (as DME) and Drs. J. Evans, Fisher, Patel, and C. Evans (as PDs). Thus, for the conduct to be in the scope of employment, liability can be imputed only to their employer for those specific roles.

Plaintiffs point to Vela's testimony that from around 2008 through 2021 he was employed by Western as a faculty member of Western's medical school. Vela taught Western's

---

providing benefits and insurance; (9) Western would provide medical students (not residents) to SHS and SHS would supervise those students following Western's guidelines as much as possible, which were attached to the Sponsorship Agreement; (10) SHS would provide adequate resources, facilities, and services to residents; (11) if, in the sole opinion of SHS, a student or resident violated a rule, bylaw, or so forth, SHS would notify Western and the DME, and the DME would suspend the student or resident until corrective action was agreed upon by Western, the DME, and SHS's CEO; and (12) PDs were appointed from Western faculty. The Sponsorship Agreement shows only one factor supporting that Western had the right to control Vela— Western had the right to terminate Vela's employment. Otherwise, the document does not show that Western had the right to control how Vela performed his work, the physical details of his job, or his compensation. Nor does the Sponsorship Agreement show that Western provided the DME with equipment. And the Sponsorship Agreement says nothing about any of the relevant factors for right to control PDs.

[14] At oral argument, counsel for Plaintiffs focused on the purported fact that Vela was "appointed" by Western. This stems from Western's authority in the Sponsorship Agreement to, in consultation with SHS, "nominate" the DME. SHS, however, must then approve that nominee. There is no evidence in this case that Western exercised that nomination authority. Indeed, Vela testified that Dr. Larry Mullins, from SHS, who helped set up SHS's residency program and originally brought Vela on as PD, "asked" Vela to become DME. But even if Western did nominate Vela, that does not make Vela an employee of Western.

medical students, who were at SHS hospitals, on a volunteer basis—he was not paid by Western. Vela signed a faculty member agreement with Western. At most, Vela was an employee of Western in his role teaching students. But that does not show that in his role *as DME* he was an employee of Western.[15]

Plaintiffs also cite general evidence about the connection between Western and SHS and its affiliated hospitals with respect to the medical school and the residency program. That Western had a medical school campus with SHS, sponsored SHS's residency program, had the authority to engage in certain conduct with respect to SHS or Good Sam, or had the authority to employ certain leadership positions, however, does not show that Vela or Drs. J. Evans, Fisher, Patel, or C. Evans were employees of Western in their relevant roles.

Plaintiffs next point to a January 31, 2008 letter, from J. Michael Finley, DO, to Lee Vander Lugt, DO, of AOA.[16] Dr. Finley enclosed the application for SHS's residency program. Dr. Finley signed the letter in his capacity as Associate Dean of Western and Chief Academic

---

[15] Section 3.3 of the Sponsorship Agreement describes the DME position and provides that the DME may be an employee of Western. If, however, the DME is employed by Western, the person is paid by Western and SHS must reimburse Western a percentage of the DME's salary, and the parties sign a separate agreement. There is no evidence that Vela was paid by Western as a DME or that the requisite separate agreement was signed.

[16] The Court previously dismissed all claims asserted by Plaintiffs against Western except the narrow claims allowed based on *respondeat superior* liability for Vela and Drs. J. Evans, Fisher, Patel, and C. Evans. Plaintiffs appear to argue that Western is liable as the employer of Dr. Finley based on the January 2008 letter. Such an assertion fails as a claim already dismissed and not proper to be raised in response to summary judgment, but it also fails on the merits. This letter alone is insufficient to support such a contention. That Dr. Finley identified himself as an associate dean of Western in January 2008 does not show that he was employed by Western during the relevant events in 2013 and later, let alone that Western had the right to control Dr. Finley during Natkin's termination hearings and other related events, in which Dr. Finley was identified as representing OPTI-West. Indeed, Dr. Finley stated in a declaration that he attended the termination hearing on behalf of OPTI-West "as a resource in case there were questions about the policies and procedures OPTI-West had helped Good Samaritan Hospital Corvallis put in place when the residency program was established." ECF 263 at 4.

Officer of Defendant Osteopathic Postdoctoral Training Institute, OPTI-West Educational Consortium (OPTI-West). Dr. Finley noted that SHS was a member of OPTI-West and that Western sponsored the proposed residency program. Dr. Finley explained that OPTI-West requested the approval of Vela as the inaugural PD for SHS/Good Sam's program and that Vela had "embraced the opportunity to develop residency programs within SHS." This letter provides no evidence that Vela or the other PDs were employees of Western.

Considering the four factors highlighted by the Oregon Court of Appeals, no reasonable juror could find that Western had the right to control Vela or Drs. J. Evans, Fisher, Patel, or C. Evans. There is no evidence that Western controlled the physical details of how these individuals performed their work in the relevant roles. Nor is there evidence that Western paid them or provided them with equipment. There also is no evidence that Western had the right fire Drs. J. Evans, Fisher, Patel, or C. Evans. Western did have the right to fire Vela, but that alone does not make Western Vela's employer. "[E]ven if it is not the control actually exercised, but that which may be exercised which is determinative, the control that is actually exercised may be informative of the control that may be exercised." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1021 (N.D. Cal. 2010) (applying similar California law on right to control) (cleaned up). There is no evidence that Western exercised *any* of its rights from the Sponsorship Agreement with Vela's DME position. The mere fact that the agreement states that the DME is employed "at the will" of Western, which implies that Western can fire the DME, does not create an employment relationship. "As [the] multiple factors suggest, the right to control is a matter of degree." *Avanti Press, Inc. v. Emp. Dep't Tax Section*, 248 Or. App. 450, 461 (2012) (cleaned up). Plaintiffs provide no evidence that Western exercised any degree of control. Plaintiffs fail to show an issue fact that Western was the employer for any of the relevant individuals.

Accordingly, the Court grants Western's motion for summary judgment on all remaining claims against Western.[17]

### 3. *Sua Sponte* Consideration of Plaintiffs' Eighth Claim

The Samaritan Defendants previously moved to dismiss against Vela and SHS, Plaintiffs' Eighth Claim for Relief, which alleges intentional interference with Natkin's contract with Good Sam. The Samaritan Defendants argued that Vela, as an employee of Good Sam, could not intentionally interfere with a contract to which he was a party. SHS's liability is based on *respondeat superior* for Vela.

The Court declined to dismiss this claim against Vela because Vela was in the "unique" position of both being a party to the contract as an employee of Good Sam and a stranger to the contract as an employee of Western. Because he was a stranger to the contract as an employee of Western, in that capacity he potentially could interfere with the contract and be held liable. *Natkin IV*, 2019 WL 1763242, at *11. The Court noted that if at summary judgment the Court concluded that Western was not Vela's employer, then Vela would be liable "if he acted solely for his own benefit." *Id.*

Before oral argument on the pending motions for summary judgment, the Court advised the parties to be prepared to discuss whether the Court should *sua sponte* dismiss or grant summary judgment in favor of Vela and SHS on this claim if the Court grants Western's motion for summary judgment and concludes that Vela is not employed by Western. At the hearing, counsel for Plaintiffs argued that there remains an issue of fact regarding whether Vela had a

---

[17] The remaining claims against Western are: Plaintiffs' Third Claim for fair procedure, as employer of Vela and Drs. J. Evans, Fisher, Patel, or C. Evans; and Sixth Claim for Intentional Interference with AOA's contract, Eighth Claim for Intentional Interference with Good Sam's contract, Defamation claims, and Intentional Interference claims based on Defamation, all as employer of Vela.

"mixed motive" in his actions. The dispositive issue, however, is not whether Vela had a "mixed motive." Oregon courts have held for decades that for an employee to intentionally interfere with his employer's contract, the employee must have acted *solely* on his own behalf and not even partially for the benefit of his or her employer. *See, e.g.*, *Sims v. Software Sols. Unlimited, Inc.*, 148 Or. App. 358, 364-65 (1997); *Boers v. Payline Sys., Inc.*, 141 Or. App. 238, 242-43 (1996); *Mannex Corp. v. Bruns*, 250 Or. App. 50, 54-55 (2012). The Court asked counsel for Plaintiffs at oral argument whether they contend that Vela acted solely on his own behalf, and they did not so contend. They instead cited that Oregon courts look to the benefit to the employer.

Oregon courts require that the so long as the employee acts within his or her authority and acts *in part* to benefit the employer, any other additional motives are "immaterial." *Sims*, 148 Or. App. at 364-65; *see also Mannex Corp.*, 250 Or. App. at 55 (explaining that so long as an employee acts with proper authority and acts in part to benefit the employer, "it is immaterial that the actor has additional motives-even improper ones"). This is another way to describe the requirement that the employee's action must be *solely* to benefit the employee.[18] If the action is not done in part to benefit the employer, then it is done solely to benefit the employee. These are the same standard. *See, e.g.*, *Mannex Corp.*, 25 Or. App. at 55-56 (discussing acting in part to benefit the employer and acting solely to benefit the employee interchangeably); *Sims*, 148 Or. App. at 364-65 (same).

As the Oregon Court of Appeals has explained, "the evidence that [a supervisor] had a 'personal vendetta' against plaintiff from which the act of terminating plaintiff's employment

---

[18] The Oregon Courts also state that employees can be held liable if they act "against the best interests of their employer" as an alternative to acting "solely in their best interest," but Plaintiffs allege in the SAC that Vela "acte[ed] for the benefit of his own interest." SAC ¶ 116.

flowed is of no legal consequence." *Id.* at 365. For example, if the supervisor believes, at least in part, that he is firing a "troublemaker," then his actions are done in part to benefit the employer. *Id.*; *see also Mannex Corp.*, 25 Or. App. at 55 (affirming summary judgment when supervisor terminated the plaintiff's employment despite stating that he "did not like" the plaintiff, she 'had too many personal problems," she was a "troublemaker," and he had to "get rid of the troublemakers," because terminating an employee who is a troublemaker is done in part to benefit the employer). Plaintiffs offer no argument or dispute that Vela's firing of Natkin was not done at least in part to benefit Good Sam and was instead done solely to benefit Vela. Thus, the Court *sua sponte* grants summary judgment in favor of Vela and SHS on this claim.[19] *Cf. Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming *sua sponte* grant of summary judgment in favor of non-appearing defendant because nonmoving party had opportunity to be heard on the issue as it applied to another defendant); *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) (affirming *sua sponte* dismissal of a claim shortly before trial).

## C.  AOA's Motion

The sole claim remaining against AOA is a breach of contract claim. Plaintiffs contend that an implied-in-fact contract exists between Natkin and AOA, arising from his membership in AOA and that AOA breached the terms of this contract. AOA argues that there is no evidence of an implied-in-fact contract. As with Western's motion, the parties brief many extraneous facts

---

[19] To the extent Plaintiffs would argue that Vela remains a stranger to the contract because the Court also has considered Natkin the employee of SHS, Good Sam's parent company, the Court would reject this contention. Plaintiffs did not argue this during the motion to dismiss, and neither the Findings and Recommendation nor the Court suggested such a possibility. The Court finds that for purposes of this claim, Natkin is not a stranger to the Good Sam contract based on his employment with SHS sufficient to enable him to interfere with that contract.

and argument. The Court focuses only on information relevant to whether the parties had an enforceable contract.

To state a claim for breach of contract, a plaintiff "must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach[,] and defendant's breach resulting in damage to plaintiff." *Slover v. Or. State Bd. Of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (quotation marks omitted). Express contracts and implied-in-fact contracts "are no different in legal effect." *Mindful Insights, LLC v. VerifyValid, LLC*, 301 Or. App. 256, 270 (2019), *adhered to on reconsideration*, 302 Or. App. 528 (2020). "The only difference between an express contract and an implied-in-fact contract is the means by which the parties manifest their agreement." *Id.* at 266 (quotation marks omitted). "In an express contract, the parties manifest their agreement by their words, whether written or spoken." *Staley v. Taylor*, 165 Or. App. 256, 262 (2000). "In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct." *Id.*; *In re Comp. of Gadalean*, 364 Or. 707, 717 n.3 (2019) (same) (citing *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 129 n.5 (2017)). An implied-in-fact contract "can arise only where the natural and just interpretation of the acts of the parties warrants such conclusion." *Owen v. Bradley*, 231 Or. 94, 103 (1962).

"Oregon subscribes to the objective theory of contracts." *Newton/Boldt v. Newton*, 192 Or. App. 386, 392 (2004). Thus, "whether the parties entered into an agreement does not depend on whether the parties had the same subjective understanding of their agreement, that is, on whether their 'minds met' on the same understanding." *City of Canby v. Rinkes*, 136 Or. App. 602, 611 (1995). Instead, the Court views the parties' conduct objectively to see if it gives rise to the reasonable inference that the parties intended to agree to something. *See Staley*, 165 Or. App. at 262 n.6 ("Frequently, implied-in-fact contracts arise because an accepted course of

conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement.").

AOA argues that there is no evidence of an implied-in-fact contract between it and Natkin as asserted in this lawsuit. Specifically, Plaintiffs contend that AOA had contractually agreed with Natkin (and all other AOA members) to ensure that Good Sam (and all other AOA accredited institutions) complied with all the terms of AOA's accreditation standards for medical institutions, The Basic Documents for Postdoctoral Training (*Basic Documents*).

Plaintiffs argue that the *Basic Documents* were AOA's "offer" to contract with Natkin and his payment of dues and applying to an accredited institution were his "acceptance" of the offer. The only conduct by AOA Plaintiffs rely on to show AOA's manifestation of agreement to the contract is the issuance of the *Basic Documents*. There are several problems with Plaintiffs' contention.

The first is that Natkin states in his declaration that in preparing to "match" with internship or residency positions during his final year of medical school, he "found and skimmed" the *Basic Documents*. He does not identify any clause that he read or relied on in any way. Merely skimming a document before applying to a residency program cannot by itself show Natkin's conduct manifested agreement to enter into a contract with AOA to ensure that the residency program to which he applied would comply with AOA standards.

Second, Natkin "found" the *Basic Documents* during his final year of medical school (2008-2009), but he joined AOA as a student in 2006. Thus, he could not have considered the *Basic Documents* to be his "offer to contract" with AOA relating to his student membership when he was not even aware of those documents until years after he joined the organization. Although Natkin disputes AOA's contention that there is a difference between a student membership and a professional membership, for purpose of summary judgment and viewing the

facts in the light most favorable to Plaintiffs, the Court considers whether Natkin considered the *Basic Documents* as an offer to contract for Natkin's *professional* membership, at the end of his *student* membership. But the problem that Natkin only "skimmed" the *Basic Documents* is still present, as well as the problem of whether objectively the *Basic Documents* could be considered a contractual offer, as discussed next.

The clauses cited by Plaintiffs objectively do not reflect an offer to contract with individual medical students or residents. Plaintiffs first rely on "Section I: Introduction to Postdoctoral Training." This introductory statement begins: "This document contains the standards for internship and residency training programs and accreditation standards for osteopathic postdoctoral training institutions (OPTI)." ECF 410-1 at 4.[20] It then briefly explains the contents of the different sections of Part One. It next states:

> Section VIII presents requirements for evaluation of resident achievement, remediation, faculty evaluation and improvements based on feedback from evaluation in addition to approval of new and current programs and PTRC program actions. The information provided in this document provides requirements and guidance to directors of medical education, specialty affiliates, intern and residency surveyors, program directors, administrators, and interns and residents. In Part Two are the basic requirements for OPTIs. The two parts are arranged to reflect the requirements for the administration of an intern or residency program and their relationship to an OPTI. In addition, there are eleven appendices which provide models, forms and examples followed by a glossary of terms to assist programs, trainees and other users of this document to prepare and implement program and institutional requirements.

*Id.*

Plaintiffs rely on the reference to "interns and residents" at the end of the description of Part One for whom the document provides guidance and "trainees" as a "user" of the document

---

[20] For record cites, the Court cites ECF pagination, not a document's internal pagination.

identified in the discussion of the appendices as evidence that the *Basic Documents* is an offer to contract with residents. The Court finds that objectively, no reasonable person could conclude that generally identifying that a resident or trainee may find guidance from or use for the *Basic Documents* is an "offer to contract" with those persons. Acknowledging that a resident might find it helpful or useful to see the accreditation standards of a residency program is not a binding offer separately to contract with that resident.

Plaintiffs next rely on the fact that the accreditation requirements themselves mandate many benefits to residents, such as requiring the residency institution to provide due process, implement particular grievance procedures, and include protections related to termination of residency or internship. This provides no support that the *Basic Documents* are an offer to contract individually with residents and interns. Establishing minimum standards to protect residents (and patients) is the point of an accrediting institution. Again, considering the document objectively, it is not a reasonable construction that having accreditation standards that offer benefits to medical students and residents is an offer to directly contract with those students and residents.

Finally, Plaintiffs rely on the requirement that the residency institution provide "[c]omplaint procedures," which are meant as a mechanism for individuals "to bring information concerning specific actions and programs that may be in noncompliance with the AOA's educational standards to the attention of the accrediting agency" and to "[r]ecognize the responsibility of the AOA to provide complainants the opportunity to use the AOA as a vehicle to address specific grievances." ECF 410-1 at 38-39 (Subsection F). This clause, however, must be considered along with an earlier clause that provides that "[t]he AOA is not a party to any contractual disputes between trainee and the base institution." *Id.* at 38 (Section D.7.5). Section F.7.5 simply sets forth a requirement that the accredited residency institutions offer specific

complaint procedures. Considering the clause objectively, no reasonable person could find that AOA is making an offer to contract *directly with a resident* to address certain grievances.

Generally, Plaintiffs argue that the alleged contract with AOA is similar to cases analyzing whether representations made in university publications form an implied-in-fact contract between the student and the university, citing *In re Pepperdine University Tuition & Fees COVID-19 Refund Litigation*, 659 F. Supp. 3d 1086, 1094 (C.D. Cal. 2023); *Arredondo v. University of La Verne*, 618 F. Supp. 3d 937, 944-46 (C.D. Cal. 2022); *Saroya v. University of Pacific*, 503 F. Supp. 3d 986, 996-98 (N.D. Cal. 2020); *Kashmiri v. Regents of University of California*, 156 Cal. App. 4th 809, 823-37 (2007). The publications in those cases, however, were aimed at students and made representations directly to students. The *Basic Documents* are directed at the accredited institutions, with a passing acknowledgment that residents and trainees may find them useful.

Plaintiffs fail to show a genuine issue of fact that AOA objectively manifested an intent to contract with Natkin (or any resident). The Court grants AOA's motion for summary judgment on Plaintiffs' breach of contract claim.

## D. Samaritan Defendants' Motion

### 1. Interference with AOA Contract

The Samaritan Defendants move against Plaintiffs' Sixth Claim, interference with AOA's contract, incorporating by reference AOA's motion for summary judgment. Because the Court grants AOA's motion, the Court grants the Samaritan Defendants' motion against this claim.[21]

---

[21] Before oral argument, the Court directed the parties to be prepared to discuss whether the Court should *sua sponte* grant summary judgment in favor of OPTI-West on Plaintiffs' Sixth Claim if the Court finds no enforceable contract between Natkin and AOA and grants the Samaritan Defendants' motion for summary judgment on Plaintiff's Sixth Claim. Plaintiffs' conceded that under *Columbia Steel*, summary judgment in favor of OPTI-West on this claim would be appropriate under those circumstances. The Court, therefore, *sua sponte* grants

### 2. Fair Procedure Claim

The Samaritan Defendants next move against Plaintiffs' Third Claim for Relief, Plaintiffs' fair procedure claim, arguing that as a matter of law the claim is not available to Natkin. The Samaritan Defendants argue that Oregon's common law right to fair procedure does not apply because as a resident Natkin did not have hospital privileges, and thus did not lose them, when he was terminated, and because the right itself does not apply to residents.

In resolving the motions to dismiss Plaintiffs' First Amended Complaint, the Court concluded that the Oregon Supreme Court would recognize the common law right to fair procedure. In reaching this conclusion, the Court discussed *Straube v. Emanuel Lutheran Charity Board*, 287 Or. 375 (1979), *Huffaker v. Bailey*, 273 Or. 273 (1975), and *Straube v. Larson*, 73 Or. App. 501, 506 n.3 (1985). *Natkin II*, 2018 WL 452165, at *10. These cases all involved medical professionals disputing decisions relating to their hospital staff privileges. Natkin, however, was not a medical "staff" member of Good Sam because he was a resident. Under Good Sam's Bylaws, medical staff members must have completed their residency or had five years' clinical experience in an accredited hospital or medical center.

The Samaritan Defendants argue that Oregon's common law fair procedure right recognized by the Court only extends to hospital medical staff or other persons granted hospital privileges, and thus does not extend to Natkin, as a resident. Natkin responds that the underlying discussion by the Oregon Supreme Court in noting the existence of the fair procedure right in other states had nothing to do with medical staff membership or hospital privileges, and that Oregon's fair procedure right is not so limited.

---

summary judgment in favor of OPTI-West. *See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995).

The Oregon Supreme Court in *Straube* recognized California and New Jersey's fair procedure right. *Straube*, 287 Or. at 379 n.3 (citing *Ascherman v. S.F. Med. Soc'y*, 39 Cal. App. 3d 623 (1974); *Falcone v. Middlesex Co. Med. Soc'y*, 34 N.J. 582 (1961)). The court described California's right, explaining that California's court adopted the right "for private orthodontic associations, even though membership in such organizations was not necessary to practice orthodontics, because membership in the associations was 'a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty.'" *Id.* at 379 (quoting *Pinsker v. Pac. Coast Soc'y of Orthodontists*, 1 Cal.3d 160, 166 (1969)). The Oregon Supreme Court then stated:

> Plaintiff contends there is a duty of fair procedure placed upon defendant in suspending his hospital privileges because those privileges are very important to plaintiff in pursuing his career and that the trial court erred in granting the partial summary judgment. He states that the cases which recognize such a right require "a hearing, timely notification sufficiently prior to the hearing to allow adequate preparation of defense, a written statement of the charges against the individual, and the right to call his own witnesses before the committee." This court has never decided whether there is such a duty in Oregon, and it is unnecessary to do so in this case because, if such duty exists, it was complied with in this case.

*Id.* at 379-80.

In previously denying the motions to dismiss, the Court focused on the framework of "hospital privileges," but that does not mean that Oregon would only adopt the right of fair procedure for medical staff or person with hospital privileges. The Samaritan Defendants argue that expanding fair procedure to hospitals in a context beyond medical staff and other persons with hospital privileges would be untenable. The Court disagrees.

A resident is not a medical student, but is a licensed professional. Good Sam requires that residents be licensed to practice medicine in Oregon. Residents also treat patients.[22] More importantly, the Oregon Supreme Court in *Straube* emphasized the part of *Pinsker* concluding that fair procedure was required because membership in the organization was a practical necessity to make a good living and maximize achievement in their profession. *Straube*, 287 Or. at 379. The court in *Straube* then articulated the argument for why Oregon should adopt a requirement for fair procedure—because the loss of hospital privileges was important to the doctor's career potential, not simply the loss of privileges working at a particular hospital.

The same career effect is present for residents losing their residency, particularly those pursing a surgical specialty. It is not the loss of privileges at a hospital that causes the career effect, but the loss of the residency. Indeed, the California Supreme Court already has extended the right of fair procedure to a surgical resident in facts similar to Natkin's claim. *See Ezekial v. Winkley*, 20 Cal. 3d 267, 270-76 (1977) (concluding that physician had a common law right to fair procedure before he could be expelled from his residency, in part because the hospital had "the power to permit or prevent [residents'] practice of a surgical specialty and to thwart the enjoyment of the economic and professional benefits flowing therefrom" and because the plaintiff had an "expectation that the requirements for full utilization of [his] medical license will

---

[22] The Samaritan Defendants argue that residents treat patients "under the supervision of an attending, board-certified physician." ECF 435 at 9. The Samaritan Defendants cite no evidence supporting this contention, and assertions in briefs are not evidence. *See Olivier v. Baca*, 913 F.3d 852, 861 (9th Cir. 2019) ("[L]egal memoranda are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." (cleaned up)). Deposition testimony by Natkin describes he and another resident treating patients in the emergency room while the supervising attending physician is at home. Dr. Seth Criner also described in his declaration treating patients alone while Vela was at home. Viewing the facts in the light most favorable to Natkin, residents treated patients without the supervision of an attending physician. Further, even if residents treated patients only while supervised, that is not dispositive, given the rationale behind the Court's reasoning.

PAGE 28 – OPINION AND ORDER

be met through his attainment of specialty status"). The Court previously quoted *Ezekiel* in explaining that the right to fair procedure arises in organizations that have the "practical power . . . to affect substantially an important economic interest," in explaining why OPTI-WEST could not assert that it did not owe any duty of fair procedure to Natkin. *See Natkin V*, 2023 WL 359589, at *6.

Between the Oregon Supreme Court's discussion of *Pinsker*'s general theme about the importance of an organization's effect on making a living and maximizing career potential, and the Oregon Supreme Court's consideration of California law, the Court finds that the Oregon Supreme Court would not so narrowly define the common law right to fair procedure as only applying to a loss of hospital privileges.[23] As the California court held in *Ezekial*, the loss of a residency program has the practical power to affect substantially the career of a licensed physician (this again distinguishes medical students). Indeed, terminating a residency might exclude a licensed physician from a specialty because it may be a practical impossibility to obtain another residency in that specialty. Thus, the minimum requirements of fair procedure are triggered in terminating a licensed physician from a residency program. The Court denies the Samaritan Defendants' motion based on the argument that Oregon's right to fair procedure does not apply to residents. This claim may proceed to trial.

---

[23] At oral argument, counsel for the Samaritan Defendants argued that including residents in the scope of Oregon's fair procedure protection would be improper "trailblazing," which federal courts are not entitled to do. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1043 (9th Cir. 2011). The Court disagrees. Including residents is a "prediction" of what the Oregon Supreme Court would do based on its discussion of the issue and not "trailblazing" new state law. *See id.*

### 3. Wrongful Termination Claim

The Samaritan Defendants move for summary judgment against Plaintiffs' Fifth Claim for Relief, Plaintiffs' wrongful termination claim based on the public policy expressed in ORS § 441.044(2), arguing that Natkin's conduct fell outside the requirements of the statute. The statute precludes a health care facility from taking an adverse employment action against an "employee who in good faith brings evidence of inappropriate care or any other violation of law or rules to the attention of the proper authority solely because of the employee's action as described in this subsection." ORS § 441.044(2).

This claim by Plaintiffs is based on the allegation that the Samaritan Defendants terminated Natkin's employment based on comments he made regarding Dr. Richard Stanley's treatment of two patients during a "fracture conference."[24] The Samaritan Defendants argue that there is no genuine dispute that: (1) Natkin did not bring the issues relating to Dr. Stanley's treatment "to the attention of the proper authority"; and (2) Good Sam did not terminate Natkin's employment "solely" because of Natkin's actions in the fracture conference relating to Dr. Stanley.[25]

---

[24] A "fracture conference" was a meeting held on Fridays in which medical students and residents reviewed a certain number of orthopedic cases, usually from the preceding several weeks, by reviewing imaging and discussing what treatment should happen and critiquing what treatment actually occurred. Interested faculty also attended these conferences.

[25] At oral argument, counsel for the Samaritan Defendants also asserted that Natkin failed sufficiently to raise a patient safety issue during the fracture conference. This argument, however, was not raised in the Samaritan Defendants' briefing and was first raised at oral argument. The Court declines to address arguments raised for the first time during oral argument. *See Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) (stating that arguments raised for the first time at oral argument are waived); *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016) ("[W]e treat this argument as waived because any textual distinction between the two terms was raised for the first time at oral argument"). The Samaritan Defendants may, however, make this argument to the jury.

### a.  Proper Authority

The Samaritan Defendants argue that "criticizing a physician's care" at a fracture conference was inconsistent with Good Sam's "established reporting procedures." The Samaritan Defendants assert that if a physician had a concern that another physician's care endangered patient safety, the concerned physician needed to submit an "incident report" to the Peer Review Committee, report to a department head, or report to the Quality Improvement Committee. Plaintiffs dispute that there were any such established requirements, formal or informal.

The Samaritan Defendants do not argue that there was a written policy establishing the procedures to report concerns about a physician's care of a particular patient. For use of an "incident report" and reporting to a department head, the Samaritan Defendants cite the deposition testimony of Dr. Todd Lewis. Dr. Lewis testified: "I would think that if a physician perceived that somebody was being endangered that that would be reported directly through to the chief of their department or through to administration through some incident report process.· I'm not sure if we ever had anything like that." ECF 413-1 at 246 (Lewis Dep. Tr. 40:12-18). He then explained that "physicians don't tend to do that" but "if you felt strongly enough about it you would find a pathway to make your objections known." *Id.* (Lewis Dep. Tr. 40:22-25).

Dr. Lewis's testimony shows two specific methods that he anticipated—an incident report or reporting directly to a department head. He added that physicians would find some "pathway," leaving an open-ended additional possibility for how physicians could be expected to convey a concern about the care of a particular patient. This contrasts with his testimony about how a physician would be expected to report a concern of overall incompetency of another doctor. Dr. Lewis testified that to make that type of report, "probably the only way to do it" would be through an incident report. *Id.* at 245 (Lewis Dep. Tr. 39:11-24).

Vela testified about the Quality Improvement Committee, explaining that it was another option for reporting concerns. That Dr. Lewis, who had been employed at Good Sam for decades and sat on leadership committees, did not know about the Quality Improvement Committee as an option for reporting concerns, shows that Good Sam's reporting options were not well established. Additionally, the fact that two doctors in leadership appeared to "brainstorm" at deposition three different potential avenues for reporting concerns, also supports the conclusion that Good Sam did not have an established procedure or requirement.

The Samaritan Defendants provided the Court with Good Sam's Bylaws, although they do not reference the Bylaws in briefing their motion for summary judgment. The Corrective Action Policy of the Bylaws states:

> Information.   Any person may provide information to the medical staff about the conduct, performance or competence of a member. Issues of concern or written complaints regarding a member's clinical or professional conduct shall be referred to the Peer Review Committee ("PRC") for review and to the department chief for information. Information may come to the PRC from the following sources:
>
> * * *
>
> • Information collected and analyzed as a result of a specific complaint or unusual occurrence report related to competence or professional conduct;
>
> • Information obtained from public sources, Hospital employees, patients, families or from a member;

ECF 415 at 47 (Bylaws § 2.1).[26]

---

[26] Natkin denies receiving a copy of the Bylaws, but the Court need not resolve that evidentiary dispute because the Bylaws do not support the Samaritan Defendants' argument regarding the "proper" procedure for complaints. Instead, they support Natkin's argument on this point. The Court did not rely on the Bylaws for the point on which the Samaritan Defendants submitted them.

At oral argument, counsel for the Samaritan Defendants referenced the "Peer Review Policy" of the Bylaws as establishing the proper "reporting procedures," but that section does not directly address how to report issues relating to the conduct, performance, or competence of a member. That section describes how a member will be professionally evaluated through the peer review process. In so doing, it explains that "[p]eer review is conducted using multiple sources of information" and that there is an ongoing professional evaluation component that "includes individual cases identified for peer review through review screening criteria, as well as referrals for adverse events." ECF 415 at 61. It does not describe *how* information is provided or "adverse events" are referred. This policy does not foreclose that fracture conferences could be a method by which to convey concerns, or definitively establish reporting procedures.

The Court must view the facts in the light most favorable to Plaintiffs. In this light, the record shows that fracture conferences were attended by medical students, residents, and interested faculty members. These conferences were intended to review the care provided to a set of cases, discuss whether different care would have been preferable, and critique the treatment given. Dr. Lewis's testimony is equivocal on the procedure by which a physician would be expected to report a concern about another physician's care of a specific patient and does not foreclose that a fracture conference could be a proper avenue to raise concerns about the specific treatment of a given fracture. Vela was asked about how to invoke the "peer review" process, without establishing that invoking the peer review process is the only way to raise concerns about another physician's care. Good Sam's Bylaws, on the other hand, state that issues of concerns "may come" to the Peer Review Committee through a specific complaint or unusual occurrence report *or* from information obtained from hospital employees, among others. The Bylaws do not limit the Peer Review Committee to responding only to "incident reports," reports given to department heads, or reports to the Quality Improvement Committee. Good Sam's only

written policy in the record is broad and vague as to how information is "obtained" from employees and how it gets to the Peer Review Committee, in addition to specific complaints and unusual occurrence reports. But the fact that the Bylaws contains a separate bullet means that there is another method besides those types of formal complaints and reports.

There is a genuine dispute about whether a fracture conference was a "proper authority" at Good Sam at which to raise concerns about a physician's care of a specific patient giving rise to concerns about patient safety. *Cf. Bala v. Or. Health & Sci. Univ.*, 2022 WL 17593169, at *3 (D. Or. Dec. 13, 2022) (less formal reports constituted the basis of ORS § 441.044 claim), *aff'd in part, vacated in part on other grounds, remanded sub nom. Bala v. Henrikson*, 2024 WL 546349 (9th Cir. Feb. 12, 2024); *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 111 (1984) (applying the statute when it was numbered ORS § 441.057, noting that oral statement to nursing home administrator was enough to invoke statutory protection). Accordingly, the Court denies the Samaritan Defendants' motion based on this argument.

### b. Sole Reason

The Samaritan Defendants also argue that Plaintiffs' claim fails because there is no genuine dispute whether his conduct at the fracture conference was the "sole" reason he was terminated. The Samaritan Defendants argue that there were several bases on which they based Natkin's termination of employment. The Samaritan Defendants first point to Natkin's disciplinary history. They next argue that his disciplinary history was compounded by the "negative" meeting with Vela and Dr. Stanley the day before the fracture conference. They also argue that shortly after the fracture conference, resident Dr. Kelli Baum reported that Natkin stated "payback's a bitch," adding further grounds to terminate Natkin's employment. Finally, the Samaritan Defendants emphasize that Dr. Seth Criner, who chose and presented the cases at the fracture conference, was only reprimanded because he did not have the disciplinary history of

Natkin. The Samaritan Defendants contend that given these undisputed facts, no reasonable juror could conclude that the Samaritan Defendants' *only* reason for terminating Natkin's employment was because of his comments at the fracture conference.

There are many disputed facts related to Natkin's history with Good Sam. It is undisputed, however, that Natkin was placed on a "learning contract" in his second year of residency. The Samaritan Defendants characterize that Natkin's third year of residency "went well." In his fourth year of residency, Dr. Stanley raised a complaint to Vela about Natkin's conduct in the operating room. Natkin met with Dr. Stanley and Vela on September 26, 2013, to discuss Dr. Stanley's concerns. After that meeting, Vela told Natkin to have no more conflict with Dr. Stanley and to stay off Vela's radar. The next day was the fracture conference at issue. Dr. Criner states in his declaration that he alone selected the 12 cases to be discussed at the fracture conference, and he did not consult with Natkin. Dr. Criner explains that he chose Dr. Stanley's elbow repair because an attending physician, Dr. Jacqueline Krumrey, previously asked for that surgery to be revisited "because of how poorly the surgery was performed." ECF 268-3 at 4-5 (Criner Decl. ¶ 11). It also is a reasonable inference that Dr. Criner selected these cases more than one day before the conference.

After the fracture conference, Dr. Baum reported that Natkin stated "payback's a bitch, isn't it?"[27] Vela called a meeting of the Orthopedic Residency Advisory Committee (ORAC) for September 30, 2013. The committee voted to sanction Natkin, including possible termination of employment, and send his case to the Graduate Medical Education Committee. According to Dr. Criner, he spoke with Dr. Krumrey and Dr. J. Evans, the other members of the ORAC, and

---

[27] Natkin denies saying this, but he does not dispute that Dr. Baum reported that Natkin said it.

they reported that Vela had decided to fire Natkin and they believed there was nothing they could do about it. According to Dr. Krumrey, Vela began the ORAC meeting by telling the other two members that Vela had decided to terminate Natkin's employment. Dr. J. Evans then essentially conceded that if that was what Vela wanted to do, then that was what needed to be done, and Dr. Krumrey emphasized that Vela needed to have appropriate documentation because in her previous job a resident was fired and brought legal action.

Vela testified during deposition that he was only "one part of the process" to fire Natkin. Vela explained that the process included considering Natkin's issues "over the past two years." Vela, however, was "particularly" bothered by the fact that Natkin discussed Dr. Stanley's cases the day after Vela personally told Natkin to have no more conflict with Dr. Stanley. Vela considered Dr. Stanley's cases to have been "pulled" from the "past" with questions by Natkin to "incite doubt." Vela stated that also considering the "payback's a bitch" comment, he believed that Natkin's decision to "incite doubt" about Dr. Stanley was "a calculated decision." Because of that, Vela believed that Natkin had "crossed a red line" because Natkin engaged in conduct "in direct contrast to the orders I had given him within the last 24 hours."

In discussing proof of causation in the comparable context of retaliation,[28] the Oregon Court of Appeals has explained:

> Proof of a causal connection between protected conduct and a materially adverse action can be established (1) "*indirectly*, by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct" or (2) "*directly*, through evidence of retaliatory animus directed against a plaintiff by the defendant." *Boynton-Burns v. University of Oregon*, 197 Or. App. 373, 380 (2005) (emphases in original; internal quotation marks omitted). In *Boynton-Burns*, we elaborated on the initial portion of that test by noting that, "[i]f the

---

[28] Retaliation, however, requires "but for" causation, not "sole" causation.

> plaintiff attempts to establish the causal connection indirectly, relying on mere temporal proximity between the events, the events must be 'very close' in time." 197 Or. App. at 381 (citing *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

*Meyer v. Or. Lottery*, 292 Or. App. 647, 681-82 (2018). The Court then discussed federal retaliation cases, noting that a gap of six weeks to two months has been found to be sufficient to infer causation.

The gap here is three days—the fracture conference was September 27, 2013, and the ORAC meeting took place September 30, 2013. Viewing the disputed facts in the light most favorable to Natkin, Vela had decided to fire Natkin before that meeting took place, and the other participants simply acquiesced to Vela's decision.[29] That only leaves Vela's motivation—was it solely because of the fracture conference or was it because of something more? Based on the extremely close temporal proximity and Vela's testimony, the Court concludes this presents an issue of fact for the jury.

Vela emphasized that warned Natkin to have no more conflicts with Dr. Stanley and stay off Vela's radar. It particularly bothered Vela that the next day, at the fracture conference, Natkin discussed Dr. Stanley's cases despite Vela's warning. This is not a focus on the concerns raised by Dr. Stanley that predated the fracture conference, it is that Natkin's conduct *at the fracture conference* felt disrespectful to Vela by ignoring his direct warning and crossing the "red line." A reasonable juror could conclude that Natkin's conduct at the fracture conference is the sole reason Vela decided to fire Natkin, considering Vela's testimony and the temporal proximity. A

---

[29] Viewing the facts in the light most favorable to Plaintiffs, there are fact issues with the remainder of the process for terminating Natkin's employment. The members of the subsequent hearing panels were either picked by Vela or included some of the same members as the ORAC, thereby potentially "infecting" the panels with the allegedly tainted motives. Thus, the ORAC meeting is the only meeting that could potentially dispose of this claim at summary judgment.

reasonable juror also could determine that Vela's raising to the committee Natkin's conduct from a year earlier was pretext, particularly given that the decision to fire Natkin had already been made and Dr. Krumrey had given her warning to properly "document" the employment termination. The fact that Dr. Criner was merely reprimanded could be seen as further evidence of Vela's targeted animosity against Natkin. The Court thus denies this portion of the Samaritan Defendants' motion for summary judgment.

**E.  Remaining Claims**

After this decision and the Court's previous opinions on the motions to dismiss, no claims remain against Western and AOA. With summary judgment granted *sua sponte* against Plaintiffs on their Sixth Claim, asserted against OPTI-West, and their Eighth Claim, asserted against Vela and SHS, the only claims remaining for trial are:

1.    Third Claim, Fair Procedure, against;
   - Vela (directly),
   - Good Sam (directly, as Natkin's employer, and by *respondeat superior* as Vela's employer),
   - SHS (directly, as Natkin's employer, and by *respondeat superior* as the employer of Vela, Nancy Bell, and Drs. J. Evans, Fisher, Patel, C. Evans, and Krumrey), and
   - OPTI-West (by *respondeat superior* liability as Finley's employer);

2.    Fourth and Fifth Claims, Wrongful Termination—against Good Sam (directly);

3.    Eighth Claim, Intentional Interference Good Sam Contract—OPTI-West (by *respondeat superior* as Finley's employer);

4.    Ninth Claim, Breach of Good Sam Contract—against Good Sam (directly);

5.    Tenth Claim, Breach of Good Sam Contract Implied Covenant—against Good Sam (directly);

6.    Defamation Claims (Twelfth-only for Natkin's application to Pennsylvania, Thirteenth, and Twenty-Second), against:
   - Vela (directly), and
   - Good Sam and SHS (by *respondeat superior* as Vela's employer); and

7.    Intentional Interference Claims based on Defamation (Sixteenth and Twenty-third), against:

- Vela (directly), and
- Good Sam and SHS (by *respondeat superior* as Vela's employer).

## CONCLUSION

The Court GRANTS Defendant AOA's motion for summary judgment, ECF 407. The Court GRANTS Defendant Western's motion for summary judgment, ECF 404. The Court GRANTS IN PART and DENIES IN PART the Samaritan Defendants' motion for summary judgment, ECF 412. The Court grants summary judgment against Plaintiffs' Sixth Claim for Relief and denies summary judgment against Plaintiffs' Third and Fifth Claims for Relief. The Court *sua sponte* grants summary judgment on Plaintiffs' Eighth Claim for Relief, as alleged against Vela and SHS. The Court *sua sponte* grants summary judgment on Plaintiffs' Sixth Claim for Relief, as alleged against OPTI-West.

**IT IS SO ORDERED**.

DATED this 23rd day of July, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge